THE HONORABLE TIFFANY M. CARTWRIGHT

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| CITY OF PONTIAC POLICE AND FIRE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>ZOOMINFO TECHNOLOGIES, INC., HENRY SCHUCK, CAMERON HYZER, JOSEPH CHRISTOPHER HAYS, TA ASSOCIATES MANAGEMENT, LP, THE CARLYLE GROUP, INC., and DO HOLDINGS (WA), LLC,<br><br>                Defendants. | CASE NO.: 3:24-cv-05739-TMC<br><br>CLASS ACTION<br><br>**CORRECTED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ...................................................................................2

   A. ZoomInfo's Business ...........................................................................3

   B. Prior to ZoomInfo's IPO and Leading Up to the Class Period, the Company Misleadingly Inflated Its Subscriber Numbers........................3

   C. Defendants Knowingly Inflated ZoomInfo's Revenue Figures, as Defendant Schuck Entered into a Plan to Sell Off His Shares .............6

   D. Defendants Issued False and Misleading Statements About ZoomInfo's Growth and Profitability .................................................9

   E. Defendants Buried an Internal Report Confirming ZoomInfo's Growth Was Unsustainable While Selling Off Hundreds of Millions in Shares...............11

   F. Defendants Knew that Customers Would Not Renew Because They Were Not Using ZoomInfo's Products...................................................12

   G. Defendants Turned to Forced Auto-Renewals in a Last-Ditch Attempt to Prop Up ZoomInfo's Sales........................................................13

   H. Defendants Continued to Mislead Investors About ZoomInfo's Sustainability and Growth...........................................................15

   I. Defendants Slowly Revealed the Truth About ZoomInfo's Growth ...................16

II. JURISDICTION AND VENUE ........................................................................22

III. PARTIES ..................................................................................................23

   A. Lead Plaintiffs ....................................................................................23

   B. Defendants .........................................................................................23

     1. Corporate Defendant..............................................................23

     2. Individual Defendants............................................................24

     3. Sponsor Defendants ..............................................................25

   C. Relevant Third Parties.........................................................................26

IV. SUBSTANTIVE ALLEGATIONS .................................................................29

   A. ZoomInfo's Business & Company Background .................................29

   B. In Order to Inflate ZoomInfo's Stock Price and IPO, ZoomInfo Signed Droves of Unvetted Customers without Assessing Their Likelihood of Payment.....................................30

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

i

1                  1.      Leading Up to the IPO, Defendant Schuck Personally Directed
2                         Employees to Sign Deals to Increase ZoomInfo's Stock Price
                         Without Conducting Due Diligence ............................................. 31

3                  2.      During the Class Period, Defendants Continued to Direct
4                         ZoomInfo's Salespeople to Sign Customers Without Vetting Their
                         Ability to Pay ............................................................................... 32

5                  3.      ZoomInfo Exploited COVID-19 to Sign Large Amounts of
6                         Vulnerable, Unvetted SMBs, Increasing Its Undisclosed
                        Collectability Risk ....................................................................... 34

7     C.      Defendants Overstated ZoomInfo's Accounting Metrics to Falsely Convey
8            Sustainable Growth, Demand, and Company Health ............................................ 36

    D.      Defendants Falsely Assured Investors that ZoomInfo's Demand and
9            Growth Were Intact. .............................................................................................. 41

10    E.      As ZoomInfo's Stock Price Soared, Defendants Dumped Their Shares and
11           Profited by Over $1 Billion During the Class Period ............................................ 43

12    F.      ZoomInfo Concealed a Marketing Survey Revealing Drastic Erosion of
           the Company's Market Share .................................................................................. 45

13    G.      Defendants Continued Falsely to Assure Investors that ZoomInfo's
14           Success Was Sustainable at the Same Time They Continued to Offload
           Their Shares of Company Stock .............................................................................. 46

15    H.      Defendant Schuck Dumped Over $414 Million of ZoomInfo Stock While
16           Continuing to Conceal the Known Risk of Non-Payment ................................... 47

17    I.      ZoomInfo's Internal Tracking Systems Confirmed That Customers Were
           Not Using the Platform .......................................................................................... 50

18    J.      Defendants Schuck, Hyzer, and Hays Proceeded to Unload Another
19           $344.8 Million Worth of Shares as the Company's Stock Price Reached
           New Highs ............................................................................................................. 51

20    K.      ZoomInfo Coerced Renewals from Customers to Maintain the False
21           Appearance of Steady Revenue .............................................................................. 52

22    L.      Defendants Continued to Mislead Investors Regarding ZoomInfo's
           Sustainability and Growth ...................................................................................... 53

23    M.      By October 31, 2022, Defendant Schuck Had Sold Over $936 Million
24           Worth of His Personal Shares of ZoomInfo ......................................................... 54

    N.      The Truth Regarding ZoomInfo's Unsustainable Growth and Misleading
25           Revenue Recognition Slowly Emerged .................................................................. 55

26                  1.      Defendants Revealed Increased "Scrutiny" By Customers During
27                         the Renewal Process on November 1, 2022 ............................................. 56

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC              ii

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

2.    Defendants Again Revealed Increased "Scrutiny" By Customers During the Renewal Process on November 16, 2022 ............................... 58

3.    Fearing the Full Fraud Was Soon to Be Revealed, Defendants Quickly Dumped Additional Holdings ...................................................... 60

4.    Defendants Revealed Declining Contract Values and Increased Customer Cancellations on July 31, 2023 .......................................... 61

5.    Defendants Revealed a Large Pool of Small Business Customers That Exhibited "Weakness" During Renewals, Causing Net Revenue Retention to Decline on May 7, 2024 ......................................... 63

O.    The Truth Is Fully Revealed on August 5, 2024, When ZoomInfo Incurs a $33 Million Charge Due to Customer Non-Payment and Is Forced to Implement a "New Business Risk Model" to Reduce Write-Offs ........................ 66

V.    POST-CLASS PERIOD DEVELOPMENTS .......................................................... 67

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........................................................ 68

A.    November 9, 2020 – Q3 2020 Earnings Call and Press Release .......................... 68

B.    November 13, 2020 – Q3 2020 SEC Form 10-Q/A ................................................ 76

C.    November 18, 2020 – RBC Capital Market Conference .................................... 76

D.    February 22, 2021 – Q4 2020 and Full Year 2020 Earnings Call ..................... 78

E.    February 26, 2021 – SEC Form 10-K ...................................................................... 80

F.    March 2, 2021 – JMP Securities Technology Conference .................................. 81

G.    May 3, 2021 – Q1 2021 SEC Form 10-Q ................................................................ 82

H.    May 3, 2021 – Q1 2021 Earnings Call .................................................................... 83

I.    May 25, 2021 – JP Morgan Global Virtual Technology, Media and Communications Conference ................................................................................... 85

J.    June 14, 2021 – Analyst Day ................................................................................... 86

K.    August 2, 2021 – Q2 2021 Financial Results ........................................................ 87

L.    August 2, 2021 – Q2 2021 Earnings Call .............................................................. 89

M.    November 1, 2021 – Q3 2021 SEC Form 10-Q ...................................................... 92

N.    November 1, 2021 – Q3 2021 Earnings Call .......................................................... 92

O.    February 15, 2022 – Q4 2021 and Full Year 2021 Earnings Call ..................... 93

P.    February 16, 2022 – Yahoo Finance Interview ...................................................... 94

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                   iii

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Q.    February 24, 2022 - 2021 SEC Form 10-K ..................................................95

R.    May 2, 2022 – Q1 2022 Financial Results & Earnings Call ................................96

S.    August 1, 2022 – Q2 2022 Financial Results ........................................97

T.    November 1, 2022 – Q3 2022 SEC Form 10-Q ....................................98

U.    November 1, 2022 – Q3 2022 Earnings Call ........................................99

V.    November 16, 2022 – RBC Global Technology, Internet, Media & Telecom Conference ........................................................100

W.    February 6, 2023 – Q4 2022 and Full Year 2022 Earnings Call ......................101

X.    February 16, 2023 – 2022 SEC Form 10-K ........................................102

Y.    May 1, 2023 – Q1 2023 Financial Results ........................................103

Z.    July 31, 2023 – Q2 2023 Financial Results & Earnings Call ............................104

AA.    October 30, 2023 – Q3 2023 Financial Results ........................................106

BB.    May 7, 2024 – Q1 2024 Financial Results & Earnings Call ................................107

VII.    LOSS CAUSATION ......................................................................108

A.    November 1, 2022 – First Partial Corrective Disclosure/Materialization of the Risk ..............................................................109

B.    November 16, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk ..............................................112

C.    July 31, 2023 – Third Partial Corrective Disclosure/Materialization of the Risk    114

D.    May 7, 2024 – Fourth Partial Corrective Disclosure/Materialization of the Risk    117

E.    August 5, 2024 – Final Corrective Disclosure/Materialization of the Risk .........120

VIII.    ADDITIONAL INDICIA OF SCIENTER ....................................................122

A.    Defendants Enriched Themselves Through Significant Insider Sales While Possessing Adverse Information Not Available to the Public ............................122

1.    Defendants Schuck, Hyzer, and Hays Collectively Sold Over $1.1 Billion Worth of ZoomInfo Stock ..........................................122

2.    Defendants Furthered Their Scheme by Selling $2 Billion Worth of Shares in Two Secondary Public Offerings ........................124

(a)    The August 6, 2021 Secondary Offering ..................................125

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

iv

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

(b)     The August 11, 2021 Secondary Offering ................................. 127

B.     Defendants Schuck, Hyzer, and Hays Personally Directed the Company to Sell to Unqualified Customers and Engage in Coercive and Predatory Sales Practices..............................................................................128

C.     Defendants Hyzer and Schuck Closely Monitored Metrics Concerning Demand, Renewal, and Retention..............................................130

D.     Defendants' Post-Class Period Admissions Support a Strong Inference of Scienter ................................................................................133

E.     Defendants' SOX Certifications Support a Strong Inference of Scienter...........134

F.     Continued Customer Demand and Growth for the Company's Go-To-Market Intelligence Platform Were Critical to ZoomInfo's Core Operations........................................................................136

G.     Defendant Hyzer's Suspiciously Timed Departure Supports an Inference of Scienter ......................................................................137

IX.     DEFENDANTS' SCHEME TO DEFRAUD ................................................138

X.     CONTROL PERSON ALLEGATIONS...................................................139

XI.     APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................................140

XII.     NO SAFE HARBOR ................................................................142

XIII.     CLASS ACTION ALLEGATIONS ..................................................143

XIV.     COUNTS AGAINST DEFENDANTS................................................145

COUNT I ............................................................................. 145

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against All Defendants) .......................... 145

COUNT II .......................................................................... 147

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Against All Defendants) ........................ 147

COUNT III............................................................................ 149

For Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants and the Sponsor Defendants) ......................... 149

XV.     REQUEST FOR RELIEF ...........................................................151

XVI.     JURY DEMAND ...................................................................151

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    v

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Lead Plaintiffs State Teachers Retirement System of Ohio and Ohio Public Employees Retirement System (collectively, the "Ohio Funds" or "Lead Plaintiffs"), bring this action on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company")[1] during the period from November 10, 2020 through August 5, 2024, inclusive (the "Class Period") and who were damaged thereby (the "Class"), against Defendants ZoomInfo, Henry Schuck ("Schuck"), Peter Cameron Hyzer ("Hyzer"), Joseph Christopher Hays ("Hays") (collectively, the "Individual Defendants"), TA Associates Management L.P. ("TA Associates"), The Carlyle Group, Inc. ("Carlyle Group"), and DO Holdings (WA), LLC ("DO Holdings") (collectively, the "Sponsor Defendants") (together with the Company and the Individual Defendants, "Defendants").[2]   The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of U.S. Securities and Exchange Commission ("SEC") filings by ZoomInfo; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of ZoomInfo with knowledge of the matters alleged herein; and consultation with experts in the areas of accounting.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiffs believe that substantial additional

---

[1] ZoomInfo's common stock trades on the NASDAQ stock exchange under the ticker symbol "ZI."

[2] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of ZoomInfo, TA Associates, Carlyle Group, and/or DO Holdings during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) ZoomInfo's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This securities fraud class action is a prototypical example of why Congress enacted the Securities and Exchange Act of 1934.  First, Defendants took their private company public in an Initial Public Offering ("IPO").  Second, in order to make sure the stock price soared, Defendants made a series of misleading statements about the Company's supposedly stellar financial results and sustainable customer growth.  Third, taking Defendants at their word, investors poured money into the Company, raising its stock price dramatically.

2.    However, unbeknownst to those investors, Defendants knew all along that, rather than vetting customers' financial health and stability, the Company was conducting **no due diligence whatsoever** into the customers with which it was contracting to achieve its seemingly impressive revenue growth.  As a result, the Company's growth depended on risky and unsustainable contracts, therefore leading to material overstatement of its financial results.

3.    Finally, with the stock price artificially propped up by their continuing misstatements, Defendants unloaded tens of millions of shares of Company stock and reaped an exorbitant profit—in this case, **nearly $8.6 billion**, and, in the CEO's case, **more than $1 billion**. After cashing in, the inevitable happened.  The risky and unsustainable contracts failed, and the Company was forced to disclose publicly that its stated financials were not as stellar as Defendants previously claimed.  Indeed, the growth ZoomInfo had touted for years slowed down or turned negative.  On this news, the stock price plummeted, causing misled investors to lose billions of their investments—in this case **nearly 80% of shareholder value**.

4.    All said, Defendants devised and carried out a textbook, insider trading-based securities fraud scheme.  Lead Plaintiffs sue to recover the losses that Defendants' scheme caused investors.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                           2

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1

### A.    ZoomInfo's Business

2

5.    ZoomInfo is a technology company that offers digital sales and marketing tools to

3

businesses.  ZoomInfo's flagship product, SalesOS, is in essence a digital lead list—a commercial

4

database that provides sales and marketing professionals with organizational and contact

5

information to help them identify, connect, and engage with prospective customers.  ZoomInfo

6

primarily operates in the "B2B" market, meaning that its customers are typically businesses that

7

sell to other businesses, rather than directly to consumers.

8

6.    Critically, ZoomInfo's revenue depends on a subscription-based model that

9

requires the Company to sign up new subscribers and then keep those subscribers as customers

10

through renewals, typically on an annual basis.  Subscription-based businesses are highly attractive

11

to investors due to their ostensibly recurring, predictable revenue.  Defendants also understood

12

that subscriptions and renewals were crucial to ZoomInfo's success because they accounted for

13

nearly 100% of the Company's revenue.

14

7.    Defendant Schuck co-founded ZoomInfo's predecessor, DiscoverOrg, in 2007, as

15

a marketing and sales startup that provided its B2B clients with a database of business information

16

and contacts.  He managed DiscoverOrg with Defendants Hyzer and Hays.  On February 4, 2019,

17

DiscoverOrg acquired competitor Zoom Information, Inc., another sales and marketing software

18

company that provided business contact information to its customers.  Following the acquisition,

19

Defendants rebranded the combined company as ZoomInfo.

20

### B.    Prior to ZoomInfo's IPO and Leading Up to the Class Period, the Company Misleadingly Inflated Its Subscriber Numbers

21

22

8.    Prior to ZoomInfo's June 4, 2020 IPO, and leading up to the Class Period,

23

Defendants set and followed a singular goal: to drive ZoomInfo's customer volume as high as

24

possible, as quickly as possible, at any cost.  Defendants did so to pump up ZoomInfo's valuation

25

in advance of the IPO and to create the appearance of a sustainable and recurring subscriber base

26

that would drive stable revenue growth.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

3

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

9.      Defendants accomplished this fraudulent scheme by directing and incentivizing ZoomInfo's salespeople to close as many deals as possible with potential customers—**all without conducting any due diligence into those customers' ability to pay or likelihood of renewal**. In doing so, ZoomInfo signed large amounts of customers belonging to its riskiest segments: small and medium businesses ("SMBs") and Mid-Market businesses.  Defendants' affirmative decision not to vet businesses in those segments led to ZoomInfo accruing a large number of customers that were extremely unlikely to pay and were almost certain not to renew at the end of their subscription terms.  In other words, these customers were highly unlikely to generate **real, sustainable** revenue.

10.     Compounding these issues, ZoomInfo allowed these extremely risky customers to defer payment or applied steep concessions to their subscription price just so they could report the sale and supposed revenue to investors and give the appearance of successful growth.  Indeed, multiple Former Employees ("FE") confirmed that, leading up to the Class Period, ZoomInfo's strategy of signing a high-volume of customers **without any verification or due diligence** was baked into its business model.[3]

11.     For example, according to FE-2, a former Senior Sales Manager responsible for ZoomInfo's Mid-Market customers, the Company was only concerned about increasing its volume of business after it was acquired by DiscoverOrg in February 2019 and rebranded as ZoomInfo.[4] FE-2 further recalled that ZoomInfo did not conduct any due diligence on potential clients to ensure that it was bringing in high quality and solvent customers.  Similarly, according to FE-3, a former Revenue Accountant at the Company, ZoomInfo's problem with non-payments from customers resulted from the company's aggressive sales incentives and culture, including CEO Henry Schuck's insistence that the company "just sell, sell, sell, sell" – and the company's rapid expansion upon its acquisition by DiscoverOrg.  FE-3 explained that there were "no barriers" and "no constraints" placed on the Sales Team regarding which potential customers they could sell

---

[3] FEs are identified herein by number (FE-1, FE-2, etc.).  All FEs are described in the feminine to protect their identities.

[4] All FEs are described in detail in Section III.C. ("Relevant Third Parties"), herein.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    4

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

to.  According to FE-3, "[t]he entire length of the company, a decade, the entire thing is just sell – just sell, get that deal signed.  Does it mean we're going to collect the money?  No.  That's what was happening at a large scale here.  But it got out of control."

12.    Numerous other FEs tell the exact same story.  For example, FE-10, a former employee in ZoomInfo's Revenue Operations department, explained that there was no credit check conducted and lack of concern regarding whether a customer was a good company or not.  Likewise, according to FE-1, a former Sales Manager for the Company, there were no discussions around due diligence and vetting prospective customers.  FE-1 explained that the Company created an environment for employees that contributed to a lack of care regarding due diligence.  FE-1 explained that the mentality was "get it done, we'll deal with that [any problems] later."

13.    By early 2020, the COVID-19 pandemic only accelerated Defendants' fraudulent scheme to grow the Company's reported revenue by signing up risky customers.  During the COVID-19 pandemic, ZoomInfo took advantage of struggling businesses' need for digital sales and marketing tools as traditional channels slammed shut—conferences ceased, in-person meetings ground to a halt, and entire industries suspended operations.  ZoomInfo used the pandemic—and the Paycheck Protection Program ("PPP") loans that many small and medium sized businesses received during the pandemic—to further bolster its sales despite knowing that a large percentage of these new customers were unvetted, relying on temporary funding, subject to no due diligence, and, therefore, were highly risky and unlikely to result in real, durable revenue growth from renewals.

14.    Prior to the IPO and leading up to the Class Period, Defendant Schuck knowingly did everything he could to further this scheme and held meetings where he told employees to sell at all costs to maximize the stock's offering price.  Indeed, according to FE-2, ZoomInfo pushed hard to sign up as many customers as possible in the months prior to going public to increase its pre-IPO stock price.  Specifically, FE-2 explained that during monthly meetings leading up to the IPO, Schuck told employees that the Company needs "all-hands-on-deck" to sign up as many customers as possible.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                     5                     BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

15.     Moreover, leading up to the IPO, Defendant Schuck **personally** directed employees to sell to as many customers as possible for the **express purpose of increasing the Company's pre-IPO stock price**.  FEs confirmed that Defendant Schuck coupled this directive with ZoomInfo not performing due diligence into its customers' ability to pay.

16.     For example, FE-2 detailed that approximately eight months prior to going public, Schuck began talking about the IPO and the Company's "exit plan" during monthly meetings.  FE-2 added that in the months leading up to the IPO, the Company began distributing equity in ZoomInfo to employees who previously did not have it in order to incentivize them to sell to as many customers as possible because the Company's stock price would increase if they were successful in signing up new customers.

17.     On June 4, 2020—three months into the COVID-19 pandemic and amid significant market volatility—ZoomInfo went public with shares at a price of $21.00 per share.  The IPO was a huge success and that day shares rose more than 60% to close at $34.00 per share.

### C.    Defendants Knowingly Inflated ZoomInfo's Revenue Figures, as Defendant Schuck Entered into a Plan to Sell Off His Shares

18.     Now a public company, ZoomInfo was required to comply with the strict reporting guidelines set forth by the SEC and Generally Accepted Accounting Principles ("GAAP").  Critically, GAAP obligates public companies to account for the likelihood of collectability when reporting their financial figures to the public.

19.     Specifically, GAAP **required** ZoomInfo to perform a robust assessment of its likelihood of collecting on its contracts as part of its calculation of Remaining Performance Obligations ("RPO")—a metric closely tracked by investors as an indicator of ZoomInfo's health and expected revenue from the "contracts" it had on the books.[5]  Indeed, a Barclays analyst covering ZoomInfo noted that "the best approach" to observe and understand "**consumption-based revenue models** is to **start with RPO**" because "in addition to revenue, RPO can provide

---

[5] RPO represents the aggregate value of all outstanding contracts for which the Company has not yet recognized revenue.

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

some **more context as it includes deferred revenue**. . . ." Moreover, Morgan Stanley described ZoomInfo's current RPO bookings as "**a proxy for annual contract value**," further signaling the Company's purportedly growing revenue.

20.    Prior to and during the Class Period, Defendants misleadingly and materially overstated RPO by not accounting for the likelihood of nonpayment when reporting the number to investors. Specifically, according to ASC 606, ZoomInfo was required to, as part of an **initial contract review prior to day one of the contract's inception**, evaluate the total consideration (*i.e.*, dollars) that was **probable** to be received. As a result, an improper overestimation of total consideration expected to be received over the life of the contract **overstates** the Company's RPO and revenue.

21.    Defendants overstated ZoomInfo's RPO by not discounting at all the amount that was probable to be received for risky SMB contracts that they knew were almost certain not to be paid in full. For example, according to FE-3, the Accounts Receivable team wasn't applying the proper accounting guidelines, including developing a variable constraint model to understand what the likelihood of collecting was. According to FE-3, these accounting methodologies weren't being applied. FE-3 stated that a key problem that preceded the $33 million charge ZoomInfo announced in August 2024 was the company's failure to follow very specific accounting rules on the need to predict the collectability of accounts by conducting a proper variable constraint analysis, referring to the accounting practice known as variable consideration.

22.    In failing to do so, throughout the Class Period, Defendants issued inflated RPO numbers to investors that did not accurately portray the amount of risk that Defendants, but not investors, knew was underlying the Company's supposedly sustainable growth and profitability.

23.    Worse, Defendants further inflated RPO by not writing down bad debt for accounts that Defendants knew to be uncollectable or delinquent. Instead, Defendants misleadingly counted revenue from accounts that were hundreds of days into delinquency—and therefore certain not to be collected—in the RPO figures it reported to investors. Specifically, ZoomInfo allowed

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    7

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

delinquent accounts to sit on the Company's books as accounts receivable **for months**—which demonstrated that the Company would never collect revenue on these contracts.

24.    For example, according to FE-3, for each account there was accounts receivable information available for "different buckets" in relation to the age of the accounts receivable balance associated with that account.  FE-3 recalled that there were not timely updates to the delinquency of payments, which was a problem because customers were offered access to ZoomInfo's products without a requirement of upfront payment.  According to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

25.    During the first half of the Class Period, Defendants misleadingly reported consistently increasing RPO figures each quarter that drove the Company's stock price to historic highs while Defendants sold off their shares.

26.     Indeed, unbeknownst to investors, at some point prior to November 30, 2020, Defendant Schuck entered into a 10b5-1 trading plan, which allowed him to start selling off his shares in the open market following any SEC imposed lockup period.[6]  Such plans are intended to protect an officer or director from being accused of insider trading because the timing of the future trades is pre-determined in the plan.  Here, however, Defendant Schuck was already in possession of material non-public information related to the inflated RPO figures as well as the risky nature of the Company's unvetted contracts, particularly with ZoomInfo's SMB customers, which he knew were unlikely to pay or renew their contracts.  Accordingly, the fact that Defendant Schuck sold **$1 billion of Company stock during the Class Period** pursuant to a 10b5-1 trading plan only confirms that Defendants knowingly entered into this scheme to defraud the market.

---

[6] Moreover, Defendant Schuck's 10b5-1 trading plan is not and was not publicly filed. Accordingly, investors had no idea that he was going to unload his shares until he actually did so.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

8

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1

2

### D.    Defendants Issued False and Misleading Statements About ZoomInfo's Growth and Profitability

27.    The Class Period begins on November 10, 2020, approximately four months after ZoomInfo's IPO.[7]  Defendants made several false and misleading statements touting the growth of new customers, as well as posting strong RPO figures, while omitting the fact that the Company's customer growth was driven by risky customers that were unlikely to pay or renew their contracts.

28.    For example, during an earnings call discussing the Company's Q3 2020 results, Defendant Schuck falsely touted "***[b]ecause of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for [o]ur customers spending over $100,000 a year with us, we are raising our financial guidance for the full year***."  However, this statement was false and misleading because it omitted the fact that ZoomInfo's "***record quarterly new sales***" and full-year guidance raise was attributable not to the "***strength . . . . across all areas of the business***," but rather due to sweeping, risky sales made without conducting any due diligence into customers' ability to pay for their subscription contracts.

29.    Indeed, unbeknownst to investors, ZoomInfo's decision to generate quick sales by skipping the vetting process entirely led to a disproportionate rise in risky SMB and Mid-Market customers that posed a high likelihood of nonpayment.  Defendants' statement further omitted that ZoomInfo's decision to "***rais[e] financial guidance for the full year***" was not attributable to the "***strength that we're seeing across all areas of the business***," but rather Defendants' complete lack of due diligence and willingness to sell to any customer regardless of non-payment and collectability risk.  In fact, ZoomInfo's purported "***record quarterly new sales***" were not sustainable and omitted the fact that the Company made those sales to risky SMB clients with no due diligence and that were unlikely to meet their payment obligations to the Company.

---

[7] Defendants' false and misleading statements occurred during the Company's earnings call for the third quarter of 2020, for the period ended September 30, 2020, after market close.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

9

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

30.     Additionally, during the same call, Defendant Hyzer stated that: "[w]ith respect to liabilities and future performance obligations, unearned revenue at the end of the quarter was $176 million. ***And remaining performance obligations were $458 million, of which, $349 million are expected to be delivered in the next 12 months***." However, as set forth above, Defendants' calculation of RPO was materially overstated because it completely failed to take into account the likelihood of collectability on the contracts that Defendants executed without performing due diligence and that they knew were risky and certain not to result in full payment because the accounts had been delinquent for up to hundreds of days. For example, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

31.     As the Class Period progressed, Defendants continued making false and misleading statements that omitted the fact that ZoomInfo's purported growth was fueled by subscription contracts that were entered into with no due diligence and were far riskier than Defendants claimed.

32.     Additionally, Defendants made misleading statements about the durability of the customers they gained during the COVID-19 pandemic when, in reality, Defendants knew that those customer subscriptions were not durable at all and, in fact, the underlying customers were unlikely to pay ZoomInfo for their contracts, much less renew.

33.     For example, while speaking at an investor conference on November 18, 2020, Defendant Schuck falsely stated "***[a]nd so, we don't view a world where customers kind of like come out of – get vaccines and go, oh, well, let's just go back to this really inefficient way to go-to-market where we're not leveraging data and insights and technology to do that. So, we feel pretty confident that shift is here to stay***." Unbeknownst to investors, Defendants knew full well that neither demand nor the customers that ZoomInfo signed during COVID-19 were "***here to stay***."

34.     Defendants' knowledge of ZoomInfo's financial metrics is undeniable. For example, during a podcast on March 14, 2024, Defendant Hyzer, when asked about the financial

figures that ZoomInfo "report[s] to the street" (i.e., RPO), responded stating "**[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about**." Additionally, on February 26, 2021, in the Company's 10-K for the fiscal year of 2020, Defendant Schuck was designated as the chief operating decision maker ("CODM"), who "reviews financial information for purpose of making operating decisions, assessing financial performance and allocating resources." Numerous FEs also confirmed that they saw Defendants review and report on various internal Company metrics including account health and market share.

### E. Defendants Buried an Internal Report Confirming ZoomInfo's Growth Was Unsustainable While Selling Off Hundreds of Millions in Shares

35.     By 2021, ZoomInfo was nearing the first annual renewal cycle for the droves of unvetted customer subscription contracts captured during the COVID-19 pandemic. By that time, unbeknownst to investors, ZoomInfo's declining demand had become such a pervasive and threatening problem that the Company's senior leadership commissioned a marketing survey. This survey confirmed markedly reduced demand for ZoomInfo's products and the Company's market share erosion. Defendants, however, concealed the results of the survey and continued to tout the same false narrative of sustainable growth to investors.

36.     Specifically, according to FE-11, a former employee in the Marketing Department, she attended meetings every Thursday with [Defendant] Hays and Shane Murphy-Reuter (ZoomInfo's former Chief Marking Officer) to discuss the status updates on demand generation. FE-11 stated that she commissioned a marketing survey in partnership with a vendor to survey several thousand users to compare features of ZoomInfo and their competitors, including data quality, ease of use, etc. FE-11 explained that the results of the survey showed that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed.

37.     FE-11 added that this survey alluded to the declining market share held by ZoomInfo. FE-11 recalled that this was presented during a Thursday meeting that she had weekly

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    11

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

with [Defendant] Hays and Murphy-Reuter, but it was "buried because it did not tell the story they wanted to tell."

38.     FE-11 explained that she also had meetings with [Defendant] Hays, Murphy-Reuter, and [Defendant] Schuck that occurred every few weeks during her 2021 tenure.  FE-11 recalled that Schuck was aware of the changing landscape in the market for ZoomInfo.  FE-11 explained that she had expressed in these meetings that the "gravy train of growth" was slowing down to the executives present, and that that the "hyper growth" that the Company had experienced was not going to last and the Company needed to admit that.

39.     During this time, armed with inside information about the risky contracts on ZoomInfo's books and lack of sustainable growth (and clear of any SEC lockup restrictions) Defendant Schuck began selling off hundreds of millions of dollars in ZoomInfo shares.  Indeed, by **August 5, 2021, Defendant Schuck had sold 4.7 million shares at inflated prices resulting in personal gains of over $234 million**.

## F.     Defendants Knew that Customers Would Not Renew Because They Were Not Using ZoomInfo's Products

40.     To make matters worse, Defendants knew that ZoomInfo's customers were not using its products, and therefore were certain not to renew.  Defendants' knowledge is apparent because ZoomInfo had a robust internal tracking system that confirmed the Company's customers were not using the very platform to which they had subscribed.  For example, FE-7 explained that low utilization rates were a "clear sign of trouble" and once seeing these figures she could tell if the New Business group had signed up customers for "a lot" of products that they were not going to use.

41.     Specifically, numerous FEs recalled that the Company's leadership had access to account health information through an online system called Gainsight. [8]  Critically, this reporting

---

[8] Gainsight and Salesforce are companies that provide software and digital platforms to assist businesses with managing their customer relationships.  For example, FE-8 recalled the ability to see notes regarding the health and risk associated with specific accounts in ZoomInfo's customer relationship management (CRM) platform, Gainsight.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    12

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

assigned each customer a score based predominantly on how often the customer was logging in and using ZoomInfo.  FEs recall declining usage rates and collectability challenges—particularly among ZoomInfo's SMB and Mid-Market segment—that these systems reported.  FEs recalled Defendant Schuck presenting these figures and discussing customer health in meetings.

42.     For example, FE-8, a former Customer Success Manager, explained that ZoomInfo collected usage metrics directly from the customer's platform and that information went to both Gainsight and Salesforce.  According to FE-8, every account had their own Health Score that was color-coded and designated as red, yellow, or green, and this was calculated in Gainsight and visible in the dashboard.  FE-4, a former Senior Account Executive, recalled quarterly All Hands Meetings typically led by [Defendants] Schuck and Hyzer that also served as a "State of the Union" regarding customer account health.  FE-4 further recalled that that the meeting included a "color coded box sequence" with "green fading into yellow, fading into red."  FE-4 continued to say based on the customer health status displayed in these meetings that she thought to herself that the current status was "not where we [ZoomInfo] wanted to be."

### G.     Defendants Turned to Forced Auto-Renewals in a Last-Ditch Attempt to Prop Up ZoomInfo's Sales

43.     ZoomInfo knew it could not sustain demand for its products—particularly amongst SMB and Mid-Market customers—of which many posed great collectability risk.  Accordingly, ZoomInfo resorted to adhesive auto-renewal provisions in its subscription contracts—which included steep price increases—in order to force customers to stay with ZoomInfo for another year and continue to prop up sales while Defendants liquidated their personal shares.  As described by numerous FEs, ZoomInfo used these auto-renewal provisions offensively, by manipulating its outreach to customers to lock subscribers—particularly SMB and Mid-Market customers—into another year of services despite their likelihood of non-payment.  Critically, ZoomInfo continued to report contracts that were renewed via adhesive auto-renewal tactics as revenue when reporting revenue figures such as RPO, despite knowing that customers were even less likely to pay for a contract that they had no intention of renewing.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    13

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

44.     Former employees described ZoomInfo engaging in coercive renewal tactics in order to book such contracts as revenue instead of considering it "churn"—another word for a canceled or not-renewed subscription.  For example, FE-6, who was employed by ZoomInfo in a senior leadership capacity within the Company's Account Management function, explained that if a customer expressed that they did not want to renew their contract with ZoomInfo, but their window to opt-out had passed that this was still considered revenue on the books and not a churn instance.

45.     ZoomInfo exploited this fact and did everything to force auto-renewals on its own customers.  For instance, FE-11, a former employee in the Marketing Department, explained that ZoomInfo's auto-renewal policy was "entrapment" for the customer and the Company attempted to bully customers into renewals.

46.     Former employees recalled being instructed purposefully to wait until after the opt-out window closed 60 days prior to the contract renewal date.  For example, FE-10, a former employee on the Revenue Operations team, explained that there were customers approached after their opt-out window had closed, effectively locking them into another year commitment.  Similarly, FE-5, a former member of ZoomInfo's Renewals Support team, recalled that there were Account Managers who instructed her to not contact customers until their contract was 59 days away from ending.  Likewise, FE-12, a former Sales Development Representative, explained that the opt-out option was not highlighted by ZoomInfo, and it appeared some Account Managers were purposefully waiting until the 60-day notice window expired before reaching out to customers about renewals.

47.     Other FEs recalled how ZoomInfo knew that certain verbiage would result in the renewal email going to customers' spam folders and therefore missed.  FE-10 explained that she had seen the copy used for emails and through discussions with colleagues, and it appeared that the Company purposely structured them with the hope that it would be caught in the user's spam filter and therefore missed.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    14

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

### H.    Defendants Continued to Mislead Investors About ZoomInfo's Sustainability and Growth

48.    As the Class Period progressed, Defendants continued to mislead investors about the Company's sustainable growth, risky customer base, and the inevitable revenue decline that was coming.  For example, Defendants continued to report inflated RPO figures on February 15, 2022 during the Company's earnings call for the 2021 financial year and fourth quarter of 2021.

49.    During the call, Defendant Hyzer stated, "[w]ith respect to liabilities and future performance obligations, unearned revenue at the end of the quarter was $364 million and *remaining performance obligations, or RPO, were $864 million, of which $672 million are expected to be delivered in the next 12 months*."  Defendants' statements were false and misleading because they touted quarter-over-quarter RPO—and revenue—growth, while, unbeknownst to investors, these figures were overinflated because they failed to account for the Company's knowledge that a significant number of ZoomInfo's risky SMB clients presented collectability issues and indeed were neither paying nor renewing.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

50.    Notably, Defendants also doubled down on the COVID-19 story they were peddling in order to keep the stock price elevated.  Indeed, they continued to do so even after learning the results of the marketing survey they commissioned in 2021 that told them the opposite.

51.    For example, during the February 15, 2022 call, an analyst with Wolfe Research asked Defendant Schuck if there was a pull-forward in customer demand and how much "room" the Company still has to expand.  Defendant Schuck falsely stated that COVID-19 did not cause a pull-forward in demand and that "*we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or were one-off or a pull-forward*."  Schuck made this false statement while knowing both that a concealed marketing report and the Company's internal customer tracking system confirmed the exact opposite.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    15                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

52.     Defendants' scheme had its intended effect.  By October 2022, ZoomInfo was trading at around $45, more than double the IPO price of $21.  Moreover, as of that time, **Defendant Schuck had sold 16,137,040 Company shares, reaping proceeds of approximately $936 million**.  However, aware that it was simply a matter of time before the concealed dangers of risky customer contracts, lack of demand, and customer non-renewal came to fruition, Defendants had no choice but to slowly reveal their revenue-related problems, all while continuing to offload additional shares.

### I.     Defendants Slowly Revealed the Truth About ZoomInfo's Growth

53.     The truth began to emerge, through a series of partial disclosures beginning in late 2022.  Defendants could no longer stem the tide resulting from drastically diminished demand for ZoomInfo's products, coupled with mounting collectability problems triggered by droves of subscription contracts with SMBs and Mid-Market customers that ZoomInfo targeted and signed without conducting **any due diligence** into its customers' ability to pay.

54.     Moreover, many of the SMB and Mid-Market customers that began their subscriptions in 2020, and that ZoomInfo had coerced into locking in renewals the following year, were now fervently seeking to terminate their relationship with the Company.  All the while, investors remained in the dark concerning the fact and extent of Defendants' undisclosed financial risk.

55.     On November 1, 2022, after the market closed, ZoomInfo disclosed that, at the end of Q3 2022, the Company "saw a greater level of financial scrutiny from buyers, which further elongated sales cycles."  The market was surprised by this news of decelerating growth.  For example, analysts from Canaccord Genuity expressed concern, stating, "[w]ell, **this wasn't the update that we were expecting** to get from ZoomInfo. . . . where **ZI seems to be seeing more pronounced headwinds** is on seat count and data expansion growth. . . ."

56.     In addition, Canaccord Genuity noted that "[t]aking a step back, **ZoomInfo's lackluster Q3 came as a surprise**, and we're therefore not shocked to see the stock down 20%+.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    16

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

After all, **management was pretty bullish at our conference in mid-August**, and as late as mid-September at the Goldman event, the suggestion was that Q3 was not looking any worse than Q2."

57.    In response to this news, the price of ZoomInfo's stock fell $12.69 per share, or approximately **29%**, to close at $30.81 per share on November 2, 2022.

58.    During the earnings call on November 1, 2022, however, Defendants downplayed the bad news.  Specifically, despite having internally confirmed its market share erosion in 2021, and knowing about scores of customers seeking to sever ties with ZoomInfo's platform after being locked into financially oppressive autorenewals, Defendants misleadingly citing a "challenging macroeconomic environment," and accordingly, cautioned ZoomInfo's investors to "expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021."

59.    Critically, Defendants knew that the customers attempting to terminate their subscription contracts were disproportionately comprised of ZoomInfo's risky SMB customers, that were originally signed up for ZoomInfo subscriptions without being vetted in any way for their ability to pay.

60.    During that same earnings call on November 1, 2022, Defendant Hyzer also offered additional assurances to investors.  For example, when analysts posed specific questions about the cause of the delayed renewal timeline, Defendant Hyzer said, "***gross retention continues to be really strong, over 90%***," and Defendant Schuck touted that ZoomInfo was "***continuing to see really strong demand. . . . what we're seeing is even though we're seeing a really strong demand environment, those deals are just taking longer to get to close***."

61.    Shortly thereafter, on November 16, 2022, ZoomInfo's stock price declined again as Defendant Hyzer spoke at the RBC Global Technology, Internet, Media & Telecom Conference.  During the conference, Defendant Hyzer disclosed that "we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team, and we don't see that – and we continue to see that scrutiny in Q4."  Defendant Hyzer emphasized that "we don't see any evidence currently that that macroeconomic pressure is going to subside or turn around quickly or . . . in the short term . . . . [I]f you look at doing 4% to 5%

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    17                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

sequential growth each quarter in 2023 [] that would get you into something that's more like a high-teens growth rate" for the year.

62.    The market was surprised by this news.  Analysts from Bank of America Global Research reported that "[w]e find the timing of the new disclosure odd given the company reported its 3Q22 results just two weeks ago on 11/2/22, which raises the question if the selling environment has deteriorated further since."

63.    In response to this news, the price of ZoomInfo's stock fell from $31.69 per share on November 15, 2022, to $26.17 per share on November 17, 2022, or approximately **17%**, over a two-day trading period on above-average trading volume.

64.    However, during the same conference on November 16, 2022, Defendant Hyzer also offered additional assurances to investors.  For example, an analyst with RBC asked Defendant Hyzer to recap ZoomInfo's prior quarter earnings.  In response, Defendant Hyzer stated, "as we started talking about in Q2, *we are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales cycles*."  In explaining ZoomInfo's financial performance, Defendant Hyzer omitted any reference to the Company's years of failing to conduct due diligence into its customers' ability to pay, or the company's inflated RPO figures, much of which was uncollectable.

65.    The market absorbed Defendant Hyzer's assurances.  Analysts at Wolfe Research explained the disclosure by stating, "based on our math this guidance, while below expectations, looks to be in line with how ZI and Cameron Hyzer have set initial numbers in the past. . . . [I]t is also hard to believe that the business has broken in this short of a time period."  In subsequent quarters, ZoomInfo went on to present quarterly misleading RPO figures that failed to take into account the likelihood of nonpayment resulting from the Company's years of signing unvetted customers and included uncollectable debt that should have been written off.

66.    Critically, before their fraud was fully revealed, Defendants engaged in additional rounds of insider trading.  In June 2023 alone, Defendant Schuck sold an additional **$55 million**

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    18

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

in stock, bringing the total proceeds of his stock sales during the Class Period to **over one billion dollars: $1,076,913,259.75**, to be precise.

67.    The truth about Defendants' financial condition continued to be revealed as ZoomInfo disclosed more and more bad news about the sustainability of its customer growth. On July 31, 2023, the Company issued a press release announcing ZoomInfo's financial results for its second quarter of 2023 ended June 30, 2023 ("2Q23 Press Release"). In the 2Q23 Press Release, the Company announced a decline in ZoomInfo's customer base with high-value ACV, of which RPO is a proxy. In addition, during the earnings call, Defendant Hyzer also revealed that during the quarter the Company "saw continued elevated write-offs for our smaller customers." However, investors remained in the dark as to the extent of the problems underlying the Company's customers'—particularly SMBs—nonpayment. The market reacted to the news with surprise. For example, analysts from UBS Research noted that "ZI's 16% 2QF23 revs growth missed the guide (~1% short of mid-point) . . . This was **well below investor expectations** & even short of the bear case for a modest guide down."

68.    In response to this news, the price of ZoomInfo's stock fell from $25.57 per share on July 31, 2023, to $18.40 per share on August 2, 2023, or approximately **28%**, on above-average trading volume.

69.    However, during the Company's earning call on the same day, July 31, 2023, Defendants nonetheless continued to reassure investors that these increased cancellations resulted from "***budgetary pressures and their corresponding downward pressure on renewals***" and that "***[i]n the SMB segment . . . we still see strong performance***." However, Defendants' statements continued to conceal the true extent of ZoomInfo's financial problems stemming from its lack of due diligence, which resulted in years of inflated RPO figures that failed to reflect not only the likelihood of customer nonpayment, much of which was uncollectable and should have been written off. Analysts with Barclays responded to Defendants' assurances, stating, "**[w]e see this more as a reflection of the market rather than a ZI specific issue**."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                     19

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

70.     Then, on May 7, 2024, the extent of ZoomInfo's poor financial results continued to deteriorate beyond investor expectations as the Company revealed that ZoomInfo had a large pool of small business customers that exhibited "weakness" during renewals in the period.  Specifically, Defendant Schuck stated that "[a]s it relates to net revenue retention, in the quarter our SMB business continued to be challenged and performed worse than prior periods." As a result, ZoomInfo reduced its annual revenue guidance from a range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

71.     Analysts from Piper Sandler Research were shocked, reporting "Our patience has worn thin in waiting for a fundamental recovery at ZI on further erosion across the cohort of SMB and mid-market customers that has been spotty for the past two years but is **now showing further signs of another leg down**."

72.     On this news, the price of ZoomInfo's stock fell from $16.02 per share on May 7, 2024, to $12.14 per share on May 8, 2024, or approximately **24%**.

73.     Despite the foregoing, Defendants continued to mislead investors concerning the severe extent of its collectability problems.  For example, during the same May 7, 2024 earnings call, Defendant Hyzer stated, "***SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months.***" However, Defendants continued to conceal the full extent of the problems stemming from years of failing to conduct due diligence into its customers' ability to pay, and inflating its RPO figures while knowing that they kept revenue on ZoomInfo's books that should have been written down.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

74.     The full truth was revealed on August 5, 2024, when Defendants announced that ZoomInfo was incurring a $33 million charge because "[d]uring the quarter, the company made a change in estimates related to the collectability of receivables from customers and changed

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              20

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

operational procedures to require upfront pre-payment for services from certain smaller customers." ZoomInfo decreased its revenue guidance by approximately $65M following the disclosure. Moreover, the charge was material from an accounting standpoint because Defendants' inclusion of uncollectable contracts in prior quarters allowed ZoomInfo to beat both Wall Street and internal guidance.

75. During the earnings call on the same day, Defendant Schuck admitted that elevated level of write-offs was the driver behind the $33 million charge. Specifically, "**in 2022 and 2023, [the Company] <u>extended credit to a higher mix of SMB customers</u>, and the rate of non-payment by these customers increased throughout the past 24 months**."

76. Finally, Defendants announced that they would be separating from Defendant Hyzer as the Company's longtime CFO.

77. Analysts were shocked by the Company's new revelation of the $33 million charge and poor financial performance. For instance, analysts from KeyBanc noted that "**[t]his has been a long-running complaint from investors in ZoomInfo; the problems that caused results and guidance to disappoint were new, varied, and seemed to multiply since the end of the SaaS spending spree in 2021**."

78. In response to this news, ZoomInfo's stock fell from $9.80 per share on August 5, 2024, to $8.01 per share on August 6, 2024, or approximately **18%**.

79. Collectively, over the course of these disclosures, ZoomInfo went from trading as high as $45.90 per share on November 1, 2022, to trading at just $8.01 per share at the end of the Class Period on August 5, 2024, erasing more than $37 per share and approximately 80% of shareholder value. Meanwhile, while investors were left holding the bag, Defendant Schuck earned **<u>over $1 billion in proceeds</u>** from sales of his shares during the Class Period.

80. Tellingly (and cynically), two days after the final corrective disclosure, on August 7, 2024, Defendant Schuck **<u>purchased</u>** 1.5 million shares of ZoomInfo while its shares traded at the rock-bottom price of $8.49 per share—nearly 80% below the Class Period highs that Defendant Schuck profited off of when he was selling off his shares.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                     21

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

81.     After the Class Period and mere days after Defendants' final corrective disclosure, on August 13, 2024, Defendants admitted that the revenue and bad debt charge stemmed from "**a higher risk of non-payment than we had previously estimated**." Defendants' admission made clear that the Company's failure to perform due diligence when signing customers up for subscription contracts and then failing to discount or write off those contracts for likelihood of payment **at all** led to the corresponding decline in ZoomInfo's stock price.

## II.     JURISDICTION AND VENUE

82.     The claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

83.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

84.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). ZoomInfo's stock trades on the Nasdaq Global Market, a national stock exchange, under the symbol "ZI." The Company was incorporated in the state of Delaware, and maintains its corporate headquarters in Vancouver, Washington. Many of the acts charged herein, including the preparation or dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

85.     In connection with the acts alleged in this Complaint, Defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate email communications, and the facilities of the Nasdaq.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    22

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

III.    **PARTIES**

    A.    **Lead Plaintiffs**

    86.    Lead Plaintiff State Teachers Retirement System of Ohio was established in 1920 and has been serving active, inactive, and retired Ohio public educators for over 100 years.  The State Teachers Retirement System of Ohio manages $92.6 billion, as of June 30, 2024, for approximately 540,000 members.  The State Teachers Retirement System of Ohio is overseen by a combination of 11 State Teachers Retirement Board members, 11 senior staff members and over 400 associates.  On December 12, 2024, the Court appointed State Teachers Retirement System of Ohio as Lead Plaintiff for this litigation.  As set forth in its certification (*see* ECF No. 36-1), State Teachers Retirement System of Ohio purchased ZoomInfo common stock during the Class Period and suffered damages as a result of Defendants' fraud.

    87.    Lead Plaintiff Ohio Public Employees Retirement System is the largest state pension fund in Ohio and provides retirement, disability, and survivor benefit programs for public employees throughout the state.  Ohio Public Employees Retirement System manages $114.4 billion, as of December 31, 2023, for over 1 million past and present Ohio workers.  Ohio Public Employees Retirement System is administered and managed by an eleven-member Board of Trustees.  On December 12, 2024, the Court appointed Ohio Public Employees Retirement System as Lead Plaintiff for this litigation.  As set forth in its certification (*see* ECF No. 36-1), Ohio Public Employees Retirement System purchased ZoomInfo common stock during the Class Period and suffered damages as a result of Defendants' fraud.

    B.    **Defendants**

        1.    **Corporate Defendant**

    88.    Defendant ZoomInfo is a software and data company that provides businesses with access to a database with the contact information of potential customers.  ZoomInfo is incorporated under the laws of Delaware with its principal executive offices located in Vancouver, Washington.  The Company's common stock is listed on Nasdaq Global Select Market under the trading symbol "ZI."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    23

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

## 2. Individual Defendants

89.      Defendant Schuck was, at all relevant times, the Chief Executive Officer ("CEO"), Chairman of ZoomInfo's Board of Directors (the "Board"), and a director on the Board.  Prior to these roles, Schuck served as cofounder and CEO of DiscoverOrg, which acquired ZoomInfo in 2019.  Schuck is an attorney who is admitted to practice in the State of Washington and Nevada. During the Class Period, in his role as CEO of ZoomInfo, Defendant Schuck participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the retention of customers.  In his role as CEO of ZoomInfo, Defendant Schuck also signed the Company's annual and quarterly SEC filings, which contained false and misleading statements and financial figures.  During the Class Period, Schuck sold more than 21.3 million shares of ZoomInfo stock in open market transactions, reaping proceeds of more than $1 billion while in possession of material nonpublic information about the Company's fraudulent conduct.

90.      Defendant Hyzer was, at all relevant times, the Chief Financial Officer ("CFO") for ZoomInfo.  Hyzer served as CFO from November 2018 to October 2024.  During the Class Period, in his role as CFO of ZoomInfo, Defendant Hyzer led multiple teams including, accounting, finance, internal audit, SEC reporting, and tax treasury, and also participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the retention of customers.  In his role as CFO of ZoomInfo, Defendant Hyzer also signed the Company's annual and quarterly SEC filings, which contained false and misleading statements and financial figures.  During the Class Period, Defendant Hyzer sold more than 600,000 shares of ZoomInfo Stock in open market transactions, reaping proceeds of more than $35 million, while in possession of material nonpublic information about the Company's fraudulent conduct.[9]

---

[9] Defendants Schuck, Hyzer, and Hays are collectively referred to as the "Individual Defendants."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    24

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

91.    Defendant Hays was, at all relevant times, the President and Chief Operating Officer ("COO") for ZoomInfo.  Prior to these roles, Hays served as President and COO of DiscoverOrg, which acquired Zoom Information, Inc. in 2019.  Hays served in these roles from May 2016 to January 2024.  Hays was responsible for generating new business sales and sales development.  During the Class Period, in his role as COO, Defendant participated in Defendants' fraudulent scheme.  During the Class Period, Defendant Hays sold more than 1 million shares of ZoomInfo stock in open market transactions, reaping proceeds of more than $60 million while in possession of material nonpublic information about the Company's fraudulent conduct.

### 3.    Sponsor Defendants

92.    Defendant TA Associates was, at all relevant times, a global private equity firm based in Boston, Massachusetts.  TA Associates, founded in 1968, has been in business for over 50 years and has raised over $60 billion in capital.  During the Class Period, TA Associates and Defendant Carlyle Group collectively sold more than $7.5 billion in ZoomInfo Stock.  These sales were effectuated in part through multiple registered public stock offerings.  Additionally, Defendants TA Associates and Carlyle Group were controlling shareholders of the Company during the Class Period and together held a significant percentage of the combined voting power immediately following ZoomInfo's secondary registered public offering held on August 9, 2021.  Accordingly, Defendant TA Associates exercised actual power or control over the Company, its officers, and directors.

93.    Defendant Carlyle Group, Inc. was, at all relevant times, a global investment firm based in Washington, DC.  Carlyle Group, founded in 1987, is one of the largest investment firms in the world with $441 billion of assets under management.  During the Class Period, Carlyle Group and Defendant TA Associates collectively sold more than $7.5 billion in ZoomInfo stock.  These sales were effectuated in part through multiple registered public stock offerings.  Additionally, Defendants TA Associates and Carlyle Group were controlling shareholders of the Company during the Class Period and together held a significant percentage of the combined voting power immediately following ZoomInfo's secondary registered public offering held on

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    25

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

August 9, 2021. Accordingly, Defendant Carlyle Group exercised actual power or control over the Company, its officers, and directors.

94.    Defendant DO Holdings was, at all relevant times, a limited liability company that is owned by Defendant Schuck and Kirk Brown, cofounder and former director of ZoomInfo's predecessor, DiscoverOrg. Accordingly, Defendant DO Holdings exercised actual power or control over the Company, its officers, and directors.

C.    **Relevant Third Parties**

95.    FE-1 was employed by ZoomInfo as a Manager, Sales UK & EMEA from July 2022 until January 2024. FE-1 explained that she was responsible for a Sales Team that fluctuated between six and eight sales representatives and was focused on SMB and Mid-Market customers. According to FE-1, she directly reported to current Director, Sales Ryan Ooesterveld and former SVP, International Revenue & Emerging Products Ray Mariano Jr.

96.    FE-2 was employed by ZoomInfo as a Senior Sales Manager, Mid-Market from July 2018 to December 2019 and as a Sales Director from January 2020 to November 2021. FE-2 advised that as a Sales Director, she served as a first line manager and oversaw sales teams ranging from six to 10 sales representatives. FE-2 explained that she and her teams were responsible for driving new business in the United States.

97.    FE-3 was employed by DiscoverOrg, and subsequently ZoomInfo, as a Revenue Accountant prior to and leading up to the Class Period. FE-3 was later employed by ZoomInfo as a Revenue Accountant during and through the end of the Class Period. FE-3's role with ZoomInfo as a Revenue Accountant involved working on complex revenue issues, including contract modifications. FE-3 attended meetings with a consulting firm engaged by ZoomInfo to advise on the problem around the application of variable constraint.

98.    FE-4 was employed by ZoomInfo as a Senior Account Executive from October 2019 through March 2024. FE-4 recalled later, in mid-2023, transitioning to an Account Management role focusing on Commercial customers, which FE-4 described as one step above mom-and-pop shops. FE-4 explained that she began her tenure at ZoomInfo with its predecessor,

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

26

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

DiscoverOrg. FE-4 continued to say that she spent her initial six to eight months on the North America Team before volunteering to join a newly assembled team focused on building out ZoomInfo's footprint in the EMEA region. FE-4, recalled quarterly All Hands Meetings typically led by current CEO Henry Schuck and former CFO Cameron Hyzer that also served as a "State of the Union" regarding customer account health.

99.     FE-5 explained that she initially began her tenure at ZoomInfo working as a New Business Inbound SDR (Sales Development Representative) in October 2022 and was responsible for customers across various segments (Enterprise, Mid-Market, and SMB). FE-5 continued to say that she transitioned to a Customer Inbound SDR in May 2023, when the opportunity presented itself due to short-staffing on the customer side. FE-5 explained that she joined the Renewals Support Team in September 2023 and remained there for the remainder of her employment until July 2024.

100.     FE-6 was employed by ZoomInfo in a senior leadership capacity within the Company's Account Management function and was responsible for renewing and cross-selling to existing clients across various geographies and customer segments. FE-6 was employed by ZoomInfo leading up to and during the Class Period until four quarters before the end of the Class Period.

101.     FE-7 was employed by ZoomInfo as an Enterprise Account Executive from November 2020 until September 2023. FE-7 reported to a direct manager, who reported to a director and vice president and that the structure eventually reached former Chief Revenue Officer Dave Justice (previously Tim Strickland and former President & Chief Operating Officer Chris Hays) and current CEO Henry Schuck. According to FE-7, her group had two organizations, "New Business" and "Retain and Grow" or "R&G." FE-7 was a member of the R&G group and had newly signed up accounts transitioned to her from the New Business group. FE-7 explained that she was responsible for a group of Enterprise customers.

102.     FE-8 was employed by ZoomInfo as a Customer Success Manager from December 2021 until September 2024. FE-8 explained that she "tallied" or computed the risk scores in her

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    27

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

role, and, in doing so, considered multiple factors including information obtained through conversations with customers.

103.    FE-9 was employed by ZoomInfo as a former Senior Account Executive, Talent Solutions from July 2022 until January 2023.  FE-9 was employed by Comparably,[10] a company acquired by ZoomInfo in April 2022, from January 2021 until the acquisition.  According to FE-9, the first aspect of the acquisition marketed by ZoomInfo was that Comparably data was now included in ZoomInfo's TalentOS product. FE-9 described ZoomInfo's TalentOS product as a way for recruiters to poach talent.

104.    FE-10 was employed by ZoomInfo in a variety of roles from June 2018 until March 2023.  According to FE-10, she initially joined the Company as a Client Success Specialist in June 2018 and transitioned to an Enterprise Customer Success Manager in January 2019.  FE-10 continued to explain that she began her final role as a Revenue Operations Product Manager in November 2019.  According to FE-10, in her final role she reported to a Manager, who reported up two levels in the corporate hierarchy to former Chief Business Officer (previously Senior Vice President Operations and Interim CMO) Scott Sutton, who reported to [Defendant] Hays.

105.    FE-11 is a former employee in the Marketing Department at ZoomInfo who was employed during the Class Period for over three quarters during 2021. According to FE-11, while at ZoomInfo she attended meetings every Thursday with Christopher Hays and Shane Murphy-Reuter to discuss the status updates on demand generation.  FE-11 explained that she also had meetings with [Defendant] Hays, former Chief Marketing Officer Shane Murphy-Reuter, and [Defendant] Schuck that occurred every few weeks during her 2021 tenure.

106.    FE-12 was employed by ZoomInfo from June 2022 until December 2023, first as an Inbound Sales Development Representative ("SDR") from June 2022 until February 2023, and then as an Outbound Sales Development Representative until her departure.  In FE-12's role as an

---

[10] Comparably was a talent solutions platform that provided the ability for companies to survey current employees for recruitment purposes.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    28

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Inbound SDR she was focused on new business and reported up the corporate hierarchy four levels to President, Global Sales Development, SVP Global Sales Development Brian Vital.  In FE-12's role as an Outbound SDR she worked exclusively on renewals and reported up the corporate hierarchy three levels to former Director, Sales Development - Emerging Markets & Expansion Zack Thompson.

107.    FE-13 was employed by DiscoverOrg in November 2015, as Director, Learning and Development and Sales Enablement until July 2016.  FE-13 later held the role of Vice President, Learning and Development and Customer Support from July 2016 until September 2019.  FE-13 remained with the Company upon DiscoverOrg's acquisition of ZoomInfo, holding the position of Vice President, Customer Experience – Head of Customer Onboarding and Education from September 2019 until March 2023.  In this role, FE-13 oversaw various customer-related functions, including customer experience, customer support and customer onboarding.  FE-13 reported to Chief Customer Officer, Dominic Constandi, who reported to President and Chief Operating Officer, Christopher Hays.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    ZoomInfo's Business & Company Background

108.    ZoomInfo is a technology company that offers digital sales and marketing tools to businesses.[11]  ZoomInfo's flagship product, SalesOS, is a commercial database that provides sales and marketing professionals with organizational and contact information to help them identify, connect, and engage with prospective customers.  In other words, SalesOS is a digital lead list.[12]

109.    ZoomInfo primarily operates in the "B2B" market, meaning that its customers are typically businesses that sell to other businesses, rather than directly to consumers.  ZoomInfo's

---

[11] ZoomInfo operates within the go-to-market ("GTM") space, as it facilitates solutions for customers launching a product or service.

[12] ZoomInfo's platform offers additional products, such as MarketingOS and TalentOS, designed to enhance business's efforts to run advertisements and recruit employee candidates, respectively.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                29

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1    sales and marketing tools purport to add value to B2B customers by offering detailed information

2    about organizational structures, decision makers, and buying behaviors.  ZoomInfo's customers

3    fall into three broad categories: (1) Enterprise; (2) Mid-Market; and (3) small-to-medium

4    businesses ("SMB").

5            110.    ZoomInfo offers subscriptions at various price points based on customer usage, and

6    those subscriptions account for nearly 100% of the Company's revenue.  Specifically, those price

7    points, or subscription tiers, allow customers to purchase licenses or "seats" to access various

8    products, as well as units or "credits" to access specific information within ZoomInfo's databases.

9    Subscription-based businesses are highly attractive to investors due to their potentially recurring,

10   predictable revenue.

11           111.    Defendant Schuck co-founded ZoomInfo's predecessor, DiscoverOrg, in 2007, as

12   a marketing and sales startup that provided its B2B clients with a database of business information

13   and contacts.  He managed DiscoverOrg with Defendants Hyzer and Hays.  On February 4, 2019,

14   Schuck, Hyzer, and Hays acquired competitor Zoom Information, Inc., another sales and

15   marketing software company that provided business contact information to its customers.

16   Following the acquisition, Schuck, Hyzer, and Hays rebranded the combined company as

17   ZoomInfo.

18   **B.    In Order to Inflate ZoomInfo's Stock Price and IPO, ZoomInfo Signed
         Droves of Unvetted Customers without Assessing Their Likelihood of
19        Payment**

20           112.    Following ZoomInfo's rebranding, and leading up to the Class Period, Defendants

21   sought to turn a personal profit by rapidly pumping up ZoomInfo's stock price and conducting an

22   IPO.  Unbeknownst to investors, Defendants' scheme required the Company to fail to conduct a

23   critical and required task to accurately determine the accuracy of future revenue by quickly signing

24   on new customers **without performing any due diligence concerning those customers' ability

25   to pay** for their subscription contracts.  As a result of this fraudulent scheme, investors were left

26   completely in the dark as to the undisclosed financial risk within ZoomInfo's customer base.

27   Specifically, ZoomInfo's failure to vet its SMB and Mid-Market business customers—many of

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    30                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

which ZoomInfo targeted during the COVID-19 pandemic—caused weakness in the Company's ability to collect on their contracts.

1.    **Leading Up to the IPO, Defendant Schuck Personally Directed Employees to Sign Deals to Increase ZoomInfo's Stock Price Without Conducting Due Diligence**

113.    Leading up to the IPO, Defendant Schuck personally directed employees to sell to as many customers as possible for the express purpose of increasing the Company's pre-IPO stock price. FEs confirmed that Defendant Schuck coupled this directive with ZoomInfo not performing due diligence into its customers' ability to pay.

114.    For example, FE-2 detailed that approximately eight months prior to going public, Schuck began talking about the IPO and the Company's "exit plan" during monthly meetings. FE-2 explained that during monthly meetings leading up to the IPO, Schuck told employees that the Company needs "all-hands-on-deck" to sign up as many customers as possible. FE-2 added that in the months leading up to the IPO, the Company began distributing equity in ZoomInfo to employees who previously did not have it in order to incentivize them to sell to as many customers as possible because the Company's stock price would increase if they were successful in signing up new customers.

115.    Also, according to FE-2, ZoomInfo did not conduct any due diligence on potential clients to ensure that the Company was bringing in high quality and solvent customers. FE-2 noted that this was unusual since other companies she worked for conducted due diligence on customers before signing them to contracts.

116.    Defendants' scheme to sign massive numbers of unvetted customers in order to grow the Company's revenue numbers was an initial success, and, on June 4, 2020, ZoomInfo went public. ZoomInfo's IPO was the largest public debut by a software company in a decade. It was also the first technology IPO during the pandemic.

117.    Given market volatility during the early days of the COVID-19 pandemic and lockdowns, ZoomInfo's decision to go public in June 2020 drew some initial skepticism, especially within the tech sector. Indeed, at the time, few technology companies took steps to go public.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    31

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Through the IPO, Defendants sold 44.5 million Company shares at a price of $21.00 per share. Shares rose more than 60% on the first day of trading to close at $34.00 per share.  The Company raised nearly $1 billion in its offering, making it the largest technology listing in the U.S. at the time.

118.    Leading into the Class Period, Defendants touted sustainable demand for its digital products, despite the skepticism surrounding its decision to go public during the pandemic.  For example, on August 10, 2020, during ZoomInfo's first earnings call after the IPO, Defendant Schuck said, "pandemic or not . . . we are seeing demand for our data, insights, and technology successfully signing dozens of new customers."  However, investors remained in the dark regarding ZoomInfo's wholesale lack of due diligence when signing its vast amounts of new customers.

### 2.    During the Class Period, Defendants Continued to Direct ZoomInfo's Salespeople to Sign Customers Without Vetting Their Ability to Pay

119.    Leading up to the IPO and during the Class Period, numerous FEs confirmed that, as part of ZoomInfo's aggressive push to increase sales and inflate the price of ZoomInfo stock, the Company did not perform due diligence into new customers' ability to pay when closing their contracts.  FEs confirmed that ZoomInfo's decision not to vet customers led to large numbers of customer subscriptions—disproportionately within ZoomInfo's SMB and Mid-Market segments—carrying a high likelihood of nonpayment.  FEs further specified frequent instances of ZoomInfo allowing customers that posed a high collectability risk to begin using ZoomInfo immediately, without tendering payment.  This forced FEs in ZoomInfo's accounting department to recognize revenue that ZoomInfo knew it was unlikely to collect.

120.    For example, according to FE-1, a former Sales Manager for the Company, during her tenure at ZoomInfo, there were no discussions around due diligence and vetting prospective customers.  FE-1 added that ZoomInfo did not have any credit control procedures.  FE-1 explained that, at other similar companies she previously worked for, credit checks were conducted on prospective customers and included in their file, but at ZoomInfo no such checks were conducted

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                          32

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

to check credit or existing debts held by prospective customers.  FE-1 explained that the mentality was "get it done, we'll deal with that [any problems] later."  FE-1 further recalled that the pressure on sales to get revenue and a lack of concern about customer legitimacy from superiors led to these issues.

121.    Similarly, FE-10, a former employee in ZoomInfo's Revenue Operations department, explained that the mentality towards SMB customers in this group was "we don't care, just sign them on and achieve renewals," and an overall lack of care towards this cohort.  FE-10 explained that there was no credit check conducted and lack of concern regarding if a customer was a good company or not.

122.    Moreover, ZoomInfo's aggressive sales practices and lack of due diligence led to customers defaulting on their payment obligations.  For instance, according to FE-3, ZoomInfo's problem with non-payments from customers resulted from the company's aggressive sales incentives and culture, including CEO Henry Schuck's insistence that the company "just sell, sell, sell, sell" – and the company's rapid expansion upon its acquisition by DiscoverOrg.  FE-3 continued to say that the actions of the Company made the aggressiveness apparent, including not conducting credit checks on potential customers, not requiring upfront payment from customers, and not requiring more than a business name and a business address to get a deal signed.  FE-3 explained that there were "no barriers" and "no constraints" placed on the Sales Team regarding which potential customers they could sell to.  FE-3 noted that ZoomInfo "sold to anyone with a pulse, basically."  According to FE-3, "[t]he entire length of the company, a decade, the entire thing is just sell – just sell, get that deal signed.  Does it mean we're going to collect the money?  No.  That's what was happening at a large scale here.  But it got out of control."

123.    Defendants knew that these risky and unsustainable sales were happening because the Company promoted internal policies that incentivized salespeople to sign customers without any due diligence and with no payment upfront so they could make a commission.  FE-4 explained that, for example, if a salesperson's quota is $1.1 million and they exceed that by a certain number they then get to a level called "Heater," which increased their commission on any additional

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    33

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

business they did beyond that figure from 7% to 10%. FE-4 continued to say that once salespeople reached "Heater" they would sell anything at any price point to take advantage.

124. Other FEs recalled similar problems. For instance, throughout FE-3's tenure at ZoomInfo, it was very hard for the company to fully implement a policy of collecting payments upfront from customers, FE-3 said. According to FE-3, this was in part due to the company's sales culture. For example, FE-3 said, a hot shot sales guy might find a mom-and-pop business and land a $20,000 deal with them. But, FE-3 continued, the business doesn't have the money to pay up front. Still, FE-3 said, ZoomInfo would essentially decide, OK, well, you can just have this service anyway.

125. FE-3 added that ZoomInfo's average contract size was about $15,000-20,000. Usually, when talking about that contract size, companies require payment upfront, FE-3 said. Then, FE-3 said, on her side of the business – the accounting side – she and her colleagues had to technically recognize the deal as revenue because it's on paper and there was a "contract." "But we're rolling our eyes – when we see this stuff, we're like, 'Are we ever going to see that money?'" FE-3 said.

### 3. ZoomInfo Exploited COVID-19 to Sign Large Amounts of Vulnerable, Unvetted SMBs, Increasing Its Undisclosed Collectability Risk

126. During this same time, in early 2020, the COVID-19 pandemic was setting in. But rather than approach the pandemic with caution, Defendants took advantage of COVID-19 and used it as an opportunity to sign up even riskier customers that they knew were unvetted and certain not to renew when the pandemic was over.

127. Because of the lockdowns caused by the pandemic, traditional sales and marketing channels slammed shut—conferences ceased, in-person meetings ground to a halt, and entire industries, such as events and manufacturing, suspended operations. Businesses of all sizes, but particularly smaller organizations, scrambled for reliable digital sales and marketing tools to keep their means of support afloat. Moreover, businesses, broadly speaking, found themselves more

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    34

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

tethered to the internet than ever before, becoming more susceptible to online advertisements for products and services to help them weather the storm, or even thrive, during a period of chaos.

128.    Many smaller and midsize organizations also underwent budget restructuring or obtained temporary funding, including federal Paycheck Protection Program ("PPP") loans, for example, to accommodate the shift to virtual work and volatile market conditions.  Notably, ZoomInfo's platform provided this information, as well as other budgetary information, to help its customers determine whether a potential customer had the ability to pay for its products or services.

129.    Defendants took swift advantage of skyrocketing demand for digital sales and marketing tools to sign scores of SMB and Mid-Market customers without verifying their ability to pay.  To investors, ZoomInfo's growth appeared to be indicative of its profitability and sustainability.  However, Defendants knew that the subscriptions with SMBs that ZoomInfo procured during the COVID-19 pandemic were both driven by temporary demand and saturated with financial risk as a result of ZoomInfo's wholesale lack of due diligence regarding their ability to pay.

130.    Accordingly, Defendants knew that these customers would not continue to generate the stable revenue growth that ZoomInfo portrayed to the investors.  As COVID-19 wore on, many of these SMBs lost funding or went out of business, eliminating their need for ZoomInfo's products.  FEs describe how the Company knew and understood internally of this inevitable contraction of SMB customers.  FE-13 explained that, like for other companies in the tech industry, everything was great for ZoomInfo around the start of the COVID-19 pandemic.  However, as time went on, and as employees returned to the office across the country, FE-13 said it became increasingly difficult for ZoomInfo to retain business.   FE-13 explained that a lot of customers were reducing spend and many smaller businesses went out of business.

131.    Similarly, FE-11 continued to explain that even if the customers—SMB customers with contract values of $20,000 to $25,000—that interacted with ZoomInfo's digital advertisements on places like LinkedIn, Google, and Facebook—are signed on that they don't stick

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                          35

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1  and go somewhere else for less after a year unless they are trapped by the auto-renewal policy.

2  FE-11 added that ZoomInfo had no means to maintain growth.

3      132.    Moreover, as Defendants saw the writing on the wall that the demand prompted by

4  COVID-19 was drying up amongst its SMB customers, a crop of low-cost competitors further

5  diminished these customers' demand for ZoomInfo.

6      **C.    Defendants Overstated ZoomInfo's Accounting Metrics to Falsely Convey**
       **Sustainable Growth, Demand, and Company Health**

7

8      133.    Once ZoomInfo completed its IPO and became a public company, it was required

9  to comply with SEC and GAAP regulations regarding its financial statements—including with

10  respect to the amount of revenue the Company expected to receive on its subscription contracts.

11  Critically, however, in the face of these mounting payment and collection (and therefore, **revenue**)

12  problems, Defendants chose to manipulate key accounting metrics to keep their scheme under

13  wraps and in turn further misled investors.  Defendants did so by falsely overstating key accounting

14  metrics without incorporating the likelihood of not collecting payment on customer subscriptions

15  as required by GAAP.[13]

16      134.    Financial analysts who covered ZoomInfo's stock focused on Remaining

17  Performance Obligations ("RPO"), a key GAAP metric.  RPO represents the aggregate value of

18  all outstanding contracts the Company has not recognized revenue for yet.  ZoomInfo reported

19  RPO to investors on a quarterly basis and included it as part of its income statement.  Accordingly,

20  ZoomInfo was required to report RPO based on GAAP, as disclosed in ZoomInfo's notes to its

21  financial statements.[14]

22

23  [13] Accounting Standards Codification ("ASC") is a set of accounting principles and standards
    used in the United States. The Financial Accounting Standards Board ("FASB") created the ASC
    to provide a single source of GAAP.  Accounting Standards Update No. 2014-09, *Revenue from*

24  *Contracts with Customers (Topic 606)* is the principal GAAP that applies to ZoomInfo's relevant
    accounting issues ("ASC 606").

25  [14] For example, ZoomInfo's Amended 10-Q dated November 13, 2020 states:

26

27  At times, the Company may adjust billing under a contract based on the addition of services or
    other circumstances, which are accounted for as variable consideration under Accounting

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    36

135.    Critically, publicly traded companies are required to account for the likelihood of collectability when reporting their financial figures to the public.  Specifically, GAAP, and specifically ASC 606, **required** ZoomInfo to perform a robust assessment of its likelihood of collecting on its contracts as part of its calculation of RPO.  Specifically, according to ASC 606, ZoomInfo was required to, **as part of an initial contract review prior to day one of the contract's inception**, evaluate the total consideration (*i.e.*, dollars) that was probable to be received.  As a result, an improper overestimation of total consideration expected to be received over the life of the contract **overstates** the Company's RPO and revenue.

136.    RPO was crucial to analysts and the investing public because it gave insight into the revenue that ZoomInfo stood to collect on subscription contracts.  For example, on August 11, 2020, Morgan Stanley described ZoomInfo's current RPO bookings as "**a proxy for annual contract value**."[15]    As Barclays stated, "in addition to revenue, RPO can provide some more context as it includes deferred revenue, unbilled backlog from multi-year contracts, and capacity contracts billed arrears. . . . A combination of revenue [] and RPO give a full picture of consumption revenue model."  Barclays further stated that "we believe that **the best approach to model consumption-based revenue models is to start with RPO**."[16]

---

Standard Update ("ASU") 2014-09, *Revenue from Contracts with Customers*, later codified as Accounting Standards Codification ("ASC") Topic 606 (collectively with subsequent amendments, "Topic 606"). The Company estimates these amounts based on historical experience and reduces revenue recognized.

. . .

The assessment of variable consideration to be constrained is based on estimates, and actual consideration may vary from current estimates. As adjustments to these estimates become necessary, they are reported in earnings in the periods in which they become known. Changes in variable consideration are recorded as a component of net revenue.

[15] ZoomInfo's annual contract value ("ACV") was another key performance indicator tracked by investors.  As Morgan Stanley put it, ZoomInfo's strong ACV reporting is "**indicative that existing customers are sticking around**."  Wells Fargo described ZoomInfo's reporting high ACV figures as "relatively good indicators of the health of the business."

[16] A "consumption-based revenue model" is also known as usage-based pricing.  This is a pricing model where customers pay for what they use.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    37

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

137.    Defendants overstated RPO during the Class Period by not accounting **at all** for risky SMB contracts that it knew were almost certain not to be paid in full.  For example, FE-3 stated that a key problem that preceded the $33 million charge ZoomInfo announced in August 2024 was the company's failure to follow very specific accounting rules on the need to predict the collectability of accounts by conducting a proper variable constraint analysis, referring to the accounting practice known as variable consideration.[17]  FE-3 explained that, although the $33 million charge due to non-payments from customers that ZoomInfo revealed upon reporting its Q2 2024 financial results in August 2024 came out of the blue, the underlying causes of the charge had been an issue for years and years and should have been addressed in a much earlier point.

138.    Moreover, ZoomInfo did not even have a variable constraint model in place to assess collectability.  Indeed, ZoomInfo did not use any variable constraint model analysis—as required by GAAP—during the Class Period.

139.    For example, according to FE-3, the Accounts Receivable team wasn't applying the proper accounting guidelines, including developing a variable constraint model to understand what the likelihood of collecting was.  According to FE-3, "variable constraint" was "not being applied correctly" and that the Company had been dealing with the issue "for years."

140.    FE-3 explained that ZoomInfo also was selling to accounts that had a high risk of collectability, which also tied into the variable constraint calculation.  As the company grew, no one was actually paying attention to the necessity of actually collecting the cash, FE-3 said.  According to FE-3, when you're dealing with that much money of collections, you need to be able to very accurately predict down to 1 or 2 percent, plus or minus, what you're going to get in the actual door.  However, FE-3 continued, that's more of a rule of thumb.

---

[17] A variable constraint analysis relies on the concept of variable consideration.  Variable consideration refers to parts of a contract's price that change depending on future events or conditions.  These, and other factors, refer to the assessment of how likely a company is to actually receive payment on a given contract.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    38

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

141.    Worse, Defendants further inflated RPO by not writing down bad debt for accounts that Defendants knew to be uncollectable or delinquent.  Instead, Defendants misleadingly counted revenue from accounts that were hundreds of days into delinquency—and therefore certain not to be collected—in the RPO figures it reported to investors.  Specifically, ZoomInfo allowed delinquent accounts to sit on the Company's books as accounts receivable **for months**—which demonstrated that the Company would never collect revenue on these contracts.

142.    For example, according to FE-3, for each account there was accounts receivable information available for "different buckets" in relation to the age of the accounts receivable balance associated with that account.  According to FE-3, there were buckets for account receivables that increased in 30-day increments (30, 60, 90, etc.) and once an account reached 60 days delinquent that it became "much more concerning" and there was an increase in doubtfulness around collectability.  FE-3 recalled that there were not timely updates to the delinquency of payments which was a problem because customers were offered access to ZoomInfo's products without a requirement of upfront payment.  According to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

143.    Throughout the Class Period, by manipulating RPO, Defendants misled investors regarding the risk associated with its purported sales growth quarter-over-quarter.  By reporting robust RPO numbers, ZoomInfo painted a picture of a healthy company with predictable future revenue when in reality that revenue was based on customers that were signed **using no due diligence whatsoever** and therefore known to have significant collectability risk and much of which should have been written off.

| Date | Reported RPO |
|------|--------------|
| November 13, 2020 | As of September 30, 2020, Total RPO were *$457.6 million*, of which, *$349 million* were expected to be recognized within one year. |
| February 26, 2021 | As of December 31, 2020, Total RPO were *$559 million*, of which, *$432.2 million* were expected to be recognized within one year. |

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    39

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

| May 3, 2021 | As of March 31, 2021, Total RPO were **$591.6 million**, of which, **$461.3 million** were expected to be recognized within one year. |
| August 2, 2021 | As of June 30, 2021, Total RPO were **$648.1 million**, of which, **$505.2 million** were expected to be recognized within one year. |
| November 1, 2021 | As of September 30, 2021, Total RPO were **$712.3 million**, of which, **$552.2 million** were expected to be recognized within one year. |
| February 25, 2022 | As of December 31, 2021, Total RPO were **$864.4 million**, of which, **$671.5 million** were expected to be recognized within one year. |
| May 2, 2022 | As of March 31, 2022, Total RPO were **$917.6 million**, of which, **$715.0 million** were expected to be recognized within one year. |
| August 1, 2022 | As of June 30, 2022, Total RPO were **$984.7 million**, of which, **$764.2 million** were expected to be recognized with one year. |
| November 1, 2022 | As of September 30, 2022, Total RPO were **$978.8 million**, of which, **$756.9 million** were expected to be recognized within one year. |
| February 16, 2023 | As of December 31, 2022, Total RPO were **$1,106.7 million**, of which, **$842.2 million** are expected to be recognized within one year. |
| May 1, 2023 | As of March 31, 2023, Total RPO were **$1,092.5 million**, of which, **$839.2 million** were expected to be recognized within one year. |
| July 31, 2023 | As of June 30, 2023, Total RPO were **$1,110.9 million**, of which, **$848.7 million** were expected to be recognized within one year. |
| October 30, 2023 | As of September 30, 2023, Total RPO were **$1,056.7 million**, of which, **$795.2 million** were expected to be recognized within one year. |
| February 15, 2024 | As of December 31, 2023, Total RPO were **$1,152.9 million**, of which, **$856.4 million** were expected to be recognized within one year. |
| May 7, 2024 | As of March 31, 2024, Total RPO were **$1,133.4 million**, of which, **$837.8 million** were expected to be recognized within one year. |

144.    Investors also understood RPO to be a meaningful "proxy" of ZoomInfo's growing annual contract value, or ACV and, therefore, reflective of positive company health.  Indeed, as stated by Morgan Stanley on June 29, 2020, speaking of ZoomInfo's customers with high dollar

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    40

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

amount ACV, this number **will primarily indicate ZoomInfo's ability to get into larger and more complex sales organizations**."  Likewise, as Morgan Stanley put it, ZoomInfo's strong ACV reporting is "**indicative that existing customers are sticking around**."  Wells Fargo described ZoomInfo's high-dollar value ACV—investors understood RPO to be a proxy for—as "**relatively good indicators of the health of the business**."  Accordingly, throughout the Class Period, Defendants manipulated RPO figures, as well as omitted and concealed from investors an undisclosed financial risk.

### D.  Defendants Falsely Assured Investors that ZoomInfo's Demand and Growth Were Intact

145.    The Class Period begins on November 10, 2020.  The day prior, ZoomInfo released its earnings for its third quarter of 2020 and held an associated earning's call.  During the call, Defendant Hyzer stated that: "[w]ith respect to liabilities and future performance obligations, unearned revenue at the end of the quarter was $176 million.  ***And remaining performance obligations were $458 million, of which, $349 million are expected to be delivered in the next 12 months***."

146.    However, Defendants' statement was false and misleading because ZoomInfo's calculation of RPO was materially overstated.  Specifically, to conceal that ZoomInfo did not perform any due diligence into its customers' ability to pay, Defendants did not do a variable constraint analysis—as required by GAAP—to determine the likelihood that ZoomInfo would fail to collect full contract value from its customers.  Moreover, Defendants further inflated RPO by not writing down bad debts for accounts that were proven uncollectable accounts and, instead, misleadingly counted revenue from those accounts in its RPO financial figures.  Accordingly, ZoomInfo's complete failure to take into account the likelihood (and in many cases certainty) of non-collection on its contracts, and reporting RPO without factoring in a required analysis, Defendants misled investors to believe that the Company was collecting more revenue than was true.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                41

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

147.    Moreover, on the same earnings call, Defendant Schuck touted that, "*because of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for our customers spending over $100,000 a year with us, we are raising our financial guidance for the full year*."

148.    However, Defendants' statement was false and misleading because ZoomInfo's "*record quarterly new sales*," "*across all areas of the business*" that supposedly drove the Company's fiscal year guidance were driven by sales achieved through a systemic directive to close deals quickly without vetting customers. As such, Defendants' statement raising guidance as a result of its record sales omitted a known financial risk—nonpayment by customers that were never vetted for their ability to satisfy their financial obligations to the Company.

149.    Analysts reacted positively to ZoomInfo's false assurances. For example, Canaccord reported that ZoomInfo's "**unparalleled combo of growth and profits carries on**," citing key takeaways from Defendants' statements that "the demand environment remains healthy as COVID-19 has put an emphasis on go-to-market agility and resource efficiency," and that "ZoomInfo can **sustain growth rates well north of 30% for at least the next couple of years, solidly ahead of consensus** which . . . is generally a **good thing for stock-price performance**."

150.    Later that month, on November 18, 2020, Defendants attended the RBC Capital Markets Global Technology, Internet, Media, and Telecommunications Conference. During the conference, an analyst with RBC asked Defendant Schuck to speak on the impact of a potential COVID-19 vaccination on ZoomInfo's business. Defendant Schuck rejected the idea that vaccinations and the resumption of in-person activities would depress demand for ZoomInfo's products. Indeed, Defendant Schuck stated, "*we don't view a world where customers kind of like come out of – get vaccines and go, oh, well, let's just go back to this really inefficient way to go-to-market where we're not leveraging data and insights and technology to do that. . . . that shift is here to stay*." In so stating, Defendant Schuck falsely communicated to investors that the COVID-19 pandemic was not a fleeting surge in demand for its products but, rather, had merely accelerated the utility and longevity of ZoomInfo's platform.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    42

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

151.    Defendants' knowledge of ZoomInfo's financial performance is undeniable. For example, during a podcast on March 14, 2024, Defendant Hyzer, when asked about the financial figures that ZoomInfo "report[s] to the street" (i.e., RPO), responded stating "**[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about**." Additionally, on February 26, 2021, in the Company's 10-K for the fiscal year of 2020, Defendant Schuck was designated as the chief operating decision maker ("CODM"), who "reviews financial information for purpose of making operating decisions, assessing financial performance and allocating resources." Numerous FEs also confirmed that they saw Defendants review and report on various internal Company metrics including account health and market share.

152.    Armed with this significant inside knowledge about the Company's true performance, Defendants embarked on a media circuit in December, attending numerous investor conferences touting ZoomInfo's false narrative of sustainable growth and steady cash collection. As investors bought into Defendants' false narrative and ZoomInfo's stock price climbed, Defendants began offloading hundreds of millions of dollars in their personal holdings of ZoomInfo stock.

**E.    As ZoomInfo's Stock Price Soared, Defendants Dumped Their Shares and Profited by Over $1 Billion During the Class Period**

153.    Soon after making these false and misleading statements, with ZoomInfo stock trading at artificially inflated prices and following the expiration of the lock-up period on December 2, 2020,[18] Defendants began selling off their shares. In particular, Defendant Schuck began selling blocks of his shares on December 15, 2020, steadily dumping shares each month. **During the Class Period, Defendant Schuck sold 21,345,375 shares of ZoomInfo stock, for proceeds of <u>approximately $1.1 billion</u>.**

154.    Moreover, as part of their scheme and to disguise their insider sales, just after the start of the Class Period, Defendants entered into Rule 10b5-1 trading plans that allowed them to

---

[18] According to the Form 424B4 filed with the SEC on June 5, 2020 (the "Prospectus"), Defendants agreed not to dispose or sell their shares of Class A common stock for a period of 180 days after the date of the Prospectus.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    43

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

sell their stocks at a predetermined time during the Class Period.[19]   However, Defendants implemented their plans when they were already in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth and customer demand. For example, Defendants Schuck, Hyzer, and Hays knew that COVID-19 had only created a temporary surge in demand for the Company's product and saw internal metrics and reports showing that this demand was subsiding as the impacts of the pandemic began to recede. *See supra* Sections IV.B. and IV.F. Likewise, Defendants Carlyle Group, TA Associates, and DO Holdings, through their power and control over the Company, were aware of and/or had access to such information.

155.   Given their knowledge of this material nonpublic information, Defendants continued to keep the price of ZoomInfo's stock artificially inflated by misleading investors about the Company's growth and customer demand while selling hundreds of millions of dollars' worth of ZoomInfo stock.

156.   As detailed below, throughout the Class Period, Defendants made misrepresentations and omissions concerning the sustainability of the Company's growth and customer demand.  Shortly after each of these false and misleading statements and omissions, Defendants unloaded **more than $8.6 billion** in insider trades in total.  Specifically, Defendant Schuck unloaded **approximately $1.1 billion** worth of shares, including the sale of shares through his investment vehicle, Defendant DO Holdings; Defendant Hyzer sold **more than $35 million** worth of shares; Defendant Hays sold **over $66 million** worth of shares; and Defendants Carlyle Group and TA Associates collectively sold **more than $7.5 billion** worth of shares.

---

[19] According to publicly available Form 4s, Defendant Schuck adopted his 10b5-1 trading plan "prior to November 30, 2020."  Defendant TA Associates adopted a plan on December 6, 2020. Defendant Carlyle Group did not discuss the adoption of a Rule 10b5-1 until they filed their Form 4 on June 22, 2021.  Defendant DO Holdings adopted a plan even later on September 15, 2021.

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

157.     Specifically, and as merely the first of many examples to follow, in December 2020, when ZoomInfo's stock was trading around $43 per share—more than double the Company's IPO price of $21 per share—Defendants made the following sales:

- On December 4, 2020, **without adopting a 10b5-1 plan**, Defendant TA Associates sold 6,859,327 shares, reaping **over $300 million** in proceeds, and Defendant Carlyle Group sold 11,817,596 shares for **approximately $518 million**.

- On December 7, 2020, **outside of his Rule 10b5-1 trading plan**, Defendant Hays sold 23,687 shares for $1,023,472.40.[20] Then, on December 11, 2020, Defendant Hays sold another 30,000 shares, totaling $1,242,606.60 in proceeds. Finally, on December 14, 2020, again **outside of his Rule 10b5-1 plan**, Defendant Hays sold yet another 17,241 shares, this time totaling $726,708.15 in proceeds.[21] In full, during December 2020, alone, Defendant Hays sold 70,928 shares for total proceeds totaling **$2,992,787.15**.

- On December 15, 2020, Defendant Schuck sold 400,000 shares, totaling **over $16 million** in proceeds.

- On December 22, 2020, Defendant Hyzer sold 90,950 shares for **more than $4 million** in proceeds.

**F.     ZoomInfo Concealed a Marketing Survey Revealing Drastic Erosion of the Company's Market Share**

158.     By 2021, unbeknownst to investors, ZoomInfo's declining demand had become a pervasive and threatening problem. Indeed, the results of a marketing survey revealed market share erosion that ZoomInfo's senior leadership concealed. Instead, Defendants continued to represent a false narrative of sustainable demand and growth to investors. This marketing survey confirms Defendants' knowledge that demand for ZoomInfo's products was known by Defendants to be unsustainable during the Class Period.

159.     Specifically, according to FE-11, she attended meetings every Thursday with Christopher Hays and Shane Murphy-Reuter to discuss the status updates on demand generation. FE-11 stated that, in 2021, she commissioned a marketing survey in partnership with a vendor to

---

[20] According to the Form 4, filed with the SEC on December 8, 2020, the shares were "sold to cover the Reporting Person's tax liability in connection with the vesting of the securities."

[21] According to the Form 4, filed with the SEC on December 16, 2020, the shares were "sold to cover the Reporting Person's tax liability in connection with the vesting of the securities."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    45

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

survey several thousand users to compare features of ZoomInfo and their competitors, including data quality and ease of use. FE-11 explained that the results of the survey showed that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed. FE-11 recalled that this was presented during a Thursday meeting that she had weekly with Hays and Murphy-Reuter, but it was "buried because it did not tell the story they wanted to tell."

160.    FE-11 added that ZoomInfo wouldn't realize that the competition was real. FE-11 added that this survey alluded to the declining market share held by ZoomInfo. According to FE-11, ZoomInfo no longer has the best data when previously, as DiscoverOrg, their data quality was what set them apart. FE-11 explained that ZoomInfo "scaled too big" and maintaining the quality of their datasets became more difficult. FE-11 explained that she also had meetings with [Defendant] Hays, former Chief Marketing Officer Shane Murphy-Reuter, and [Defendant] Schuck that occurred every few weeks during her 2021 tenure. FE-11 explained that she had expressed in these meetings that ZoomInfo's "gravy train of growth" was slowing down to the executives present. FE-11 explained that the "hyper growth" the Company had experienced was not going to last and the Company needed to admit that.

161.    As a result, as the Class Period continued, Defendants knew that ZoomInfo had two major problems: (1) a known financial risk of non-payment from customers that entered contracts with ZoomInfo without any due diligence into their ability to pay, and (2) declining demand for its digital marketing tools that would cut into its reported growth figures.

### G.    Defendants Continued Falsely to Assure Investors that ZoomInfo's Success Was Sustainable at the Same Time They Continued to Offload Their Shares of Company Stock

162.    As Defendants were reaping a significant profit by selling their shares of ZoomInfo stock, they continued to artificially prop up the Company's stock price by falsely representing stable demand to investors. For example, on the Company's February 22, 2021 Earnings Call, Defendant Hyzer touted ZoomInfo's "***record new customer additions and strong retention in***

*upsell activity in the fourth quarter*" and "***more than 20,000 customers representing greater than 35% growth relative to 2019.***"

163.    Hyzer's statements, however, were false and misleading because they failed to disclose the enormous financial risk associated with those customers based on the Company's wholesale failure to assess their ability to actually pay for their subscriptions.    Indeed, unbeknownst to investors, ZoomInfo's "***record new customer additions***" and "***20,000 customers***" were **completely unvetted for their ability to pay for their subscription contracts**.    Thus, Defendant Schuck's statements were false and misleading because they provided investors with metrics understood to reflect ZoomInfo's growing demand and profitability when, in reality, the figures concealed the risk of nonpayment by a significant proportion of ZoomInfo's customers.

164.    On May 3, 2021, Defendants again touted ZoomInfo's RPO figures by reporting "***remaining performance obligations, or RPO, were $592 million, of which $461 million are expected to be delivered in the next 12 months***."    However, as with previous quarterly reporting of its RPO, these financial figures were false and misleading because they failed to encompass the requisite analysis, pursuant to GAAP, to account for the likelihood of customer non-payment.    As FEs confirm, ZoomInfo's failure to vet customers before executing subscription contracts resulted in the Company extending its services to risky customers—particularly SMBs—without factoring the likelihood of collection into their RPO figures, thus presenting a falsely inflated accounting of ZoomInfo's revenue recognition.    Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**H.    Defendant Schuck Dumped Over $414 Million of ZoomInfo Stock While Continuing to Conceal the Known Risk of Non-Payment**

165.    Following a slew of Defendants' false assurances that the Company was seeing sustained growth and demand from all customer segments, ZoomInfo's stock price climbed higher, reaching $66.58 per share at the close of trading on August 5, 2021.    Defendants, however, continued to offload significant portions of their shares, with knowledge that the purported demand

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    47

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

and growth for their products was propped up by indiscriminately entering into contracts with customers that could not pay. Specifically, by August 5, 2021, Defendant Schuck had already unloaded 4.7 million shares, reaping **$234 million** in proceeds.

166.    Then, on August 6, 2021, the Company conducted a secondary offering (the "August 6 Secondary Offering") for the sale of 27 million shares of the Company's Class A common stock, pursuant to the Company's Registration Statement on Form S-3. Particularly, the August 6 Secondary Offering was a non-dilutive secondary offering, which allowed Defendants to sell their existing shares directly to investors, without issuing any additional shares. In connection with the August 6 Secondary Offering, Defendants made the following sales:

- **Outside of his Rule 10b5-1 trading plan**, Defendant Schuck sold 3,286,639 shares at an offering price of $54.75 per share, making **over $179.9 million**.[22]

- **Without adopting a Rule 10b5-1 trading plan**, Defendant TA Associates sold 9,625,934 shares over totaling **$527 million** in proceeds.[23]

- **Without adopting a Rule 10b5-1 trading plan**, Defendant Carlyle Group sold 9,236,692 shares making **over $505 million**.[24]

167.    Defendants continued to offload their shares when, on August 11, 2021, the Company conducted another secondary offering (the "August 11 Secondary Offering") for the sale of an additional 20 million shares of ZoomInfo stock. The August 11 Secondary Offering was also a non-dilutive secondary offering where Defendants sold their existing shares to investors in exchange for the proceeds from their sales. In connection with the August 11 Secondary Offering, and through open market shares, Defendants made the following sales:

- **Outside of his Rule 10b5-1 trading plan**, Defendant Schuck sold 2,545,328 shares at an offering price of $62 per share, profiting **over $157.8 million**. Then, on September 2, 2021, Defendant Schuck sold an additional 386,020 shares at $62 per

---

[22] Defendant Schuck was the indirect owner of the shares in question. Specifically, the shares were held directly by DO Holdings (WA) LLC, which was owned and controlled by Defendant Schuck and Kirk Brown. In total, DO Holdings (WA) LLC sold 5,920,821 shares in the August 6 Secondary Offering.

[23] TA Associates' trades were related to various investment funds associated with and controlled by TA Associates.

[24] Carlyle Group's trades were related to various investment funds associated with and controlled by Carlyle Group.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

48

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

share through exercising an over-allotment option, gaining an additional **$23.9 million** in proceeds.  In combination, Defendant Schuck sold 2,931,348 shares for proceeds of **$181 million**.

- **Without adopting a Rule 10b5-1 trading plan,** Defendant TA Associates sold 6,953,598 at an offering price of $62 per share, making **over $431 million** in proceeds.  Then, on September 2, 2021, Defendant TA Associates sold an additional 1,043,039 shares through exercising an over-allotment option, reaping **$64.6 million** in proceeds.  On the same day, pursuant to its Rule 10b5-1 trading plan adopted on December 6, 2020, Defendant TA Associates, through its affiliates and subsidiaries, sold an additional 991,362 shares for proceeds of **over $65 million** at an average price of $66.03 per share.  In total, Defendant TA Associates sold 8,987,999shares for proceeds of **over $560.6 million**.

- **Without adopting a Rule 10b5-1 trading plan,** Defendant Carlyle Group sold 7,401,220 shares at an offering price of $62 per share, making **over $458 million** in proceeds.  Then, on September 2, 2021, Defendant Carlyle Group sold an additional 1,035,891 shares through exercising an over-allotment option, profiting **over $64.2 million**.  In total, Defendant Carlyle sold 8,437,111 shares for proceeds of **$523.1 million**.

168.     Additionally, Defendants Hays and Hyzer made the following sales:

- On September 1, 2021, **outside of his Rule 10b5-1 trading plan**, Defendant Hays sold 1,702 shares, totaling **$108,883.72** in proceeds.[25]  On September 9, 2021, Defendant Hays sold 14,054 shares, totaling **$907,753.02** in proceeds.  Again, on September 10 and September 14, 2021, **outside of his 10b5-1 plan**, Defendant Hays sold 226,000 shares, totaling **approximately $14.5 million** in proceeds.  In full, during September 2021, Defendant Hays sold 241,756 shares for proceeds of **$15.5 million**.

- On September 15, 2021, **outside of his Rule 10b5-1 trading plan**, Defendant Hyzer unloaded 300,000 shares for **over $20 million** in proceeds.

169.     In total, this August and September 2021 frenzy of sales netted Defendants Schuck, Hays, Hyzer, TA Associates, and Carlyle Group **over $2.5 billion**, all while in possession of material, non-public information about the sustainability of the Company's customer demand and growth.

170.     And as of September 2, 2021, Defendant Schuck had pocketed **over $620 million** from selling 11,317,987 shares; by September 14, 2021, Defendant Hays had sold 466,664 shares,

---

[25] According to the Form 4, filed with the SEC on September 3, 2021, the shares were "shares sold to cover the Reporting Person's tax liability in connection with the vesting of the HSKB Units."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

49

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1    totaling **over $26.5 million** in proceeds; and by September 15, 2021, Defendant Hyzer had sold

2    474,343 shares, totaling **approximately $28.7 million** in proceeds.

3        **I.    ZoomInfo's Internal Tracking Systems Confirmed That Customers Were
            Not Using the Platform**

4

5        171.    Defendants knew that ZoomInfo's subscription contracts were risky and faced

6    serious collectability problems because they tracked customer usage.  Moreover, due to

7    ZoomInfo's "consumption-based revenue" model for its subscription contracts, investors also

8    understood that ZoomInfo's profitability depended on customers using the Company's products.

9    For example, FE-7 explained that low utilization rates were a "clear sign of trouble" and once

10   seeing these figures she could tell if the New Business group had signed up customers for "a lot"

11   of products that they were not going to use.

12       172.    Indeed, ZoomInfo's robust internal tracking systems confirmed this growing

13   problem of customers not using the Company's platform.  Numerous FEs recalled that ZoomInfo's

14   representatives had access to account health information through an online system called

15   Gainsight.  FEs explained that the figures from Gainsight were made visible to senior leadership

16   through other internal systems including Salesforce—platforms to support businesses' efforts to

17   manage their customer relationships.  Critically, this reporting assigned ZoomInfo's customers

18   scores and color coding based predominantly on how often the customer was logging in and using

19   ZoomInfo which sent an unmistakable signal to Defendants that declining usage rates and

20   collectability challenges were occurring in droves.

21       173.    For example, FE-8 recalled the ability to see notes regarding the health and risk

22   associated with specific accounts in ZoomInfo's customer relationship management (CRM)

23   platform, Gainsight.  According to FE-8, Gainsight housed information on all of ZoomInfo's

24   customer accounts.  FE-8 explained that ZoomInfo collected usage metrics directly from the

25   customer's platform and that information went to both Gainsight and Salesforce.

26       174.    FE-8 continued to explain that every account had their own Health Score that was

27   color-coded and designated as red, yellow, or green and this was calculated in Gainsight and visible

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    50

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

in the dashboard. According to FE-8, the overall Health Score was primarily determined by considering the number of active versus unactive licenses and customer sentiment. FE-8 added that customer sentiment was manually input by the representatives responsible for the account and based on conversations with customers. Similarly, according to FE-12, prior to contacting customers she was able to see account metrics in Salesforce to give her an idea of the account's health.

175.    FEs confirmed that Defendant Schuck and Hyzer interacted with the information set forth in Gainsight by presenting the color-coded scores in internal meetings. For example, FE-4, recalled quarterly All Hands Meetings typically led by current CEO Henry Schuck and former CFO Cameron Hyzer that also served as a "State of the Union" regarding customer account health. FE-4 further recalled that that the meeting included a "color coded box sequence" with "green fading into yellow, fading into red." FE-4 continued to say based on the customer health status displayed in these meetings that she thought to herself that the current status was "not where we [ZoomInfo] wanted to be." FE-4 recalled having customers that did not use ZoomInfo's product at all or only logged in once a month or went even longer in between logins. FE-4 explained that, if a customer had five to ten seats that there were one or two logging in. FE-4 described that "plenty had not done the basics" with respect to product usage. According to FE-4, it was likely that the percentage of total licenses on her book that were not logging into their ZoomInfo account was greater than 30-45%.

**J.      Defendants Schuck, Hyzer, and Hays Proceeded to Unload Another $344.8 Million Worth of Shares as the Company's Stock Price Reached New Highs**

176.    After lying to the market about the strength of the Company's customer demand, which sent the Company's stock price skyrocketing to a Class Period high of $77.35 per share at the close of trading on November 17, 2021, Defendants proceeded to unload even more of their shares at an unprecedented pace. Notably, in November 2021 alone, Defendant Schuck sold

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    51

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

3,727,028 shares at an average price of $69.64 per share, reaping **over $258 million**, which brought his total gains to **over $879 million**.[26]

177.    And by the end of 2021, Defendant Hyzer had sold 504,343 shares for **over $30.8 million**, and Defendant Hays had sold 907,051 shares, totaling **over $56 million** in proceeds. Specifically, Defendants Hyzer and Hays made the following sales:

- On November 17, 2021, Defendant Hyzer sold 15,000 shares for proceeds of $1,150,779.50.  On December 17, 2021, Defendant Hyzer sold another 15,000 shares for proceeds of **$905,250**.  In total, Defendant Hyzer sold 30,000 shares for proceeds of **over $2 million**.

- From November 3 to November 29, 2021, Defendant Hays sold 195,728 shares for total proceeds of **$14 million**.  Then, from December 1 to December 27, 2021, Defendant Hays sold another 244,659 shares for proceeds of **$15 million**.  In combination, Defendant Hays sold 440,387 shares, totaling **$29 million** in proceeds.

### K.    ZoomInfo Coerced Renewals from Customers to Maintain the False Appearance of Steady Revenue

178.    As the Class Period continued and the Company was losing SMB customers at a rapid pace, ZoomInfo pivoted from trying to boost sales to trying to force existing customers to renew.  These renewals were critical to maintaining the appearance of a successful Company.  Indeed, Defendants could create a public impression of continuing growth only if ZoomInfo retained its subscribers year-over-year in addition to adding new customers.

179.    As described in Sections IV.B. and IV.F., *supra*, ZoomInfo knew that it could not sustain demand for its products—particularly amongst SMB customers—many that posed great collectability risk as a result of the Company's lack of due diligence.  Accordingly, ZoomInfo resorted to adhesive and coercive auto-renewal provisions.  These provisions essentially forced customers to stay with ZoomInfo for another year, often at steeply increased prices and paying full price for concessions and add-ons extended during the prior year.  FEs also describe how ZoomInfo's attempts to enforce the auto-renewal provision entrapped customers and were met

---

[26] Defendant Schuck's sales from November 16, 2021 to November 30, 2021 were indirect sales and involved shares that he beneficially owned through Defendant DO Holdings.

with great resistance from customers—particularly SMBs—that were not able to pay, a problem created by ZoomInfo's failure to conduct initial due diligence.

180.    Defendants' plan to force renewals was simple.  First, entrap customers in an autorenewal, and then threaten them with litigation or turning them over to collection agencies. For example, FE-5, recalled that there were Account Managers who instructed her to not contact customers until their contract was 59 days away from ending. FE-5 explained that the deadline to opt-out was 60 days and by waiting the extra day it ensured the customer was locked into their renewal, which assisted Account Managers in meeting their quotas. Moreover, FE-10 continued to explain that she had seen the copy used for renewal opt-out e-mails and through discussions with colleagues, it appears that the Company purposely structured them with the hope that it would be caught in the user's spam filter and therefore missed.

181.    Defendants utilized these tactics and then dealt with the repercussions after, even though it was clear that the customer was not likely to pay for the autorenewal.  For example, FE-10 recalled discussions with colleagues where they noted that they felt like they were a collections agency for customers who did not want to continue their relationship after being locked into a renewal.  FE-9 further explained that auto-renewals were a common reason and SMB customers were prone to "ghosting" ZoomInfo.  FE-9 stated that issues with the auto-renewal policy contributed to "a lot of people not paying."

182.    Defendants' coercive practices around its auto-renewal clause allowed ZoomInfo to try and salvage some renewed subscriptions, particularly amongst SMB customers.  However, by forcing another year of customer subscriptions through these coercive practices, ZoomInfo further forestalled the inevitable consequences of its failure to perform due diligence into customers' ability to pay.

### L.    Defendants Continued to Mislead Investors Regarding ZoomInfo's Sustainability and Growth

183.    By 2022, Defendants' scheme resulted in ZoomInfo forcing many of its customers—particularly SMB and Mid-Market customers—into subscriptions that the Company

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    53

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

knew they were not using. Moreover, ZoomInfo's aggressive sales practices and lack of due diligence that led to these customer subscriptions—many that were signed on during the temporary pressures of the COVID-19 pandemic—fostered a significant likelihood that these customers would not pay ZoomInfo the full value of their subscription contracts. Despite the foregoing, Defendants continued their campaign to investors touting ZoomInfo's growing demand and record profitability.

184. Specifically, on February 15, 2022, Defendants continued to tout, "with respect to liabilities and future performance obligations, *unearned revenue at the end of the quarter was $364 million and remaining performance obligations, or RPO, were $864 million, of which $672 million are expected to be delivered in the next 12 months*." However, this statement was false and misleading because it referenced Defendants' RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP, specifically ASC 606, rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable and allowing these accounts to remain in accounts receivable for up to hundreds of days. For example, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### M. By October 31, 2022, Defendant Schuck Had Sold Over $936 Million Worth of His Personal Shares of ZoomInfo

185. By the end of October 2022, while in possession of material, nonpublic information, Defendants had already unloaded **nearly $8.5 billion** through their fraudulent scheme—specifically, Defendant Schuck dumped 16,137,040 shares for proceeds of **more than $936**

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    54                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1    **million**; Defendant Hyzer sold 564,343 shares for **more than $33 million** in proceeds; Defendant

2    Hays sold 1,104,466 shares totaling **more than $64.8 million** in proceeds; and Defendants Carlyle

3    Group and TA Associates sold 126,690,152 shares totaling **more than $7.5 billion** in proceeds.

4        186.    Aware that it was simply a matter of time before investors discovered the truth

5    about ZoomInfo's unsustainable and fraudulent growth metrics—Defendants had no choice but to

6    slowly reveal their revenue-related problems—while Defendants Schuck, Hyzer, and Hays

7    continued to offload an additional 1,349,440 shares totaling **$68.9 million** in proceeds,

8    specifically:

9        • From March 18, 2022 to June 6, 2022, Defendant Schuck sold 1,092,025 shares at
           an average price of $51.43 per share with a high of $61.02 per share on April 4,
10          2022, netting **over $57 million** in proceeds.

11       • From March 18, 2022 to October 10, 2022, Defendant Hyzer sold 60,000 shares
           at an average price of $48.83 per share with a high of $60.02 on March 23, 2022,
12          netting **over $3.3 million** in proceeds.

13       • From February 17, 2022 to October 3, 2022, Defendant Hays sold 197,415 shares
           at an average price of $45.59 per share with a high of $55.22 on March 1, 2022,
14          totaling **approximately $8.6 million** in proceeds.

15   **N.    The Truth Regarding ZoomInfo's Unsustainable Growth and Misleading
            Revenue Recognition Slowly Emerged**

16

17       187.    The truth began to emerge, through a series of partial disclosures beginning in late

18   2022 through mid-2024.  As 2022 ended, Defendants could no longer stem the tide resulting from

19   drastically diminished demand for ZoomInfo's products, coupled with mounting collectability

20   problems triggered by ZoomInfo's droves of subscription contracts with SMBs and Mid-Market

21   customers that ZoomInfo targeted and signed **without conducting any due diligence into the**

22   **customer's ability to pay**.

23       188.    Moreover, Defendants had used coercive auto-renewal tactics to effectively lock in

24   many of the SMB and Mid-Market customers that began their subscriptions in 2020, yet were now

25   fervently seeking to terminate their relationship with the Company.  All the while, investors

26   remained in the dark concerning not only the fact of this undisclosed financial risk but its extent

27   and severity.  Defendants further concealed the truth by failing to perform a requisite variable

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    55            BYRNES KELLER CROMWELL LLP
                                                            1000 Second Avenue, 38th Floor,
                                                            Seattle, WA 98104
                                                            Telephone: 206-622-2000 • Fax: 206-622-2522

constraint analysis with respect to its revenue metrics—which would have accounted for the likelihood of ZoomInfo not collecting the full value of its contracts.  Additionally, Defendants failed to write off delinquent accounts, instead allowing them to stay in accounts receivable. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

189.    Nevertheless, throughout the Class Period, ZoomInfo repeatedly represented to investors that the Company's growth was premised on sustainable demand and growth across all customer segments.  Moreover, Defendants' financial figures, specifically the Company's quarterly RPO metrics, gave investors the misleading impression that ZoomInfo's revenue was growing sequentially throughout the Class Period, which further entrenched investors into Defendants' false narrative that ZoomInfo's profitability was underpinned by a growing cohort of solvent customers.

190.    Defendants, knowing that ZoomInfo would be forced to come clean about its segment of customers that could not pay the full value of their contracts, released bits and pieces of the true cause of its financial decline over several months, to allow themselves to further reap a profit by selling their personal ZoomInfo shares.  In doing so, Defendants continued to conceal the full extent of the financial risk resulting from its failure to conduct due diligence into its customers' ability to pay.

### 1.    Defendants Revealed Increased "Scrutiny" By Customers During the Renewal Process on November 1, 2022

191.    On November 1, 2022, ZoomInfo disclosed that at the end of Q3 2022, the Company "saw a greater level of financial scrutiny from buyers, which further elongated sales cycles."  During the November 1, 2022 earnings call, Defendants cited a "challenging macroeconomic environment," and accordingly, cautioned ZoomInfo's investors to "expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    56

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

192.    In response to this news, the price of ZoomInfo's stock fell $12.69 per share, or approximately **29%**, to close at $30.81 per share on November 2, 2022.

193.    The market was surprised by this news of decelerating growth.  For example, analysts from Canaccord Genuity expressed concern, stating, "[w]ell, this wasn't the update that we were expecting to get from ZoomInfo. . . . where ZI seems to be seeing more pronounced headwinds is on seat count and data expansion growth, which played a key role in the net revenue retention gains that the business enjoyed in 2021." Canaccord Genuity further noted that "[t]aking a step back, ZoomInfo's lackluster Q3 came as a surprise, and we're therefore not shocked to see the stock down 20%+.  After all, management was pretty bullish at our conference in mid-August, and as late as mid-September at the Goldman event, the suggestion was that Q3 was not looking any worse than Q2."

194.    Despite this disclosure (and the resulting stock drop), Defendant Hyzer nonetheless continued to reassure investors by attributing ZoomInfo's growth deceleration to factors beyond the Company's control, stating that ZoomInfo would be adjusting its "cash flow expectations in the short term *to reflect the potential for more flexibility in payment terms related to a worsening macro environment*."  By pointing to macroeconomic factors as the purported reason that ZoomInfo's customers were looking for "more flexibility in payment terms," Defendants provided investors with a cause for ZoomInfo's declining performance that was not attributable to its ongoing failure to conduct due diligence into its customers, leading SMB and Mid-Market customer churn and the Company's undisclosed risk of customer nonpayment—based on these customers being unwilling or unable to pay for their contracts with ZoomInfo.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable and allowing these accounts to remain in accounts receivable for up to hundreds of days.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    57

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

195.     During the same call, Defendant Hyzer offered additional assurances to investors. For example, when analysts posed specific questions about the cause of the delayed renewal timeline, Defendant Hyzer said, "***gross retention continues to be really strong, over 90%***," and Defendant Schuck touted that ZoomInfo was "***continuing to see really strong demand. . . . what we're seeing is even though we're seeing a really strong demand environment, those deals are just taking longer to get to close***."  Defendants' statements were materially false and misleading because demand had markedly declined for ZoomInfo's products and its coercive auto-renewal measures contributed to inflated retention figures that did not accurately reflect customers committing to the continuation of their subscriptions with ZoomInfo—or their commitment to pay for them.

196.     Accordingly, the market absorbed Defendants' false assurances regarding the cause of ZoomInfo's surprising growth deceleration.   As analysts from Credit Suisse explained, "although ZoomInfo's near-term momentum has been negatively impacted by increasing macroeconomic uncertainty, we continue to believe in the need to modernize the B2B go-to-market stack—driving long-term growth for the CRM market as a whole and for ZoomInfo specifically."

197.     As a result, ZoomInfo's stock price remained artificially inflated, even after this news, as Defendants had yet to disclose the full extent of the financial consequences resulting from the Company's failure to perform due diligence when closing deals with new subscribers and unsustainable demand for ZoomInfo's products.

### 2.     Defendants Again Revealed Increased "Scrutiny" By Customers During the Renewal Process on November 16, 2022

198.     Shortly thereafter, on November 16, 2022, ZoomInfo's stock price again declined as Defendant Hyzer spoke at the RBC Global Technology, Internet, Media & Telecom Conference. During the conference, Defendant Hyzer further disclosed that increased customer scrutiny during the contract renewal process had continued into the fourth quarter and would negatively impact ZoomInfo's ability to grow its revenues in fiscal year 2023.  More specifically, Wall Street's

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              58

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

estimates were in the mid-20% range with respect to ZoomInfo's annual revenue growth figures but Defendant Hyzer indicated that growth would likely be in the "high teens."

199.     Specifically, Defendant Hyzer disclosed that "we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team, and we don't see that – and we continue to see that scrutiny in Q4."  Defendant Hyzer emphasized that "we don't see any evidence currently that that macroeconomic pressure is going to subside or turn around quickly or  . . . in the short term . . . . [I]f you look at doing 4% to 5% sequential growth each quarter in 2023 [] that would get you into something that's more like a high-teens growth rate."

200.     Reacting to the disclosure, analysts from Wolfe Research noted that "ZoomInfo's CFO, Cameron Hyzer, . . .  shocked many investors as he indicated 'high-teens growth' for FY23 makes sense vs. the mid-20%+ many on the Street were modeling."  Likewise, analysts from Bank of America Global Research reported that "[w]e find the timing of the new disclosure odd given the company reported its 3Q22 results just two weeks ago on 11/2/22, which raises the question if the selling environment has deteriorated further since."

201.     In response to this news, the price of ZoomInfo's stock fell from $31.69 per share on November 15, 2022, to $26.17 per share on November 17, 2022, or approximately **17%**, over a two-day trading period on above-average trading volume.

202.     Despite this disclosure (and the resulting stock drop), Defendant Hyzer nonetheless continued to reassure investors during the conference that the deceleration in ZoomInfo's growth was due to macroeconomic factors, rather than disclose the full impact of the Company's years of aggressive sales to customers without performing any due diligence regarding their ability to pay. Defendants also continued to conceal the full extent of the financial impact flowing from ZoomInfo's lack of due diligence into its customers' ability to pay for their subscription contracts, much of which was uncollectable and should have been written down.  For example, Defendant Hyzer stated, "as we started talking about in Q2, *we are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales cycles*.  In September, we

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                        59

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team." Defendant Hyzer's statements continued to conceal the full degree of ZoomInfo's financial problems.

203.    However, the market absorbed Defendant Hyzer's false assurances regarding the purported cause and severity of ZoomInfo's growth deceleration. As analysts at Credit Suisse explained, "[d]espite the near-term uncertainty in revenue growth, we expect the company to maintain its strong unit economics, which underscore ZoomInfo's strong free cash flow generation." Analysts at Wolfe Research explained the disclosure by stating, "based on our math this guidance, while below expectations, looks to be in line with how ZI and Cameron Hyzer have set initial numbers in the past. . . . it is also hard to believe that the business has broken in this short of a time period. Two days after the disclosure, analysts at Wolfe Research further explained Defendant Hyzer's disclosure by stating, "[t]he good news is that management is firm on the notion that the commentary at RBC was driven not by any incremental developments in the last two weeks in the business, and more by the fact that the Street was too high on numbers for CY23."

204.    As a result, ZoomInfo's stock price remained artificially inflated, even after this news, as Defendants had yet to disclose the full extent of the financial consequences resulting from the Company's failure to perform due diligence when closing deals with new subscribers and unsustainable demand for ZoomInfo's products.

### 3.    Fearing the Full Fraud Was Soon to Be Revealed, Defendants Quickly Dumped Additional Holdings

205.    By February 8, 2023, Defendant Schuck had sold 19,262,041 shares totaling **over $1 billion** in proceeds, but that was still not enough. Aware that the full truth was close to being revealed, Defendants Schuck and Hyzer continued to dispose their share in a last-ditch attempt effort to profit from their fraudulent scheme.

206.    On February 24, 2023, Defendant Schuck enacted a new Rule 10b5-1 trading plan that allowed him sell up to 6 million of his common stock shares between May and November 2023. Indeed, as ZoomInfo's stock price remained artificially inflated by the remaining fraud, in

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    60

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

June 2023, Defendant Schuck sold another 2,083,334 shares at an average price of $26.39 per share, netting **more than $55 million** in proceeds, which brought his total stock sales for the Class Period to **$1,076,913,259.75**.

207.    Similarly, from May 3, 2023 to July 5, 2023, Defendant Hyzer gained **$740,075.84** in proceeds from selling 30,000 shares at an average price of $25.19 per share; and on May 22 and June 20, 2023, Defendant Hays sold another 60,000 shares, totaling **$1.5 million** in proceeds and bring his total insider sales during the Class Period to **$66,384,804.82**.

### 4.    Defendants Revealed Declining Contract Values and Increased Customer Cancellations on July 31, 2023

208.    On July 31, 2023, ZoomInfo's poor financial results continued to slide beyond expectations as the Company issued a press release announcing ZoomInfo's financial results for its second quarter of 2023, ended June 30, 2023 ("2Q23 Press Release").  In the 2Q23 Press Release, the Company announced a decline in ZoomInfo's customers with high-value ACVs, for which RPO was a proxy. Specifically, Defendant Schuck stated "[o]ur customers[,] sales leaders who sit disproportionately in the software vertical are reducing spending in the context of a lower growth environment. For high-growth companies in particular, where the demand has been reduced and investors are expecting higher levels of profitability, these cuts have proved substantial[.]"  ZoomInfo also revealed that during the quarter it "saw continued elevated write-offs for our smaller customers."

209.    In response to this news, the price of ZoomInfo's stock fell from $25.57 per share on July 31, 2023, to $18.40 per share on August 2, 2023, or approximately **28%**, over a two-day trading period on above-average trading volume.

210.    The market reacted to the news with surprise.  For example, analysts from UBS Research noted that "ZI's 16% 2QF23 revs growth missed the guide (~1% short of mid-point) & it lowered its FY23 revs growth guide to 12% from 17% (implying a 3% 4QF23 exit growth rate vs. 12% prior). This was well below investor expectations & even short of the bear case for a modest guide down."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

61

211.    Despite this disclosure (and the resulting stock drop), Defendants nonetheless continued to reassure investors that these increased cancellations resulted from "*budgetary pressures and their corresponding downward pressure on renewals*." Moreover, Defendant Schuck assured investors that the Company's SMB segment in particular, remained strong. Defendant Schuck stated, "*[i]n the SMB segment, where we see lower price and lower quality competitors, we still see strong performance, with more pipeline created, higher win rates, faster close times, and higher ASPs. Metrics that also indicate our value proposition when compared to our competition remains obvious*."

212.    Unbeknownst to investors, however, ZoomInfo carried an undisclosed financial risk related to these very customers as a result of the Company's sales-at-any-cost strategy, which included signing these customers without any due diligence into their ability to pay their contractual obligations.  Defendant Schuck also assured the market that, overall, the Company was retaining customers but continuing to see elongated renewal cycles, stating "we do expect gross retention to tick down a little, but more of the net retention in terms of our expectation is being impacted by fewer upsells and more downsells. *So it's more we're keeping those customers, but we're seeing the renewals being more challenging*. And so yeah, I think that's the real focus with respect to gross retention in 2023."  However, Defendants continued to mislead the market by omitting that a large segment of its customer base—particularly SMBs—had been locked into previous renewals for subscriptions that ZoomInfo knew they could not pay but were nevertheless counting as a way to inflate its RPO figures, much of which should have been written off.

213.    Analysts with Barclays responded to Defendants' assurances, stating, "**[w]e see this more as a reflection of the market rather than a ZI specific issue**. Prior guidance assumed that we would see an acceleration as we lapped downsells from last year. However, it appears those downsells are continuing, even in customers that already cut spend last year. Management commentary suggested that it is trying to control the controllable by working with customers to be more strategic pre-renewal[.]"  Morgan Stanley similarly took management's assurances to mean that ZoomInfo's "[w]eakness is concentrated particularly in mid-market software companies that

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    62

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

face outsized pressure to reduce their expense profiles and must digest incrementally negative outlooks relative to their view during the year-ago renewal process as peak pessimism in software likely did not occur until 1Q23."  Indeed, Morgan Stanley specifically addressed ZoomInfo's positive remarks regarding its SMB customer segment, stating "**we are encouraged by relative stability in gross retention and competitive win rates particularly in the SMB customer segment with greater competition**."

214.    As a result, ZoomInfo's stock price remained artificially inflated, even after this news, as Defendants had yet to disclose the full extent of the financial consequences resulting from the Company's failure to perform due diligence when closing deals with new subscribers and unsustainable demand for ZoomInfo's products.  Defendants had also not fully disclosed the extent to which the Company's years of inflating RPO, including through failing to write off debt that had become uncollectable, had impacted ZoomInfo's growth and profitability.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**5.    Defendants Revealed a Large Pool of Small Business Customers That Exhibited "Weakness" During Renewals, Causing Net Revenue Retention to Decline on May 7, 2024**

215.    On May 7, 2024, ZoomInfo's poor financial results continued to slide beyond expectations as the Company revealed that ZoomInfo had a large pool of small business customers that exhibited "weakness" during renewals in the period.  Specifically, Defendant Schuck stated that "[a]s it relates to net revenue retention, in the quarter our SMB business continued to be challenged and performed worse than prior periods," which caused net revenue retention to decline sequentially to 85% from the 87% reported in the fourth quarter.[27]  Defendant Hyzer further revealed that SMB "weakness" impacted ZoomInfo in Q1 due to the "higher or larger pool of renewals coming in."  Relatedly, Defendant Hyzer also disclosed that ZoomInfo had made a "shift

---

[27] Net Revenue Retention ("NRR") is a metric that measures how much revenue a company keeps from its existing customers over a specific period of time.

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

to be more selective in the deals that we're pulling in" within the SMB cohort to "help us remove some of the headwinds around write-offs." As a result, ZoomInfo reduced its annual revenue guidance from range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

216. Analysts from Piper Sandler Research were shocked, reporting "Our patience has worn thin in waiting for a fundamental recovery at ZI on further erosion across the cohort of SMB and mid-market customers that has been spotty for the past two years but is now showing further signs of another leg down."

217. On this news, the price of ZoomInfo's stock fell from $16.02 per share on May 7, 2024, to $12.14 per share on May 8, 2024, or approximately **24%**.

218. Despite this disclosure (and the resulting stock drop), Defendants nonetheless continued to conceal that the true cause of SMB and Mid-Market renewals weakness stemmed from the Company's wholesale lack of due diligence when signing customers and years of coercing renewals despite customers not using ZoomInfo's products. Indeed, when an analyst asked for more detail on the cause of SMBs' "weakness," Defendant Schuck stated, "[i]t is fundamentally down-market. We're seeing much more of a macro effect than a competitive effect. Specifically, as it relates to competition, we've not seen a material change in the competitive landscape or an increased impact to our business from competitors." However, Defendants knew in 2021 that its market share was drastically eroded by an influx of low-cost competitors.

219. Moreover, during the same earnings call, Defendants continued to mislead investors by attempting to cabin its problems with its SMB cohort to a far more recent timeframe, specifically the first quarter of 2024. However, as FEs explained, ZoomInfo knew of the problems stemming from its failure to vet customers when onboarding droves of SMB and Mid-Market customers years prior. Nevertheless, Defendant Hyzer stated, "***SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months***."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

64

220.    However, this was false and misleading because the Company had, for years, failed to conduct any due diligence into its customers' ability to pay and in accordance with GAAP, and had reported RPO without accounting for that analysis nor writing off doubtful accounts or bad debt.  Moreover, Defendant Hyzer continued to conceal the true extent of elevated write-off level at the Company, stating that "**[w]e are now requiring a majority of smaller and more risky clients to pay via credit card or ACH at checkout, which should help drive an improvement in write-offs and allow us to capture the low end of the market more effectively**."

221.    Analysts responded to ZoomInfo's assurances, revealing that investors remained in the dark regarding ZoomInfo's undisclosed financial risk arising from its failure to conduct due diligence when onboarding customers.  For example, analysts from Citi echoed management's false attribution of specific timing and uncertainty surrounding its problems with the Company's SMB cohort, noting "seems like things are starting to slow down a bit more for SMBs than start of year," that it "[c]an't attribute SMB weakness to any particular execution changes," and is "not sure why they saw a bigger down-tick in 1Q than in 2023."  Jefferies further explained that "we believe the truth is the environment has simply gotten tougher . . . we just don't see much more downside . . . if mgmt's commentary is to be believed, signs of stabilization abound."

222.    As a result, ZoomInfo's stock price remained artificially inflated, even after this news, as Defendants had yet to disclose the full extent of the financial consequences resulting from the Company's failure to perform due diligence when closing deals with new subscribers and unsustainable demand for ZoomInfo's products.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable and allowing these accounts to remain in accounts receivable for up to hundreds of days.  For example, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

223.    Shortly after Defendant Hyzer's misrepresentation and before the full fraud was revealed, on July 9, 2024, Defendant Hyzer made a final sale of 7,500 shares, totaling **$92,775**, bringing his total insider sales during the Class Period to **$35,110,546.20**.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                65

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1

2

**O.    The Truth Is Fully Revealed on August 5, 2024, When ZoomInfo Incurs a $33 Million Charge Due to Customer Non-Payment and Is Forced to Implement a "New Business Risk Model" to Reduce Write-Offs**

3

224.    Finally, on August 5, 2024, Defendants revealed that ZoomInfo was incurring a

4

$33 million charge because "[d]uring the quarter, the company made a change in estimates related

5

to the collectability of receivables from customers and changed operational procedures to require

6

upfront pre-payment for services from certain smaller customers."  ZoomInfo decreased its

7

revenue guidance by approximately $65M following the disclosure.  Moreover, the charge was

8

material from an accounting standpoint because Defendants' inclusion of uncollectable contracts

9

in prior periods allowed ZoomInfo to beat both Wall Street and internal guidance.

10

225.    During the earnings call on the same day, Defendant Schuck further explained that

11

elevated level of write-offs was the driver behind the $33 million charge.  Specifically, "**in 2022**

12

**and 2023, [the Company] extended credit to a higher mix of SMB customers, and the rate of**

13

**non-payment by these customers increased throughout the past 24 months**."

14

226.    The Company also abruptly announced the departure of Defendant Hyzer, who had

15

been with the Company for over six years and was instrumental to the Company's early growth.

16

In particular, Defendant Hyzer would "transition to serve in an advisory capacity until October 7,

17

2024 to facilitate a seamless transition[,]" and the Company appointed Vice President of FP&A,

18

Michael O'Brien as the interim Chief Financial Officer.

19

227.    Likewise, analysts from Piper Sandler were surprised by the sudden charge,

20

reporting that "**[u]nexpected write-offs impacted outlook.** A $33M non-cash charge related to

21

the collectability of previously recognized revenue (primarily within the SMB segment) resulted

22

in a downward revision to estimates." The next day, analysts from Needham & Co also reported

23

that "**the magnitude of the more recent write-down and lowered guidance is surprising**."

24

228.    In response to this news, ZoomInfo's stock fell from $9.80 per share on August 5,

25

2024, to $8.01 per share on August 6, 2024, or approximately **18%**.

26

229.    Tellingly, following the disclosure, on August 7, 2024, Defendant Schuck

27

**purchased 1.5 million shares of ZoomInfo** while ZoomInfo shares were trading at a rock-bottom

28

price of $8.49 per share—nearly 80% below the Class Period highs that Defendant Schuck profited off of when he was selling off his shares.

## V.    POST-CLASS PERIOD DEVELOPMENTS

230.    After the Class Period, and mere days after Defendants' final corrective disclosure, on August 13, 2024, Defendants admitted that the revenue and bad debt charge stemmed from "**a higher risk of non-payment than we had previously estimated**."  Defendants' admission made clear that the Company's failure to perform due diligence when signing customers up for subscription contracts led to the corresponding decline in ZoomInfo's stock price.

231.    On August 13, 2024, Defendants attended the Canaccord Genuity Growth Conference and spoke extensively about the financial results for 2Q 2024 and the $33 million accounting charge.  For instance, Defendant Schuck admitted the root cause of the charge was that "**[ZoomInfo] extended credit historically to customers who weren't creditworthy.**"  Likewise, Michael O'Brien, the succeeding and current CFO, acknowledged:

> **In June [2023], the receivable cohort that began to progress through actually had a higher risk of non-payment than we had previously estimated . . .** [A]nd we applied that increased estimate to all the other cohorts that were progressing though the aging at that time.  That's what led to the revenue and bad debt charges you saw in our results in Q2.

232.    The aftermath of the $33 million accounting charge stemming from ZoomInfo's SMB customers continued into the rest of the quarters in 2024.  On November 12, 2024, ZoomInfo held an earnings call and announced the financial results for the third quarter ended September 30, 2024.  During the call, Defendant Schuck explained that the new business risk model "will remain a headwind to the optics of our growth in the coming quarters" and "[the Company] still [has] an elevated level of processing write-offs in Q3."  Defendant Schuck added that "[t]he SMB segment, particularly the lowest end of the SMB, continues to be challenged, particularly from a net retention perspective." Specifically, in the press release published on the same day, ZoomInfo disclosed a 3% decrease in the full year guidance for revenue.  Additionally, on December 3, 2024, during the UBS Global Technology & AI Conference, Michael Graham O'Brien commented that

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                      67

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

for 2025, "I'd expect the SMB pressure from lower retention levels, we've historically seen and kind of the intentional disqualification of some of that higher risk to weigh on or potentially impair growth when you look at RPO or bookings perspective."

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

233.   Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements falsely and/or misleadingly inflated and/or maintained the price of ZoomInfo's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

234.   Throughout the Class Period, Defendants made a series of misrepresentations concerning the sustainability of ZoomInfo's growth and demand and accounting metrics affecting Company health.

### A.    November 9, 2020 – Q3 2020 Earnings Call and Press Release

235.   The Class Period begins on November 10, 2020, the day after ZoomInfo announced its financial results for the Q3 of 2020, for the period ended September 30, 2020. The day before, after market close, Defendants made various statements touting the growth of new customers and expansion to artificially inflate and/or maintain the price of ZoomInfo common stock. Defendants also set forth false and misleading financial figures, specifically RPO.

236.   For example, on November 9, 2020, Defendant Schuck and Defendant Hyzer appeared on ZoomInfo's earnings call. In his opening statement, Defendant Schuck touted the level of success the Company allegedly saw throughout the quarter. Specifically, Defendant Schuck stated:

> ***Because of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for – our customers spending over $100,000 a year with us***, ***we are raising our financial guidance for the full year***.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    68

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

237.    Defendants' November 9, 2020, statement referenced in Paragraph 236 was materially false and misleading because, as set forth in Section IV.B, *supra*, Defendants failed to disclose that ZoomInfo's purported "*[s]trength . . . across all areas of the business*" was driven by Defendants' fraudulent scheme to drive up sales quickly and at any cost by closing customer contracts **without conducting any due diligence into its customers' ability to pay**. This scheme caused ZoomInfo to sign broader amounts of risky SMB and Mid-Market customers with an increased likelihood of collectability problems.    Moreover, Defendants' statement falsely conveyed that ZoomInfo's purported "*[s]trength . . . across all areas of the business*," was the cause of its "*record quarterly new sales*," "*record engagement levels*," and "*new high watermark*," in customer spend, which was false and misleading because the true driver of ZoomInfo's sales results was Defendants' directive to close deals at any cost, including foregoing any vetting of customers' ability to satisfy their payment obligations to the Company.

238.    Moreover, Defendants' statements were false and misleading because they knew that ZoomInfo's "*record quarterly new sales*," were not sustainable and carried an undisclosed financial risk.  Notwithstanding, Defendants touted that ZoomInfo's purported "*[s]trength . . . across all areas of the business*," caused the Company to raise its guidance for the full fiscal year, without revealing the undisclosed financial risk flowing from the Company's lack of due diligence. Defendants knew that ZoomInfo captured these sales results during a period of fleeting demand stemming from the COVID-19 pandemic, which allowed the company to sign broad amounts of unvetted SMBs and Mid-Market businesses that were desperate to keep their livelihoods afloat. Defendants knew not only that this demand was temporary, but that it was also underpinned by the fact that ZoomInfo's customer base contained droves of businesses from whom ZoomInfo was unlikely to ever collect cash.  Nevertheless, Defendants touted a "*new high watermark*" of customer contract "*spending*," which was false and misleading in light of the Company's knowledge that the customers purportedly "*spending*" on these contracts had not actually spent any money and, may never actually make good on their payment obligations **at all** because they were never vetted for their collectability risk.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

69

239.    Supporting the falsity of Defendants' statement, as detailed above in Section IV.B, *supra*, multiple FEs confirmed that ZoomInfo did not perform any due diligence when signing customers.

240.    For example, according to FE-1, during her tenure at ZoomInfo, there were no discussions around due diligence and vetting prospective customers.  FE-1 added that ZoomInfo did not have any credit control procedures.  FE-1 explained that, at other similar companies she previously worked for, credit checks were conducted on prospective customers and included in their file, but at ZoomInfo no such checks were conducted to check credit or existing debts held by prospective customers.  FE-1 explained that the mentality was "get it done, we'll deal with it [any problems] later." FE-1 further recalled that the pressure on sales to get revenue and a lack of concern about customer legitimacy from superiors led to these issues.

241.    FEs further confirmed that sales during this time captured many SMB customers that posed a greater risk from a collectability standpoint in light of Defendants' directive not to conduct due diligence.

242.    Similarly, FE-10 explained that the mentality towards SMB customers in this group was "we don't care, just sign them on and achieve renewals," and an overall lack of care towards this cohort.  FE-10 added that the relationship with this cohort felt very transactional.  FE-10 explained that there was no credit check conducted and lack of concern regarding if a customer was a good company or not.

243.    Moreover, FEs directly tied the aggressive sales practice and lack of due diligence to customers defaulting on their payment obligations.

244.    For instance, according to FE-3, ZoomInfo's problem with non-payments from customers resulted from the company's aggressive sales incentives and culture, including CEO Henry Schuck's insistence that the company "just sell, sell, sell, sell" – and the company's rapid expansion upon its acquisition by DiscoverOrg.  FE-3 continued to say that the actions of the Company made the aggressiveness apparent, including not conducting credit checks on potential customers, not requiring upfront payment from customers, and not requiring more than a business

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              70

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

name and a business address to get a deal signed.    FE-3 explained that there were "no barriers" and "no constraints" placed on the Sales Team regarding which potential customers they could sell to.  FE-3 noted that ZoomInfo "sold to anyone with a pulse, basically."  According to FE-3, "[t]he entire length of the company, a decade, the entire thing is just sell – just sell, get that deal signed.  Does it mean we're going to collect the money?  No.  That's what was happening at a large scale here.  But it got out of control."

245.    Defendants knew that these risky and unsustainable sales were happening because the Company promoted internal policies that incentivized salespeople to sign customers without any due diligence and with no payment upfront so they could make a commission.  FE-4 explained that, for example, if a salesperson's quota is $1.1 million and they exceed that by a certain number they then get to a level called "Heater," which increased their commission on any additional business they did beyond that figure from 7% to 10%.  FE-4 continued to say that once salespeople reached "Heater" they would sell anything at any price point to take advantage.

246.    Other FEs recalled the similar problems.  For instance, throughout FE-3's tenure at ZoomInfo, it was very hard for the company to fully implement a policy of collecting payments upfront from customers, FE-3 said.  According to FE-3, this was in part due to the company's sales culture.  For example, FE-3 said, a hot shot sales guy might find a mom-and-pop business and land a $20,000 deal with them.  But, FE-3 continued, the business doesn't have the money to pay up front.  Still, FE-3 said, ZoomInfo would essentially decide, OK, well, you can just have this service anyway.

247.    FE-3 added that ZoomInfo's average contract size was about $15,000-20,000.  Usually, when talking about that contract size, companies require payment upfront, FE-3 said.  Then, FE-3 said, on her side of the business – the accounting side – she and her colleagues had to technically recognize the deal as revenue because it's on paper and there was a "contract."  "But we're rolling our eyes – when we see this stuff, we're like, 'Are we ever going to see that money?'" FE-3 said.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                             71

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

248.     FEs also describe how the Company knew and understood internally that ZoomInfo's SMB customer class—which had dramatically expanded as ZoomInfo capitalized on businesses' desperation during the COVID-19 pandemic to keep their livelihoods afloat—would contract as the pandemic receded.

249.     FE-13 explained that, like for other companies in the tech industry, everything was great for ZoomInfo around the start of the COVID-19 pandemic.  However, as time went on, and as employees returned to the office across the country, FE-13 said it became increasingly difficult for ZoomInfo to retain business.  FE-13 explained that a lot of customers were reducing spend and many smaller businesses went out of business.

250.     Similarly, FE-11 continued to explain that even if the customers—SMB customers with contract values of $20,000 to $25,000 who interacted with ZoomInfo's digital advertisements on places like LinkedIn, Google, and Facebook—are signed on that they don't stick and go somewhere else for less after a year unless they are trapped by the auto-renewal policy.  FE-11 added that ZoomInfo had no means to maintain growth.

251.     Moreover, as Defendants saw the writing on the wall that the demand prompted by COVID-19 was drying up amongst its SMB customers, a crop of low-cost competitors further diminished these customers' demand for ZoomInfo.

252.     During the same November 9, 2020 earnings call, an analyst asked about the underlying drivers of ZoomInfo's revenue growth reported in the quarter.  In response, Defendant Hyzer claimed the Company's growth was "***broad-based***" across all customer cohorts and that expansion in existing client accounts "***continued to accelerate***," stating in pertinent part as follows:

> And I think ***one of the things that we continue to see throughout was that, the retention or expansion among our customers continue to accelerate month-over-month throughout the year.  So, again, broad based on both new sales and retention and across all of the different segments of customer segment that we serve.***

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

253.    Defendants' statement in Paragraph 252 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251 and as alleged in Section IV.B., *supra*.  Moreover, Defendants' statement was false and misleading because ZoomInfo's "*expansion*" did not accumulate "*month-over-month throughout the year*," because Defendants specifically took advantage of the COVID-19 pandemic to capture sales, particularly in its SMB and Mid-Market segments, by closing deals quickly without conducting due diligence.  As a result, Defendants' portrayal of consistent monthly gains portrayed stable growth to investors when, in reality, Defendants' growth came from a fleeting burst of demand, coupled with fraudulent sales practices. By touting that this purported "*month-over-month throughout the year*" growth was "*broad based . . . across all of the different segments of the customer segment that we serve*," Defendants further misled investors to believe that growth across its customer classes was not disproportionately distributed.  In reality, Defendants' aggressive sales practices, which were completely devoid of due diligence, resulted in heavily weighted growth in ZoomInfo's SMB and Mid-Market customer classes, which had a concealed financial risk by way of Defendants' undisclosed failure to vet its customers for their ability to pay.

254.    Additionally, during the same call, Defendant Hyzer stated that: "*With respect to liabilities and future performance obligations*, unearned revenue at the end of the quarter was $176 million *and remaining performance obligations were $458 million, of which, $349 million are expected to be delivered in the next 12 months*."

255.    Defendants' statements in Paragraph 254 was materially false and misleading because Defendants overstated ZoomInfo's RPO by failing to apply a variable constraint analysis, as required by GAAP, to determine the likelihood of collecting the full value of its contracts, as described in Paragraphs 237 through 251 and Sections IV.B. and IV.C., *supra*.  Defendants' statements were false in light of the Company's failure to perform due diligence on its contracts, as described in Section IV.B., *supra*.  Defendants did so to conceal the large amounts of unvetted customers in its subscriber base.  Accordingly, Defendants' statement representing a specific amount of "*future performance obligations*" or "*remaining performance obligations*" that would

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    73

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

be "***delivered in the next 12 months***" was false and misleading because ZoomInfo had not followed GAAP in making this determination. As a result, Defendants' statements misled investors to believe that ZoomInfo's RPO was higher than it was in reality and, accordingly, overstated the Company's revenue. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

256.    Defendants overstated RPO during the Class Period by not accounting **at all** for risky SMB contracts that it knew were almost certain not to be paid in full. For example, FE-3 stated that a key problem that preceded the $33 million charge ZoomInfo announced in August 2024 was the company's failure to follow very specific accounting rules on the need to predict the collectability of accounts by conducting a proper variable constraint analysis, referring to the accounting practice known as variable consideration.[28] FE-3 explained that, although the $33 million charge due to non-payments from customers that ZoomInfo revealed upon reporting its Q2 2024 financial results in August 2024 came out of the blue, the underlying causes of the charge had been an issue for years and years and should have been addressed in a much earlier point.

257.    Moreover, ZoomInfo did not even have a variable constraint model in place to assess collectability. Indeed, ZoomInfo did not use any variable constraint model analysis—as required by GAAP—during the Class Period.

258.    For example, according to FE-3, the Accounts Receivable team wasn't applying the proper accounting guidelines, including developing a variable constraint model to understand what

---

[28] A variable constraint analysis relies on the concept of variable consideration. Variable consideration refers to parts of a contract's price that change depending on future events or conditions. These, and other factors, refer to the assessment of how likely a company is to actually receive payment on a given contract.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    74

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1  the likelihood of collecting was. According to FE-3, "variable constraint" was "not being applied

2  correctly" and that the Company had been dealing with the issue "for years."

3      259.    FE-3 explained that ZoomInfo also was selling to accounts that had a high risk of

4  collectability, which also tied into the variable constraint calculation. As the company grew, no

5  one was actually paying attention to the necessity of actually collecting the cash, FE-3 said.

6  According to FE-3, when you're dealing with that much money of collections, you need to be able

7  to very accurately predict down to 1 or 2 percent, plus or minus, what you're going to get in the

8  actual door. However, FE-3 continued, that's more of a rule of thumb.

9      260.    Worse, Defendants further inflated RPO by not writing down bad debt for accounts

10  that Defendants knew to be uncollectable or delinquent. Instead, Defendants misleadingly counted

11  revenue from accounts that were hundreds of days into delinquency—and therefore certain not to

12  be collected—in the RPO figures it reported to investors. Specifically, ZoomInfo allowed

13  delinquent accounts to sit on the Company's books as accounts receivable for months—which

14  demonstrated that the Company would never collect revenue on these contracts.

15      261.    For example, according to FE-3, for each account there was accounts receivable

16  information available for "different buckets" in relation to the age of the accounts receivable

17  balance associated with that account. According to FE-3, there were buckets for account

18  receivables that increased in 30-day increments (30, 60, 90, etc.) and once an account reached 60

19  days delinquent that it became "much more concerning" and there was an increase in doubtfulness

20  around collectability. FE-3 recalled that there were not timely updates to the delinquency of

21  payments which was a problem because customers were offered access to ZoomInfo's products

22  without a requirement of upfront payment. According to FE-3, ZoomInfo was keeping customers

23  on the books as accounts receivable even though they were many months delinquent, up to 360

24  days, and such customers should have been written off as uncollectable.

25      262.    By manipulating RPO, Defendants misled investors regarding the risk associated

26  with its purported sales growth. By reporting robust RPO numbers, ZoomInfo painted a picture

27  of a healthy company with predictable future income when in reality that income was based on

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

75

customers that were signed **using no due diligence whatsoever** and therefore known to have significant collectability risk.

**B.      November 13, 2020 – Q3 2020 SEC Form 10-Q/A**

263.    On November 13, 2020, ZoomInfo released its amended SEC Form10-Q containing the financial results for Q3 2020, for the period ended September 30, 2020 ("3Q20 10-Q/A").  The 3Q20 10-Q/A reported the RPO as follows:

The remaining performance obligations consisted of the following (unaudited):

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2020 | $        349.0 | $        108.6 | $        457.6 |

264.    Defendants' financial figures referenced in Paragraph 263 were materially false and misleading for the reasons set forth Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of September 30, 2020, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable and allowing these accounts to remain in accounts receivable for up to hundreds of days.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**C.      November 18, 2020 – RBC Capital Market Conference**

265.    On November 18, 2020, Defendant Schuck participated in a conference call at the RBC Capital Markets, Global Technology, Internet, Media and Telecommunications Conference.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    76

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1   In the interview, an analyst directly asked Defendant Schuck to speak on the "COVID impacts"

2   on ZoomInfo, in particular and how vaccines stand to cause a "change in business trends for 2021."

3   In response, Defendant Schuck stated:

4           And so, *we don't view a world where customers kind of like come*
            *out of – get vaccines and go, oh, well, let's just go back to this*
5           *really inefficient way to go-to-market where we're not leveraging*
            *data and insights and technology to do that. So, we feel pretty*
6           *confident that shift is here to stay.*

7           266.    Defendants' statement in Paragraph 265 was materially false and misleading

8   because, contrary to their public statements touting that the "*shift is here to stay*," regarding the

9   sustainability of the demand for ZoomInfo's digital marketing products, Defendants were

10  engaging in sales tactics that Defendants knew or recklessly disregarded would cause the

11  Company's customer base to contract once the demand driven by the COVID-19 pandemic

12  subsided, as set forth in Section IV.B., *supra*.

13          267.    Specifically, Defendants devised a scheme to inflate ZoomInfo's stock price by

14  rapidly expanding its subscriber base by signing customer contracts **without undertaking any**

15  **due diligence into those customers' ability to pay for the Company's products**.  In so doing,

16  Defendants created and concealed a financial risk of nonpayment that disproportionately affected

17  its SMBs and Mid-Market customers, many that could not afford ZoomInfo's costly subscriptions.

18  Unbeknownst to investors, Defendants exploited the COVID-19 pandemic to accelerate

19  ZoomInfo's sales to these types of unvetted, financially risky customers, that were responding to

20  temporary demand for digital marketing tools based on the ephemeral conditions of the COVID-

21  19 pandemic.  Accordingly, Defendants' statement that ZoomInfo does not "*view a world where*

22  *customers . . . go back*," was false and misleading in light of the fact that it knew customers—

23  particularly SMB and Mid-Market customers—would indeed "*go back*" once temporary business

24  closures and emergency funding subsided as the COVID-19 pandemic receded.

25          268.    As numerous FEs detail, as Defendants were engaging in these sales tactics, they

26  knew that ZoomInfo's customer base would contract as businesses reopened and traditional

27

28

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

marketing channels became available.  For example, FE-13 explained that, like for other companies in the tech industry, everything was great for ZoomInfo around the start of the COVID-19 pandemic.  However, as time went on, and as employees returned to the office across the country, FE-13 said it became increasingly difficult for ZoomInfo to retain business.  FE-13 explained that a lot of customers were reducing spend and many smaller businesses went out of business.

269.    Similarly, FE-11 continued to explain that even if the customers—SMB customers with contract values of $20,000 to $25,000 who interacted with ZoomInfo's digital advertisements on places like LinkedIn, Google, and Facebook—are signed on that they don't stick and go somewhere else for less after a year unless they are trapped by the auto-renewal policy.  FE-11 added that ZoomInfo had no means to maintain growth.

270.    Moreover, as Defendants saw the writing on the wall that the demand prompted by COVID-19 was drying up amongst its SMB customers, a crop of low-cost competitors further diminished these customers' demand for ZoomInfo.

271.    As a result, Defendants' statements were false and misleading because the Company knew that its growth captured during COVID-19 was temporary and premised on signing amounts of vulnerable customers without conducting due diligence into their ability to pay.

**D.    February 22, 2021 – Q4 2020 and Full Year 2020 Earnings Call**

272.    On February 22, 2021, ZoomInfo released its financial results for Q4 2020, for the period ended on December 31, 2020, and the full 2020 fiscal year.  In the related earnings call that was held on February 22, 2021, Defendant Hyzer stated:

> *We saw record new customer additions and strong retention in upsell activity in the fourth quarter. As of December 31, we have more than 20,000 customers representing greater than 35% growth relative to 2019*, and more than 850 customers . . . with $100,000 or more in ACV representing greater than 45% growth.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    78

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

273.    Defendants' statements in Paragraph 272 were materially false and misleading because ZoomInfo's customer base carried an undisclosed financial risk as a result of the Company selling subscriptions to unvetted customers.  This practice, described in Section IV.B. and IV.C., *supra*, resulted in ZoomInfo failing to assess the greater likelihood of nonpayment from customers, which predominantly affected its SMB and Mid-Market customer segments.   As a result, Defendants' statement that ZoomInfo "*saw record new customer additions and strong retention in upsell activity*" and "*have more than 20,000 customers representing greater than 35% growth relative to 2019*" was false and misleading because it omitted or failed to disclose the financial risk associated with those customers based on the Company's wholesale failure to assess their ability to actually pay for their subscriptions.

274.    During the same earnings call, Defendant Hyzer also discussed the Company's RPO, stating: "*With respect to liabilities and future performance obligations,* unearned revenue at the end of the quarter was $223 million [and] [t]he *remaining performance obligations or RPO were $559 million, of which, $432 million are expected to be delivered in the next 12 months*."

275.    Defendants' financial figures referenced in Paragraph 274 were materially false and misleading for the reasons set forth in Paragraphs 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of December 31, 2020, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    79

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

E.  **February 26, 2021 – SEC Form 10-K**

276.  On February 26, 2021, ZoomInfo released its SEC Form 10-K which included the financial results for the full fiscal year of 2020 which ended on December 31, 2020 ("FY20 10-K").  The FY20 10-K reported the RPO as follows:

The remaining performance obligations consisted of the following (in millions):

|  | Current | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2020 | $ 432.2 | $ 126.8 | $ 559.0 |
| As of December 31, 2019 | $ 266.6 | $ 74.1 | $ 340.7 |

277.  Defendants' financial figures referenced in Paragraph 276 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of December 31, 2020, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    80

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

F.    **March 2, 2021 – JMP Securities Technology Conference**

278.    On March 2, 2021, Defendant Schuck participated in the JMP Securities Technology Conference.  During the conference, an analyst specifically asked Defendant Schuck to describe the cause of ZoomInfo's momentum in the fourth quarter of 2020.  In response, Defendant Schuck lauded the "***broad-based improvements***" that ZoomInfo saw across its business. Specifically, Defendant Schuck stated:

> Yeah, I mean I think what 2020 was by and large was a tale of two halves.  So you had the first half of the year which you know you felt a pretty significant headwind and in the second half of the year where ***you felt improvement throughout the second half***. And ***I think Q4, what you saw was that trend continuing***.  And so we saw broad improvements in performance across the business.  ***And so you had a record new sales number, you had record retention activity, we had record international revenue, we had record engaged revenue and so you really felt that all of the things that you invested in since the acquisition of ZoomInfo and through 2020 really paid off in Q4 and so that the results were pretty broad-based improvements across the business.***

279.    Defendants' statement in Paragraph 278 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251 and as alleged in Sections IV.B. and IV.C., *supra*. Moreover, Defendants' statement was false and misleading because Defendants knew that any purported "***trend***" or "***improvement***" that carried into the present fiscal quarter was belied by a marked decline in demand.  Indeed, ZoomInfo's declining demand was so pronounced that the Company undertook, and later concealed, the results of a marketing survey that confirmed the Company's erosion of market share.  These problems, of which Defendants were aware, rendered its statements touting the Company's "***record new sales number***" false and misleading.

280.    Defendants' statement is false in light of the fact that ZoomInfo's demand problems had become so pronounced that the Company commissioned, and later concealed, a marketing survey confirming Defendants' knowledge that demand for ZoomInfo's products was known by Defendants to be unsustainable during the Class Period.

281.    Specifically, according to FE-11, while at ZoomInfo she attended meetings every Thursday with Hays and Murphy-Reuter to discuss the status updates on demand generation.  FE-

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    81                BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

11 stated that, in 2021, she commissioned a marketing survey in partnership with a vendor to survey several thousand users to compare features of ZoomInfo and their competitors, including data quality, ease of use, etc.  FE-11 explained that the results of the survey showed that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed.  FE-11 recalled that this was presented during a Thursday meeting that she had weekly with Hays and Murphy-Reuter, but it was "buried because it did not tell the story they wanted to tell."

282.    FE-11 added that ZoomInfo wouldn't realize that the competition was real. FE-11 added that this survey alluded to the declining market share held by ZoomInfo.  According to FE-11, ZoomInfo no longer has the best data when previously, as DiscoverOrg, their data quality was what set them apart.  FE-11 explained that ZoomInfo "scaled too big" and maintaining the quality of their datasets became more difficult.  FE-11 explained that she also had meetings with Hays, Murphy-Reuter, and Schuck that occurred every few weeks during her 2021 tenure.  FE-11 explained that she had expressed in these meetings that ZoomInfo's "gravy train of growth" was slowing down to the executives present.  FE-11 explained that the "hyper growth" the Company had experienced was not going to last and the Company needed to admit that.

### G.    May 3, 2021 – Q1 2021 SEC Form 10-Q

283.    On May 3, 2021, ZoomInfo released its SEC Form 10-Q containing the financial results for Q1 2021, for the period ended March 31, 2021 ("1Q21 10-Q").  The 1Q21 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2021 | $ 461.3 | $ 130.3 | $ 591.6 |

284.    Defendants' financial figures referenced in Paragraph 283 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of March 31, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a

result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### H.    May 3, 2021 – Q1 2021 Earnings Call

285.    On May 3, 2021, Defendants held an earnings call after reporting strong financial results for the Q1 of 2021. Defendant Hyzer and Defendant Schuck made statements in which they exclaimed about the company's growth and strong demand.

286.    In his opening statement, Defendant Schuck touted the "durable growth" ZoomInfo was seeing. Defendant Schuck specifically stated:

> ***The first quarter was marked by strong accelerating growth across all of our business lines.*** We delivered GAAP revenue of $153 million, representing 50% year-over-year growth and 12% sequentially, when adjusted for the number of days in the quarter. Adjusted operating income was $66 million, representing an operating margin of 43%. These results were driven by dependable execution across the entire company, from new business to product development to retention. Our focus on continuous improvement as a core cultural value and the execution we build on top of that has allowed us to deliver our near-term financial results consistently, while setting us up for long-term durable growth.
>
> We had strong results across all areas of the business, and I want to specifically call out that ***we achieved our best ever Q1 results this quarter on three dimensions: new business, new customer additions, and retention activity.*** We doubled the number of new customers added this quarter compared to Q1 2020. ***We also had record renewals*** and upsells as a percentage of beginning ACV for a first quarter as we saw demand for our products continue to

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    83

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

accelerate, with company looking to drive a digital, data-driven go-to-market motion.

287.    Defendants' statement in Paragraph 286 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, and as alleged in Sections IV.B., IV.C., and IV.F., *supra*. Moreover, Defendants' statement was false and misleading because, by touting "***strong accelerating growth across all of our business lines***," Defendants omitted the growing loss of market share amongst its SMB cohort and worsening undisclosed financial risk by way of the Company's wholesale failure to perform due diligence when signing up customers. Moreover, by this point in time, ZoomInfo was into its annual renewal cycle for many of its subscription contracts that were executed during the initial boom of the COVID-19 pandemic. By way of the Company's 2021 marketing survey that revealed declining demand for ZoomInfo's products—especially amongst its most risky SMB customers—touting "***best ever Q1 results this quarter on three dimensions: new business, new customer addition, and retention activity***" as well as "***record renewals***," was demonstrably false and misleading.

288.    During the same earnings call, Defendant Hyzer reported financial figures for the quarter:

> ***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $262 million. ***And the remaining performance obligations, or RPO, were $592 million, of which $461 million are expected to be delivered in the next 12 months.***

289.    Defendants' financial figures referenced in Paragraph 288 were materially false and misleading for the reasons set forth in Paragraphs 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*. ZoomInfo's financial figures were false and misleading because Defendants knew that its financial results as of March 31, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants'

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

84

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### I.    May 25, 2021 – JP Morgan Global Virtual Technology, Media and Communications Conference

290.    On May 25, 2021, Defendant Schuck participated in an analyst conference.  An analyst asked about the raised guidance for the year and the "drivers behind the Q1 success." Defendant Schuck praised the Company's execution.  Specifically, Defendant Schuck stated:

> I think the best answer to this question is, we saw an incredibly balanced set of execution across our go-to-market motion.  And so you saw new business have a record quarter. You saw enterprise customer who was spending over $100,000 a year with us brought in over 950 customers.  We saw our international continue to gain momentum.  We saw our Engage Solution continue to gain momentum.  *We saw the highest retention and renewal activity on our existing customer base that we ever saw.*

291.    Defendants' statement in Paragraph 290 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251 and as alleged in Sections IV.B. and IV.K., *supra*. Moreover, Defendants' statement was false and misleading because they touted the Company's "*highest retention and renewal activity*," despite Defendants knowing that they retained customers—predominantly vulnerable SMBs—through coercive auto-renewal practices, which simply prolonged the inevitable outfall of ZoomInfo's failure to perform due diligence into these customers' reduced likelihood of payment.

292.    Numerous FEs of ZoomInfo confirm the manner in which retention was affected by coercive use of the Company's autorenewal clause.  FEs also describe how ZoomInfo's

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

85

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

attempts to enforce the auto-renewal provision entrapped customers and were met with great resistance from customers—particularly SMBs—that were not able to pay, a problem created by ZoomInfo's failure to conduct initial due diligence.

293.    For example, FE-5 recalled that there were Account Managers who instructed her to not contact customers until their contract was 59 days away from ending. FE-5 explained that the deadline to opt-out was 60 days and by waiting the extra day it ensured the customer was locked into their renewal, which assisted Account Managers in meeting their quotas.  Moreover, FE-10 continued to explain that she has seen the copy used for renewal opt-out e-mails and through discussions with colleagues, it appears that the Company purposely structured them with the hope that it would be caught in the user's spam filter and therefore missed.

294.    Defendants utilized these tactics and then dealt with the repercussions after, even though it was clear that the customer was not likely to pay for the autorenewal.  FE-10 recalled discussions with colleagues where they noted that they felt like they were a collections agency for customers who did not want to continue their relationship after being locked into a renewal.  FE-9 further explained that auto-renewals were a common reason and SMB customers were prone to "ghosting" ZoomInfo.  FE-9 stated that issues with the auto-renewal policy contributed to "a lot of people not paying."

295.    Defendants' coercive practices around its auto-renewal clause allowed ZoomInfo to secure droves of renewed subscriptions, particularly amongst SMB customers, which rendered its statements false and misleading.

**J.    June 14, 2021 – Analyst Day**

296.    On June 14, 2021, the Defendants hosted their annual Analyst Day.  An analyst asked what the Defendants were seeing in the demand environment and in a post-COVID-19 world that gives them "comfort" that the high level of growth can continue as things normalize. Defendant Schuck falsely stated that demand was strong to continue propping up the Company's stock price.  Defendant Schuck specifically stated:

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    86

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Yes. So, I think, first, *we are seeing an incredibly healthy demand environment.* I think what you saw as COVID came on in March was a bit of a pullback and a slowdown in the decision-making process especially in the enterprise. And we really saw Q3 and Q4 really accelerating the comeback. *And we really do feel today that the pandemic environment is very far behind us and we rebounded to sort of the pre-pandemic demand environment which is fueled by a secular tailwind around digitization of the go-to-market effort.*

297.    Defendants' statements in Paragraph 296 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 266 through 271 and as alleged in Sections IV.B. and IV.F., *supra*. Moreover, Defendants' statements were false and misleading because Defendants touted an "*incredibly healthy demand environment*," while offering assurances that demand for ZoomInfo "*is fueled by a secular tailwind*," rather than the true driver of its growth— quick sales conducted without any due diligence into customers' ability to pay.

**K.    August 2, 2021 – Q2 2021 Financial Results**

298.    On August 2, 2021, ZoomInfo released its SEC Form 10-Q containing the financial results for Q2 2021, for the period ended June 30, 2021 ("2Q21 10-Q"). The 2Q21 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| *(in millions)* | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2021 | $ 505.2 | $ 142.9 | $ 648.1 |

299.    Defendants' financial figures referenced in Paragraph 298 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*. Defendants' financial figures were false and misleading because Defendants knew that its financial results as of June 30, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    87

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

300.    During the earnings call on the same day, Defendant Hyzer stated, "***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $276 million and ***remaining performance obligations or RPO were $648 million, of which, $505 million are expected to be delivered in the next 12 months***."

301.    However, Defendants' statement in Paragraph 300 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of June 30, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    88                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

L.    **August 2, 2021 – Q2 2021 Earnings Call**

302.    On August 2, 2021, ZoomInfo held their earnings call to discuss the financial results for Q2 of 2021.  Defendant Schuck spoke to the allegedly historical levels of retention activity and customer engagement in his opening statement.  Specifically, Defendant Schuck stated:

> ***This was our best ever second quarter for new customer additions, and, we recorded the highest levels ever for both retention activity and customer engagement***.

303.    Defendants' statement in Paragraph 303 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, 291 through 295 and as alleged in Sections IV.B., IV.F, IV.I, and IV.K, *supra*.  Moreover, Defendants' statement was false and misleading because ZoomInfo "***recorded . . . highest levels ever for both retention activity and customer engagement***" was fueled by its coercive tactics around auto-renewals.  Moreover, Defendants used robust internal tracking systems that revealed poor usage statistics and many customer accounts at risk of not renewing their subscriptions.

304.    Defendants knew that ZoomInfo's subscription contracts were risky and faced serious collectability problems because they tracked customer usage.  For example, FE-7 explained that low utilization rates were a "clear sign of trouble" and once seeing these figures she could tell if the New Business group had signed up customers for "a lot" of products that they were not going to use.

305.    Indeed, ZoomInfo's robust internal tracking systems confirmed this growing problem of customers not using the Company's platform.  Numerous FEs recalled that ZoomInfo's representatives had access to account health information through an online system called Gainsight.  FEs explained that the figures from Gainsight were made visible to senior leadership through other internal systems including Salesforce—platforms to support businesses' efforts to manage their customer relationships.  Critically, this reporting assigned ZoomInfo's customers scores and color coding based predominantly on how often the customer was logging in and using

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                89

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

ZoomInfo which sent an unmistakable signal to Defendants that declining usage rates and collectability challenges were occurring in droves.

306.    For example, FE-8 recalled the ability to see notes regarding the health and risk associated with specific accounts in ZoomInfo's customer relationship management (CRM) platform, Gainsight.  According to FE-8, Gainsight housed information on all of ZoomInfo's customer accounts.  FE-8 explained that ZoomInfo collected usage metrics directly from the customer's platform and that information went to both Gainsight and Salesforce.

307.    FE-8 continued to explain that every account had its own Health Score that was color-coded and designated as red, yellow, or green and this was calculated in Gainsight and visible in the dashboard.  According to FE-8, the overall Health Score was primarily determined by considering the number of active versus unactive licenses and customer sentiment. FE-8 added that customer sentiment was manually input by the representatives responsible for the account and based on conversations with customers.  Similarly, according to FE-12, prior to contacting customers she was able to see account metrics in Salesforce to give her an idea of the account's health.

308.    FEs confirmed that Defendant Schuck and Hyzer interacted with the information set forth in Gainsight by presenting the color-coded scores in internal meetings.  For example, FE-4, recalled quarterly All Hands Meetings typically led by current CEO Henry Schuck and former CFO Cameron Hyzer that also served as a "State of the Union" regarding customer account health. FE-4 further recalled that that the meeting included a "color coded box sequence" with "green fading into yellow, fading into red."  FE-4 continued to say based on the customer health status displayed in these meetings that she thought to herself that the current status was "not where we [ZoomInfo] wanted to be."  FE-4 recalled having customers that did not use ZoomInfo's product at all or only logged in once a month or went even longer in between logins.  FE-4 explained that, if a customer had five to ten seats that there were one or two logging in.  FE-4 described that "plenty had not done the basics" with respect to product usage.  According to FE-4, it was likely

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    90

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

that the percentage of total licenses on her book that were not logging into their ZoomInfo account was greater than 30-45%.

309.    During the same earnings call, Defendant Hyzer also discussed the Company's RPO, stating: "***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $276 million and ***remaining performance obligations or RPO were $648 million, of which, $505 million are expected to be delivered in the next 12 months***."

310.    Defendants' financial figures referenced in Paragraph 309 were materially false and misleading for the reasons set forth in Paragraphs 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of June 30, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    91

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

**M.     November 1, 2021 – Q3 2021 SEC Form 10-Q**

311.    On November 1, 2021, ZoomInfo released its SEC Form 10-Q containing the financial results for Q3 2021, for the period ended September 30, 2021 ("3Q21 10-Q").  The 3Q21 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2021 | $         552.2 | $         160.0 | $         712.3 |

312.    Defendants' financial figures referenced in Paragraph 311 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of September 30, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**N.     November 1, 2021 – Q3 2021 Earnings Call**

313.    On November 1, 2021, the Company held an earnings call to discuss the Q3 2021 financial results.  On the call, Defendant Hyzer discussed the Company's RPO, stating:

> ***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $288 million and ***remaining performance obligations, or RPO, were $712 million,***

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                      92

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

*of which $552 million are expected to be delivered in the next 12 months.*

314.    Defendants' statement in Paragraph 313 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**O.    February 15, 2022 – Q4 2021 and Full Year 2021 Earnings Call**

315.    The Company also held an earnings call on February 15, 2022 to discuss ZoomInfo's financial results for the fourth quarter of 2021.  During the call, an analyst asked Defendant Schuck if there was a pull-forward and "room" for the Company to expand.  Defendant Schuck falsely stated that COVID-19 did not cause a pull forward in demand for ZoomInfo's digital products.  Specifically, Defendant Schuck stated:

> I'll tell you, we're constantly looking at the data, the historical data. We look at win rates, funnel conversion, top of funnel activity. And we spent a real amount of time looking for anomalies that we could tie back to some relation to COVID.  ***And we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or one-offy or a pull-forward.***  And we wanted to be confident about that because it would affect the way we operate the business.  We didn't see any anomalies like that that made us think that COVID caused a pull-forward in the demand environment that we're seeing today wouldn't continue

316.    Defendants' statement in Paragraph 315 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 266 through 271, 279 through 287, 303 through 310, and as alleged in Sections IV.B., IV.F., IV.I., *supra*.  Moreover, Defendants' statement was false and misleading because the Company had seen a marketing survey that showed a drastic erosion of market share prior to making this statement, which rendered Defendants' statement that

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

93

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

it "***didn't see anything [to] believe that the current strong demand trends wouldn't continue or one-offy***" false and misleading. By this point, Defendants received concrete evidence showing that the sales it captured years prior were indeed attributable to a temporary spike.

317.    Further, Defendant Hyzer discussed the RPO, stating:

> ***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $364 million and ***remaining performance obligations, or RPO, were $864 million, of which $672 million are expected to be delivered in the next 12 months.***

318.    Defendants' statement in Paragraph 317 was materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of December 31, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

## P.    February 16, 2022 – Yahoo Finance Interview

319.    On February 16, 2022,  Defendant Schuck participated in an interview with Yahoo Finance.  The interviewer asked if any macro factors were causing any slowdown in large corporate

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    94

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

enterprises.  Defendant Schuck falsely denied any slowdown was occurring due to COVID-19.

Defendant Schuck also denied, once again, that COVID-19 did not cause a pull forward in demand

for ZoomInfo's digital products.  Specifically, Defendant Schuck stated:

> Yeah, we're really not, Brian.  And, you know, one thing that's interesting about our company is that there's a lot of talk about whether COVID and the pandemic had a pull forward in demand for us.  And really, what we've realized are two things.  ***One, we went back and we looked at all of our numbers-- win rates, funnel conversion, top of the funnel pipeline generation-- from before the pandemic today, and we looked for any anomalies that could have indicated that we had this pull forward in demand that came from COVID.  And we didn't see anything in the data that would help-- that would make us think that.***

320.    Defendants' statement in Paragraph 319 was materially false and misleading for the

reasons set forth in Paragraphs 237 through 251, 266 through 271, 279 through 287, 303 through

310 and as alleged in Sections IV.B., IV.F., IV.I, *supra*.  Additionally, Defendants' statements

were false and misleading because the Company had seen data, via its 2021 marketing survey and

declining usage statistics, as confirmed by numerous FEs, to render Defendant Schuck's assertions

that there were not any "***anomalies***" or "***pull forward***" in the Company's demand relating to the

COVID-19 pandemic—including ZoomInfo's large amounts of sales to unvetted customers during

that period—as false and misleading

**Q.    February 24, 2022 - 2021 SEC Form 10-K**

321.    On February 24, 2022, ZoomInfo released its SEC Form 10-K which includes the

financial results for the full fiscal year of 2021 which ended on December 31, 2021 ("FY21 10-

K").  The FY21 10-K reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2021 | $            671.5 | $            192.9 | $            864.4 |
| As of December 31, 2020 | $            432.2 | $            126.8 | $            559.0 |

322.    Defendants' financial figures referenced in Paragraph 321 were materially false and

misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged

in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    95

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

because Defendants knew that its financial results as of December 31, 2021, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**R.     May 2, 2022 – Q1 2022 Financial Results & Earnings Call**

323.   On May 2, 2022, ZoomInfo released its SEC Form 10-Q containing the financial results for Q1 2022, for the period ended March 31, 2022 ("1Q22 10-Q"). The 1Q22 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2022 | $            715.0 | $            202.6 | $            917.6 |

324.   On the same day, during the earnings call, Defendant Hyzer stated:

> ***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $406 million and ***remaining performance obligations or RPO were $918 million, of which $715 million are expected to be delivered in the next 12 months.***

325.   Defendants' financial figures referenced in Paragraph 324 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*. Defendants' financial figures were false and misleading

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    96

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

because Defendants knew that its financial results as of March 31, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

## S.    August 1, 2022 – Q2 2022 Financial Results

326.    On August 1, 2022, ZoomInfo released its SEC Form 10-Q containing the financial results for Q2 2022, for the period ended June 30, 2022 ("2Q22 10-Q"). The 2Q22 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2022 | $    764.2 | $    220.5 | $    984.7 |

327.    On the same day, the Company also held an earnings call, during which Defendant Hyzer discussed the Company's RPO, reporting:

> *With respect to liabilities and future performance obligations,* [u]nearned revenue at the end of the quarter was $412 million and *[our] remaining performance obligations, or RPO, were $985 million, of which $764 million are expected to be delivered in the next 12 months.*

328.    Defendants' financial figures referenced in Paragraph 327 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

97

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of June 30, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large swaths of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### T.    November 1, 2022 – Q3 2022 SEC Form 10-Q

329.    On November 1, 2022, ZoomInfo released its SEC Form 10-Q containing the financial results for Q3 2022, for the period ended September 30, 2022 ("3Q22 10-Q").  The 3Q22 10-Q reported the RPO as follows:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2022 | $ 756.9 | $ 221.9 | $ 978.8 |

330.    Defendants' financial figures referenced in Paragraph 329 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of September 30, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    98                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### U.    November 1, 2022 – Q3 2022 Earnings Call

331.    On November 1, 2022, Defendants held an earnings call to discuss ZoomInfo's financial results for the third quarter of 2022. During the call, an analyst asked about renewals and if customers were "looking to downsize" or were "looking for more flexible payment terms." Specifically, Defendant Hyzer responded by stating, "***from a renewals perspective, we're actually seeing continued levels of really high gross retention***. So, we're continuing to see those renewals happen." Defendant Hyzer also stated that "***gross retention continues to be really strong, over 90%***."

332.    However, Defendant Hyzer's statements referenced in Paragraph 331 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, 291 through 295, 303 through 310, and as alleged in Sections IV.B., IV.F., IV.I., and IV.K., *supra*. Moreover, Defendants' statements were designed, by omission, to mislead investors from understanding the full extent of the Company's difficulty retaining customers—especially those in its SMB customer segment—that were adhesively locked into renewals that they could not pay for as a result of ZoomInfo's failure to conduct due diligence into its customers' ability to pay for their subscription contracts.

333.    Further, on the earnings call Defendant Hyzer reported Company's RPO:

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    99

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

> **With respect to liabilities and future performance obligations,** unearned revenue at the end of the quarter was $381 million and **remaining performance obligations or RPO were $979 million, of which $757 million are expected to be delivered in the next 12 months.**

334.    Defendants' financial figures referenced in Paragraph 333 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of September 30, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

## V.    November 16, 2022 – RBC Global Technology, Internet, Media & Telecom Conference

335.    On November 16, 2022, Defendant Hyzer spoke at the RBC Global Technology, Media & Telecom Conference. Despite revealing increased "scrutiny" in securing renewals, Defendant Hyzer nonetheless continued to reassure investors during the conference that the deceleration in ZoomInfo's growth was due to macroeconomic factors, rather than the Company's years of aggressive sales to customers without performing any due diligence regarding their ability to pay.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                   100

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

336.    Defendant Hyzer continued to conceal the full extent of the financial impact flowing from ZoomInfo's lack of due diligence into its customers' ability to pay for their subscription contracts.  For example, Defendant Hyzer stated, "as we started talking about in Q2, *we are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales cycles*.  In September, we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team."

337.    Defendant Hyzer's statements referenced in Paragraph 336 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, 291 through 295, 303 through 310, and as alleged in Sections IV.B., IV.F., IV.I., and IV.K., *supra*. Specifically, Defendant Hyzer's statement continued to conceal the full extent of ZoomInfo's financial problems caused by its years of selling to customers without performing due diligence into their ability to pay, and issuing false and misleading financial figures in connection therewith, including not writing down uncollectable accounts.

**W.    February 6, 2023 – Q4 2022 and Full Year 2022 Earnings Call**

338.    On February 6, 2023, ZoomInfo released its financial results for Q4 2022 and the full year of 2022, for the period ended on December 31, 2022 ("4Q22 10-Q").  During the earnings call held on the same day, Defendant Hyzer reported the Company's RPO for Q4 2022, stating, "*With respect to liabilities and future performance obligations*, unearned revenue at the end of the year was $420 million. And *remaining performance obligations, or RPO, were $1.1 billion, of which $842 million are expected to be delivered in the next 12 months*."

339.    Defendants' financial figures referenced in Paragraph 338 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of December 31, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    101

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

## X.      February 16, 2023 – 2022 SEC Form 10-K

340.    On February 16, 2023, ZoomInfo released its SEC Form 10-K which includes the financial results for the full year of 2022 which ended on December 31, 2022 ("FY22 10-K"). The FY22 10-K reported the following RPO:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2022 | $          842.2 | $          264.5 | $          1,106.7 |
| As of December 31, 2021 | $          671.5 | $          192.9 | $          864.4 |

341.    Defendants' financial figures referenced in Paragraph 340 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*. Defendants' financial figures were false and misleading because Defendants knew that its financial results as of December 31, 2022, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    102

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  For example, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**Y.     May 1, 2023 – Q1 2023 Financial Results**

342.    On May 1, 2023, ZoomInfo released its SEC Form 10-Q containing the financial results for Q1 2023, for the period ended March 31, 2023 ("1Q23 10-Q").  The 1Q23 10-Q reported the following RPO:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2023 | $ 839.2 | $ 253.3 | $ 1,092.5 |

343.    On the same day, Defendants hosted an earnings call, during which Defendant Hyzer discussed Company's RPO for the quarter, "***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $451 million; and ***remaining performance obligations, or RPO, were $1.1 billion, of which $839 million are expected to be delivered in the next 12 months***."

344.    Defendants' financial figures referenced in Paragraphs 342 and 343 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of March 31, 2023, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                          103                          BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

**Z.    July 31, 2023 – Q2 2023 Financial Results & Earnings Call**

345.    On July 31, 2023, ZoomInfo released its SEC Form 10-Q containing the financial results for Q2 2023, for the period ended June 30, 2023 ("2Q23 10-Q").  The 2Q23 10-Q announced the following RPO:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2023 | $ 848.7 | $ 262.2 | $ 1,110.9 |

346.    During the earnings call held on the same day, Defendant Hyzer discussed the Company's RPO, stating, "***With respect to liabilities and future performance obligations,*** unearned revenue at the end of the quarter was $443 million and ***remaining performance obligations, or RPO, were $1.1 billion, of which $849 million are expected to be delivered in the next 12 months.***"

347.    Defendants' financial figures referenced in Paragraphs 345 and 346 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*.  Defendants' financial figures were false and misleading because Defendants knew that its financial results as of June 30, 2023, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

104

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

348.    During the accompanying earnings call, Defendants nonetheless continued to reassure investors that these increased cancellations resulted from "***budgetary pressures and their corresponding downward pressure on renewals***."  Specifically, Defendant Schuck assured investors that the Company's SMB segment in particular, remained strong.  Defendant Schuck stated, "***[i]n the SMB segment, where we see lower price and lower quality competitors, we still see strong performance, with more pipeline created, higher win rates, faster close times, and higher ASPs. Metrics that also indicate our value competition when compared to our competition remains obvious***."

349.    Defendant Hyzer also assured the market that, overall, the Company was retaining customers but continuing to see elongated renewal cycles, stating "we do expect gross retention to tick down a little, but more of the net retention in terms of our expectation is being impacted by fewer upsells and more downsells.  ***So it's more we're keeping those customers, but we're seeing the renewals being more challenging***.  And so yes, I think that's the real focus with respect to gross retention in 2023."

350.    However, Defendants' statements referenced in Paragraphs 348 and 349 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, 291 through 295, 303 through 310, and as alleged in Sections IV.B., IV.F., IV.I., and IV.K., *supra*.  Specifically, Defendants' statements were false and misleading because they are designed to conceal the full extent of the Company's financial risk related to customers—particularly SMBs—that entered into uncollectable contracts as a result of the Company's sales-at-any-cost strategy, without the Company undertaking any due diligence. Defendants also continued to mislead the market by omitting that a large segment of its customer base—particularly

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    105

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

SMBs—had been locked into previous renewals for subscriptions that ZoomInfo knew they could not pay but were nevertheless counting as a way to inflate its RPO figures. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable. Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency. Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### AA.    October 30, 2023 – Q3 2023 Financial Results

351.    On October 30, 2023, ZoomInfo released its SEC Form 10-Q containing the financial results for Q3 2023, for the period ended September 30, 2023 ("3Q23 10-Q"). The 3Q23 10-Q announced the following RPO:

The remaining performance obligations consisted of the following:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2023 | $      795.2 | $      261.5 | $      1,056.7 |

352.    Likewise, during the earnings call on the same day, Defendant Hyzer discussed the RPO, stating, "***With respect to liabilities and future performance obligations***, unearned revenue at the end of Q3 was $403 million and ***remaining performance obligations or RPO were $1.1 billion, of which $795 million are expected to be delivered in the next 12 months.***"

353.    Defendants' financial figures referenced in Paragraphs 351 and 352 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 255 through 262 and as alleged in Sections IV.B. and IV.C., *supra*. Defendants' financial figures were false and misleading because Defendants knew that its financial results as of September 30, 2023, contained RPO figures that were overstated due to ZoomInfo's undisclosed, increased risk of nonpayment likelihood as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

106

the likelihood of this occurring, as required by GAAP and ASC 606 rendered these financial figures false and misleading.  Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.

### BB.    May 7, 2024 – Q1 2024 Financial Results & Earnings Call

354.    On May 7, 2024, ZoomInfo held an earnings call, announcing the financial results for Q1 2024, for the period ended March 31, 2024.  During the call, Defendant Hyzer stated, "***SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months.***"

355.    However, Defendants' statements referenced in Paragraph 354 were materially false and misleading for the reasons set forth in Paragraphs 237 through 251, 279 through 287, 291 through 295, 303 through 310, and as alleged in Sections IV.B., IV.F., IV.I., and IV.K., *supra.* Specifically, Defendant Hyzer's statement was false and misleading because the Company had, for years prior, failed to conduct any due diligence into its customers' ability to pay and in accordance with GAAP, and had reported RPO without accounting for that analysis nor writing off doubtful accounts or bad debt.  Defendants' statements omitted the full extent of financial risk that flowed from the Company's prior years of selling to large amounts of unvetted customers and inflating its RPO and, in turn, revenue figures by failing to account for their collectability risk. Finally, Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, Defendants allowed these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency.  Specifically, according to FE-3, ZoomInfo was keeping customers on the books as

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

107

1  accounts receivable even though they were many months delinquent, up to 360 days, and such
2  customers should have been written off as uncollectable.

3  **VII.    LOSS CAUSATION**

4       356.    Throughout the Class Period, as alleged herein, Defendants made materially false
5  and misleading statements and omissions and engaged in a scheme to defraud investors.
6  Specifically, Defendants misrepresented and concealed the strength of demand and renewal with
7  ZoomInfo's customers, especially SMB and Mid-Market customers, and the fact of and true extent
8  of which the Company relied on unvetted, unqualified customers with known collectability risks
9  and predatory renewal tactics to create a false appearance of sustainable demand and retention, as
10  well as the true extent of which the Company's RPO figures were inflated, including by failing to
11  conduct a variable constraint analysis—as required by GAAP.  Additionally, Defendants failed to
12  write down accounts that were uncollectable, as evidenced by having been delinquent for hundreds
13  of days and, therefore, should have been written down.  Accordingly, Defendants' misstatements
14  and omissions artificially inflated and/or artificially maintained the price of ZoomInfo common
15  stock and operated as a fraud and deceit on the Class.

16       357.    Lead Plaintiffs and Class members unknowingly and in reliance upon Defendants'
17  materially false or misleading statements and/or omissions purchased ZoomInfo common stock at
18  artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent
19  scheme, Lead Plaintiffs and other Class members would not have purchased ZoomInfo common
20  stock at the artificially inflated prices at which it traded during the Class Period.

21       358.    The market for ZoomInfo common stock was open, well-developed, and efficient
22  at all relevant times, with average daily trading volume of approximately 4,692,725 or 4.7 million
23  shares during the Class Period.  Lead Plaintiffs and other Class members purchased ZoomInfo
24  common stock relying upon the integrity of the market relating to ZoomInfo common stock and
25  suffered economic losses (i.e., damages) as a result thereof.

26       359.    The declines in the price of ZoomInfo common stock during the Class Period,
27  including the declines summarized below, are directly attributable to the market absorbing

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

108

information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

360.    Each decline in the price of ZoomInfo common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market. The timing and magnitude of the price declines in ZoomInfo common stock and market reactions to the news negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' fraudulent conduct.

361.    As described below, ZoomInfo's misrepresentations and omissions were revealed to the market through a series of five (5) corrective disclosures and/or materializations of concealed risk from November 1, 2022 through August 5, 2024.  It was not until the final corrective disclosure and/or materialization of concealed risk on August 5, 2024 that the full extent of the truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in ZoomInfo's stock price attributable to the fraud.

A.    **November 1, 2022 – First Partial Corrective Disclosure/Materialization of the Risk**

362.    On November 1, 2022, after market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when ZoomInfo held an earnings call to announce the financial results for its third quarter of 2023 ended September 30, 2022. During the associated Earnings Call, the Company disclosed that at the end of Q3 2022, the Company "saw a greater level of financial scrutiny from buyers, which further elongated sales cycles" and "expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021."

363.    The November 1, 2022 disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' misstatements, omissions, and

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    109                    BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1  fraudulent course of conduct concerning ZoomInfo's strong demand and renewal trends. The

2  disclosures about the dwindling interests in Defendants' products and lowered net retention rate

3  were foreseeable consequences of, and within the zone of risk concealed by, Defendants'

4  misrepresentations and omissions concerning the demand and desirability for the Company's

5  products and the true extent of which the Company relied on unqualified, unvetted customers with

6  known collectability risks to create a false appearance of robust demand and renewal, as well as

7  Defendants' misstatement of their RPO figures, including by first failing to conduct a variable

8  constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as

9  required by GAAP, then allowing these delinquent accounts to remain in account receivable for

10 up to hundreds of days, and finally failing to write down these known, uncollectable accounts as

11 bad debts.

12      364.    As a direct and proximate result of this partial corrective disclosure and/or

13 materialization of foreseeable risks concealed by Defendants' fraud, the price of ZoomInfo's stock

14 fell $12.69 per share, or approximately **29%,** to close at $30.81 per share on November 2, 2022.

15      365.    Upon learning of this news, analysts were disappointed and linked the Company's

16 stock drop to the announcement.  For instance, on the same day, analysts from Canaccord Genuity

17 stated that "[w]ell, this wasn't the update that we were expecting to get from ZoomInfo. . . . where

18 ZI seems to be seeing more pronounced headwinds is on seat count and data expansion growth,

19 which played a key role in the net revenue retention gains that the business enjoyed in 2021."

20 Canaccord Genuity further noted that "[t]aking a step back, ZoomInfo's lackluster Q3 came as a

21 surprise, and we're therefore not shocked to see the stock down 20%+. After all, management was

22 pretty bullish at our conference in mid-August, and as late as mid-September at the Goldman event,

23 the suggestion was that Q3 was not looking any worse than Q2."  Likewise, analysts from Bank

24 of America Global Research reported that: "[A] tougher macro is creating a harder selling

25 environment, and 2) elongating sales cycles at the end of Q3 have bled into Q4. This is causing

26 strain on overall sales productivity, which could lead to compressing NRR in the future and slower

27 revenue growth."

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

110

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

366.    Analysts also tied the Company's stock price drop to the Company's disclosure concerning weak demand and renewal.  For instance, on the same day, analysts from Raymond James reported that "[s]hares are down ~11% in early trading after hours as the magnitude of the billings shortfall was stronger than expected."

367.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal and misrepresent the strength of demand and renewal with ZoomInfo's customers, especially SMB customers, and the true extent of which the Company relied on unqualified customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention. For instance, during the Earnings Call, Defendant Hyzer reassured the market that "***So from a renewals perspective, we're actually seeing continued levels of really high gross retention.*** So we're continuing to see those renewals happen."

368.    Moreover, as alleged above in Paragraphs 329 through 334, Defendants made additional materially false and misleading statements on this date—including overstating the Company's RPO by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts—which kept the full extent of the truth from investors.

369.    As expected, despite the initial disappointing news, analysts were reassured by Defendants and remained optimistic. For example, on the same day, analysts from Credit Suisse reported that "although ZoomInfo's near-term momentum has been negatively impacted by increasing macroeconomic uncertainty, we continue to believe in the need to modernize the B2B go-to-market stack—driving long-term growth for the CRM market as a whole and for ZoomInfo specifically."  Similarly, analysts from Raymond James reported that "We're maintaining our Outperform rating on ZI . . . we still think the long-term trajectory for shares is higher, particularly given the 1) broadening product platform that addresses expanding use cases; 2) a differentiated

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

111

go-to-market motion; and 3) delivering a best in class combination of growth/margin."   On November 2, 2022, analysts from Deutsche Bank echoed the optimism, stating that "We believe wholeheartedly that macro is the only real issue here and that at 27x EV/2023 uFCF (based on AH), the stock represents an attractive entry point."

### B.   November 16, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk

370.    On November 16, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Defendants spoke at the RBC Global Technology, Internet, Media & Telecom Conference. During the conference, the Company disclosed that the intense customer scrutiny during the contract renewal process had continued into the fourth quarter and would negatively impact the Company's ability to grow its revenues in fiscal year 2023.

371.    Specifically, Defendant Hyzer disclosed that "we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team, and we don't see that – and we continue to see that scrutiny in Q4" and emphasized that "we don't see any evidence currently that that macroeconomic pressure is going to subside or turn around quickly or in the short term . . . you look at doing 4% to 5% sequential growth each quarter in 2023 [] that would get you into something that's more like a high-teens growth rate."

372.    The November 16, 2022 disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' misstatements, omissions, and fraudulent course of conduct concerning ZoomInfo's strong demand and renewal trends. The disclosures about elevated renewal pressure were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the demand and desirability for the Company's products and the true extent of which the Company relied on unqualified customers and predatory renewal practices with known collectability risks to create a false appearance of robust demand and renewal, as well as Defendants' misstatement of the RPO

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                        112

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

figures, including by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts.

373.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of ZoomInfo's stock fell from $31.69 per share on November 15, 2022, to $26.17 per share on November 17, 2022, or approximately 17%, over a two-day trading period on above-average trading volume.

374.    Analysts were shocked. For instance, analysts from Wolfe Research noted that "ZoomInfo's CFO, Cameron Hyzer, . . . shocked many investors as he indicated 'high-teens growth' for FY23 makes sense vs. the mid-20%+ many on the Street were modeling." Likewise, analysts from Bank of America Global Research reported that "[w]e find the timing of the new disclosure odd given the company reported its 3Q22 results just two weeks ago on 11/2/22, which raises the question if the selling environment has deteriorated further since." Analysts from UBS Research noted that "ZI provided a weaker-than-expected high-teens FY23 revenue growth outlook at an investor conference yesterday, which was the first time it publicly offered a glimpse into next year."

375.    Analysts also tied the Company's stock price drop to Defendant Hyzer's announcement. For instance, on the same day, analysts from Wolfe Research reported that "[t]he stock halted trading intraday briefly and finished the day down -14%. This caught many off guard because following the 3Q22 print, management indicated that their draconian scenario for FY23, which assumed incremental top line pressure from the macro environment, was mid-20% growth."

376.    Still, the Company's stock price remained artificially inflated even after this news as the full extent of the truth had not yet been revealed and/or materialized. As alleged above in Paragraphs 335 through 337, Defendants made additional materially false and misleading statements on this date. For example, Defendant Hyzer stated, "*we are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales*

*cycles*," which continued to conceal and misrepresent the true cause of ZoomInfo's declining financial performance.  For instance, as of date, investors still had not learned the full truth, which included the strength of demand and renewal with ZoomInfo's customers, especially SMB customers, and the extent to which the Company relied on unqualified, unvetted customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention.  Moreover, as of this date, investors had not learned the full truth and the risks concealed by Defendants' fraudulent scheme had not been fully revealed nor materialized—including overstating the Company's RPO by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts.

377.    Despite the negative news, investors accepted Defendants' false and misleading explanation, believing that once the macroeconomic pressure had eased, ZoomInfo's demand and renewal trends would recover.  For instance, on the same day, analysts from Canaccord Genuity noted that "[w]e think ZI has at least several years ahead where it will be able to put up durable, 25%+ growth, so we're pretty much at that lower bound of where it makes sense to step up. For longer-term investors, we would be using this afternoon's panic selling as an opportunity to add to positions in ZI. Reiterate BUY."

**C.    July 31, 2023 – Third Partial Corrective Disclosure/Materialization of the Risk**

378.    On July 31, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when ZoomInfo issued a press release announcing the Company's financial results for its second quarter of 2023 ended June 30, 2023.  In the 2Q23 Press Release, the Company announced that ZoomInfo's customers with high-value ACVs, for which RPO was a proxy, had declined.  In addition, during the earnings call, Defendant Hyzer also

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    114

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

revealed that during the quarter the Company "saw continued elevated write-offs for our smaller customers." Further, during the earnings call held later that day, Defendant Hyzer revealed that customer cancellations had increased "modestly" in the quarter and that customers had been renewing for less than the market had been conditioned to expect. Defendant Hyzer also disclosed that the Company's expectation "for net revenue retention are closer to 90% or even in the high 80s through the end of the year." As a result, ZoomInfo reduced its annual revenue guidance from a range of $1.275 billion to $1.285 billion to a range of $1.225 billion to $1.235 billion, representing a reduction of $50 million at the midpoint.

379. The July 31, 2023 disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' misstatements, omissions, and fraudulent course of conduct concerning ZoomInfo's strong demand and renewal trends. The disclosures about the sustained decline in renewal and retention rate were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the demand and desirability for the Company's products and the true extent to which the Company relied on unqualified customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention, as well as Defendants' misstatement of their RPO figures, including by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts.

380. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of ZoomInfo's stock fell from $25.57 per share on July 31, 2023, to $18.40 per share on August 2, 2023, or approximately 28%, over a two-day trading period on above-average trading volume

381. Analysts were surprised. For instance, analysts from UBS Research noted that "ZI's 16% 2QF23 revs growth missed the guide (~1% short of mid-point) & it lowered its FY23 revs growth guide to 12% from 17% (implying a 3% 4QF23 exit growth rate vs. 12% prior). This was

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                    115

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

well below investor expectations & even short of the bear case for a modest guide down." Analysts from Barclays Research noted that "the much bigger issue is the annual guidance with revenue, profit, and cash was all below expectations . . . it seems like the second round of renewals (post the initial cuts last year) will see ongoing pressure." Analysts from Wolfe Research opined that "[a]fter an in-line Q1, ZI missed quarterly guidance for the first time and cut FY23 targets, while commenting that the customer buying environment further degraded towards the end of 2Q (July trends similar to June) with net retention being pressured by more downselling activity." Specifically, as to renewals, analysts from Wells Fargo noted that "mgmt now expects renewal headwinds are likely to last through 1Q24, and is guiding for a worsening ROY environment as a result."

382.    Further, the market tied the Company's stock price drop to disappointing 2Q23 Press Release. For instance, an article from Seeking Alpha wrote that "ZoomInfo Technologies (NASDAQ:ZI) shares plunged 14% in extended-hours trading on Monday after the software and data company cut its full-year earnings and revenue outlook." Similarly, the next day, analysts from RBC Capital Market Research noted that "ZoomInfo reported disappointing results, leading shares down 17% after market close" and explained that "ZoomInfo saw incremental pressure on retention rates as down-sells were worse than expected in June."

383.    Critically, analysts began to notice and wonder why the renewal trend at the Company had become exponentially challenging over the past quarters, as compared to other software companies. Specifically, analysts from Truist Securities reported that "[r]enewal weakness was the main topic of the earnings call (according to the FactSet transcript, the word "renewal" was said 43 times)." Analysts from UBS Research reported that "[i]n contrast to our checks & other software companies who have said demand trends are stabilizing, ZI experienced a further deterioration in 2QF23 (Jun was worse than Mar) as companies who had previously cut ZI spend in the year prior continued to do so upon renewal."

384.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal and misrepresent the strength of demand and renewal with

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

116

ZoomInfo's customers, especially SMB customers, and the extent of which the Company relied on unqualified, unvetted customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention.  For instance, on the same day, July 31, 2023, Defendants nonetheless continued to reassure investors that these increased cancellations resulted from "*budgetary pressures and their corresponding downward pressure on renewals*" and that "*[i]n the SMB segment . . . we still see strong performance*."  Moreover, as alleged above in Paragraphs 345 through 350, Defendants made additional materially false and misleading statements on this date—including overstating the Company's RPO by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts—which kept the full extent of the truth from investors.

385.     Despite the negative news, investors were encouraged by Defendants' reassurance, believing that the macroeconomic headwinds were transient.  For instance, on the same day, analysts from Credit Suisse noted that "[w]e believe ZoomInfo is a leader in go-to-market intelligence solutions and is well positioned to capture digitization and efficiency-oriented investment cycles upon navigating near-term macro and operational challenges."  Similarly, analysts from Raymond James noted that "[w]e're maintaining our Outperform rating on Zoominfo . . . we'd argue that the cyclical malaise is most prominent in non-system of record front office sales, where software (now 35% of ACV) was an early adopter. We think the non-software growth at +20% offers a bullish narrative for shares when cyclical headwinds abate."

**D.     May 7, 2024 – Fourth Partial Corrective Disclosure/Materialization of the Risk**

386.     On May 7, 2024, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when ZoomInfo issued a press release announcing the Company's financial results for its first quarter of 2024 ended March 31, 2024 ("1Q24 Press

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              117

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Release"). During the earnings call held later that day, Defendant Hyzer revealed that ZoomInfo had a large pool of small business customers that exhibited "weakness" during renewals in the period, which had caused the Company's Net Revenue Retention ("NRR") to decline sequentially to 85% from the 87% reported in the fourth quarter. Defendant Hyzer further revealed that new business from small business customers had also declined in the quarter as the Company became "more selective" on deals made within the cohort. As a result, ZoomInfo reduced its annual revenue guidance from range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

387.     The May 7, 2024 disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' misstatements, omissions, and fraudulent course of conduct concerning ZoomInfo's strong demand and renewal trends. The disclosures about the further "weakness" in renewals and retention within SMB were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the demand and desirability for the Company's products and the true extent to which the Company relied on unqualified, unvetted customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention, as well as Defendants' misstatement of its RPO figures, including by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts.

388.     As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of ZoomInfo's stock fell from $16.02 per share on May 7, 2024, to $12.14 per share on May 8, 2024, or approximately **24%.**

389.     The announcement caught investors off-guard.   For instance, analysts from Canaccord Genuity were perplexed by the Company's poor performance over the past quarters,

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

118

reporting that "[i]t's clearly tough out there for any GTM tech right now, but even so, we've been surprised by the pace at which this business has decelerated – it was only six quarters ago that this business was growing in the mid-40% range." Canaccord Genuity went on noting that "[i]t was well known that this was a large SMB renewal quarter, but with that segment seemingly getting worse, particularly in March – both in terms of retention dynamics and net new business – the path to meaningful recovery appears to have pushed out even further to the right." Similarly, analysts at Piper Sandler Research were shocked, reporting: "Our patience has worn thin in waiting for a fundamental recovery at ZI on further erosion across the cohort of SMB and mid-market customers that has been spotty for the past two years but is now showing further signs of another leg down."

390. Further, the market tied the Company's stock price drop to the Company's announcement. For example, analysts from RBC Capital Market Research reported that "ZoomInfo reported subdued results and guided down, leading shares down 14% after-hours . . . with worsening trends in cRPO, billings, NRR, and $100K+ customer count"

391. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal and misrepresent the strength of demand and renewal with ZoomInfo's customers, especially SMB customers, and the extent of which the Company relied on unqualified customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention. For instance, Defendant Hyzer continued to conceal the true extent of elevated write-off level at the Company, stating that "[w]e are now requiring a majority of smaller and more risky clients to pay via credit card or ACH at checkout, which should help drive an improvement in write-off and allow us to capture the low end of the market more effectively" and "***SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend***," as alleged above in Paragraphs 354 through 355. Moreover, as of this date, investors had not learned the full truth and the extent of the risks concealed by Defendants' fraudulent scheme had not been fully revealed nor materialized— including overstating the Company's RPO by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP,

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                119

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts.

392.    Despite the negative news, investors were again comforted by Defendants' misrepresentation.  For instance, on the same day, analysts from Jefferies Research reiterated their Buy rating, stating that "[t]he stock's -17% after hours decline looks like an overreaction to us as the current weakness should prove transient with most of the renewal backlog cleared and a new AI powered platform on the horizon. Reiterate Buy."  Jefferies further explained that "we believe the truth is the environment has simply gotten tougher . . . we just don't see much more downside . . . if mgmt's [sic] commentary is to be believed, signs of stabilization abound."

**E.    August 5, 2024 – Final Corrective Disclosure/Materialization of the Risk**

393.    On August 5, 2024, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that date, ZoomInfo issued a press release announcing the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Release").

394.    The 2Q24 Release revealed that ZoomInfo was incurring a $33 million charge because "[d]uring the quarter, the company made a change in estimates related to the collectability [sic] of receivables from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers." Particularly, the change in estimates was made after ZoomInfo "deployed a new business risk model to reduce write-offs and made a change in estimates related to the collectibility [sic] of receivables." The Company further explained that "[o]f the $33 million, $15 million was recorded against revenue, $14 million was recorded as bad debt expense, and $4 million as related to other discrete items." Due to the $33 million charge, ZoomInfo also disclosed that the Company was reducing its annual revenue guidance by $65 million at the midpoint, from a range of $1.255 billion to $1.27 billion to a range of $1.19 billion to $1.205 billion.

395.    Moreover, during the earnings call on the same day, Defendant Schuck explained that elevated level of write-offs was driver behind the $33 million charge.  Specifically, "in 2022

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    120

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

and 2023, [the Company] extended credit to a higher mix of SMB customers, and the rate of non-payment by these customers increased throughout the past 24 months."

396.    On the same day, in a separate press release issued by the Company, ZoomInfo announced that Defendant Hyzer was resigning from the Company.

397.    The August 5, 2024 disclosures fully revealed the relevant truth concerning the demand and desirability for the Company's products and the true extent of which the Company relied on unvetted, unqualified customers with known collectability risks and predatory renewal practices to create a false appearance of sustainable demand and retention, as well as Defendants' misstatement of its RPO figures, including by first failing to conduct a variable constraint analysis to assess the number of customer accounts that were highly unlikely to pay, as required by GAAP, then allowing these delinquent accounts to remain in account receivable for up to hundreds of days, and finally failing to write down these known, uncollectable accounts as bad debts. The final disclosures about the $33 million charge due to collectability and elevated level of nonpayment were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions.

398.    As a direct and proximate result of this final corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of ZoomInfo's stock fell from $9.80 per share on August 5, 2024, to $8.01 per share on August 6, 2024, or approximately 18%.

399.    Analysts were shocked by the Company's new revelation of the $33 million charge and poor financial performance.  For instance, analysts from KeyBanc noted that "[t]his has been a long-running complaint from investors in ZoomInfo; the problems that caused results and guidance to disappoint were new, varied, and seemed to multiply since the end of the SaaS spending spree in 2021." Likewise, analysts from Piper Sandler were surprised by the sudden charge, reporting that "**[u]nexpected write-offs impacted outlook.** A $33M non-cash charge related to the collectability of previously recognized revenue (primarily within the SMB segment) resulted in a downward revision to estimates."  The next day, analysts at Needham & Co shared

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    121

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

the disappointment, noting "the magnitude of the more recent write-down and lowered guidance is surprising."

## VIII.   ADDITIONAL INDICIA OF SCIENTER

### A.   Defendants Enriched Themselves Through Significant Insider Sales While Possessing Adverse Information Not Available to the Public

400.   Defendants knew all along that ZoomInfo's sales growth and profitability was underpinned by a tremendous, undisclosed financial risk.  For years, Defendants fueled ZoomInfo's sales growth by executing subscription contracts without conducting any due diligence into these customers' ability to pay.  Defendants did so as part of a scheme to inflate ZoomInfo's stock price while enriching themselves at the expense of ZoomInfo's investors.  As explained above, while Defendants touted certain growth metrics such as RPO—which Defendants inflated by failing to perform a variable constraint analysis and also by failing to write down uncollectable accounts—they concealed internal information that showed that the Company's growth was not sustainable and would soon fall of a cliff.  Armed with the knowledge that the demand for and engagement of the Company's products had declined substantially and that the Company was relying more and more on risky customers that had a much higher risk of defaulting, Defendants Schuck, Hyzer, and Hays collectively sold over 23 million shares, reaping **over $1.1 billion** in proceeds throughout the Class Period.

#### 1.   Defendants Schuck, Hyzer, and Hays Collectively Sold Over $1.1 Billion Worth of ZoomInfo Stock

401.   By aggressively selling to customers without performing any due diligence, and exploiting the temporary surge in demand for digital products prompted by the COVID-19 pandemic, Defendants took ZoomInfo public on June 4, 2020.  Through the IPO, ZoomInfo sold 44.5 million shares at a price of $21 per share and raising approximately $1 billion for the Company.  ZoomInfo's stock price increased to over $40 per share by the start of the Class Period—an approximately 90% increase from the IPO price.

402.   From the start of the Class Period, Defendants engaged in a scheme to further boost ZoomInfo's stock price despite internal metrics showing demand would soon evaporate.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

122

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Defendants knew that as long as the public continued to believe that ZoomInfo's demand and growth were sustainable and the Company would not lose the customers that has transitioned to its product after the start of the pandemic, Defendants would be able to prevent ZoomInfo's stock price from falling.

403.    Indeed, as the pandemic receded and demand declined, Defendants attempted to keep ZoomInfo's stock price artificially propped up by touting misleading metrics indicating that ZoomInfo's growth and demand were strong and sustainable. However, unbeknownst to investors, ZoomInfo's growth was not sustainable because it relied on an aggressive "growth at all costs" sales strategy and loose standards for signing unqualified customers.

404.    For example, to further conceal its internal collections problems from investors, Defendants manipulated ZoomInfo's key accounting metrics—most notably RPO—to avoid addressing the growing gap between ZoomInfo's meteoric growth figures and ZoomInfo's actual cash collection. *See* Sections IV.B. and IV.C., *supra*. By failing to properly conduct a variable constraint analysis for the contracts and failing to write down accounts known to be uncollectable, Defendants' accounting fraud overstated ZoomInfo's RPO and allowed the Company to meet its growth guidance—and Wall Street estimates—without having to disclose uncollectible contracts and, hence, declining growth in accordance with GAAP. *See supra* Section IV.C. and VI.

405.    All the while, Defendants collectively sold **billions** of dollars' worth of their personal holdings of ZoomInfo stock.

406.    Specifically, during the Class Period, Defendants Schuck, Hyzer, and Hays kept the stock price artificially inflated so they could personally enrich themselves at the expense of public shareholders. Specifically, Defendants Schuck, Hyzer, and Hays each made the following open market sales during the Class Period:

> (a)    Schuck sold 21,345,375 shares of his ZoomInfo stock, personally reaping **over $1.07 billion** in proceeds;
>
> (b)    Hyzer sold 609,343 shares of his ZoomInfo stock, personally making **over $35 million** in proceeds;

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

123

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

(c)    Hays sold more than 1,164,466 shares of his ZoomInfo stock, personally making **over $66 million** in proceeds.

407.    Although many of Schuck's, Hyzer's, and Hays's open market sales were made pursuant to Rule 10b5-1 trading plans, Defendants implemented that plan as part of their scheme and when they were already in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth.  For example, as outlined above, Defendants knew that their sales growth contained an undisclosed financial risk by way of the lack of due diligence performed into customers ability to pay.  Moreover, Defendants also directed the Company to inflate its RPO figures to give the false appearance of revenue growth.  *See supra* Sections IV.B. and IV.C.  Therefore, the existence of a Rule 10b5-1 plan does not negate any inference of scienter.[29]

408.    Moreover, although the 10b5-1 plan was in place, Schuck sold hundreds of millions of dollars' worth of stock outside of the parameters of that plan.  Specifically, as explained below, Defendants furthered their fraudulent scheme by causing ZoomInfo to issue two secondary offerings that allowed Defendants Schuck, TA Associates, and Carlyle Group to collectively sell **over $2 billion** worth of stock in one month.

### 2.    Defendants Furthered Their Scheme by Selling $2 Billion Worth of Shares in Two Secondary Public Offerings

409.    As outlined above, Defendants issued several false and misleading statements that caused ZoomInfo's stock price to skyrocket.  *See supra* Section VI.  Looking to take advantage of

---

[29] Critically, throughout the rest of the Class Period, Defendant Hays made 15 insider sales outside of his Rule 10b5-1 trading plan, which were allegedly sold to cover his tax liability associated with the vesting of certain securities between February 2021 and February 2022.  Although the rest of his sales were sold pursuant to his 10b-5 trading plan, Defendant Hays implemented the plan as part of the scheme and when he was already in possession of material, non-public information about the unsustainability of ZoomInfo's growth.  For instance, as alleged herein, by 2021, Defendant Hays knew that the demand for the Company's offerings had deteriorated.  Subsequently, Defendant Hays, along with Defendants Schuck and Hyzer, conspired to conceal the demand and growth problems by directing the Company to sell to unqualified, unvetted customers with known collectability problems and to engage in undisclosed renewal tactics.  *See supra* Sections IV.B. and IV.K.  Therefore, the existence of a Rule 10b5-1 plan does not negate any inference of scienter.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

124

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

this artificial inflation, and while in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth, Defendants devised a scheme to sell massive chunks of their ZoomInfo stock in August 2021 outside of any 10b5-1 trading plan.

410.    With the stock trading at increased prices in August 2021,[30] Defendants caused ZoomInfo to issue two secondary offerings that allowed certain selling shareholders of the Company—including Defendants Schuck, TA Associates, and Carlyle Group—to sell millions of shares of ZoomInfo stock directly to the public.

411.    It is worth mentioning that there are generally two types of secondary offerings. The first type is an offering where a public company creates and sells newly issued shares to the public.  In this type of offering, the company benefits directly because it raises capital to help fund certain business objectives.  The second type of secondary offering (and the one Defendants used here) occurs when a company offers for sale shares already held by certain insiders, such as directors, officers, or other company insiders.  In this type of offering, the securities are held by insiders and sold to other investors through a stock exchange.  As such, the proceeds from a secondary offering go directly to the insiders—not the company whose shares change hands.

412.    Here, Defendants chose the second type of secondary offering and issued two secondary offerings in August 2021 that allowed certain Company insiders to sell billions of dollars' worth of their shares to the public while the Company's stock price was trading at or near all-time highs.

(a)    **The August 6, 2021 Secondary Offering**

413.    On August 3, 2021, ZoomInfo announced that certain selling shareholders of the Company—including Defendants Schuck, TA Associates, and Carlyle Group— were offering for sale, in an underwritten secondary offering, 27 million shares of the Company's Class A common stock, pursuant to the Company's Registration Statement on Form S-3, at a maximum public offering price of $55.25 per share.

---

[30] Indeed, by August 5, 2021, ZoomInfo's stock price soared to $66.58 per share—a 66% increase from the start of the Class Period less than a year earlier.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    125

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

414.    Notably, all proceeds from the August 6 Secondary Offering went to the selling shareholders themselves. No shares were sold by ZoomInfo in the offering, and the Company did not receive any proceeds from it. According to the Company's Prospectus filed with the SEC in connection with the August 6 Secondary Offering, the selling shareholders' total proceeds from the offering was $1.48 billion. This was hundreds of millions of dollars **more** than what the Company itself raised in connection with their initial public offering just over a year earlier.[31]

415.    In connection with the August 6 Secondary Offering, Defendant Schuck sold 3,286,639 shares at an offering price of $54.75 per share, making **<u>over $179.9 million</u>** in a single day while in possession of material nonpublic information.[32] Notably, as mentioned above, these sales were made outside of the parameters of Schuck's Rule 10b5-1 trading plan.

416.    Defendant TA Associates sold 9,625,934 shares at an offering price of $54.75 per share, making **<u>over $527 million</u>** in a single day in connection with the August 6 Secondary Offering.[33]

417.    Defendant Carlyle Group also sold 9,236,692 shares at an offering price of $54.75 per share, making **<u>over $505 million</u>** from the offering.[34]

418.    In total, Defendants Schuck, TA Associates, and Carlyle Group made **<u>over $1.2 billion</u>** from the August 6 Secondary Offering by selling their artificially inflated ZoomInfo stock directly to the public.

---

[31] Specifically, on June 8, 2020, ZoomInfo completed the IPO, in which it sold 51,175,000 shares of Class A common stock (including shares issued pursuant to the exercise in full of the underwriters' option to purchase additional shares) at a public offering price of $21.00 per share for net proceeds of just over $1.01 billion, after deducting underwriters' discounts (but excluding other offering expenses and reimbursements).

[32] Defendant Schuck was the indirect owner of the shares in question. Specifically, the shares were held directly by DO Holdings (WA) LLC, which was owned and controlled by Defendant Schuck and Kirk Brown. In total, DO Holdings (WA) LLC sold 5,920,821 shares in the August 6 Secondary Offering.

[33] TA Associates' trades were related to various investment funds associated with and controlled by TA Associates.

[34] Carlyle Group's trades were related to various investment funds associated with and controlled by Carlyle Group.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    126

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(b)    **The August 11, 2021 Secondary Offering**

419.    On August 9, 2021, the Company announced another secondary offering of an additional 20 million shares of ZoomInfo stock held by certain selling shareholders, including Defendants Schuck, TA Associates, and Carlyle Group, at a maximum public offering price of $63.00 per share.

420.    Like the August 6 Secondary Offering, all proceeds from the August 11 Secondary Offering went to the selling shareholders themselves.  No shares were sold by ZoomInfo in the offering, and the Company did not receive any proceeds from it.

421.    In connection with the August 11 Secondary Offering, Defendant Schuck sold 2,545,328 shares at an offering price of $62 per share—near an all-time high for the Company's stock and a 54% increase from the first day of the Class Period—personally reaping proceeds of over $157.8 million in a single day.  Then, on September 2, 2021, Defendant Schuck exercised an over-allotment option granted in connection with the August 11 Secondary Offering and sold an additional 386,020 shares at $62 per share, reaping an additional $23.9 million in proceeds.  In total, Defendant Schuck personally made **over $181.7 million** in connection with the August 11 Secondary Offering.

422.    Defendant TA Associates sold 6,953,598 at an offering price of $62 per share, making over $431 million in proceeds.  Then, on September 2, 2021, Defendant TA Associates exercised an over-allotment option granted in connection with the August 11 Secondary Offering and sold an additional 1,043,039 shares at $62 per share, reaping an additional $64.6 million in proceeds.  In total, Defendant TA Associates made **over $495.6 million** from the August 11 Secondary Offering.

423.    Defendant Carlyle Group sold 7,401,220 shares at an offering price of $62 per share, making over $458 million in proceeds.  Then, on September 2, 2021, Defendant the Carlyle Group exercised an over-allotment option granted in connection with the August 11 Secondary Offering and sold an additional 1,035,891 shares at $62 per share, making an additional $64.2 million and reaping a total of **over $523.1 million** from the August 11 Secondary Offering.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                          127                 BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

424.    In total, Defendants Schuck, TA Associates, and Carlyle Group made **over $1.2 billion** in connection with the August 11 Secondary Offering.

425.    Together with the August 6 Secondary Offering, Defendants Schuck, TA Associates, and Carlyle Group collectively made **over $2.4 billion** from the two secondary offerings by selling their shares directly to the public at artificially inflated prices.

426.    Moreover, Defendants TA Associates and the Carlyle Group continued selling shares outside of the secondary offerings.  In total, during the Class Period, TA Associates sold 59 million shares, making **over $3.54 billion**, and Carlyle Group sold over 67 million shares, making **over $3.96 billion**.    Together, these defendants made **over $7.5 billion**, and with Defendant Schuck, **over $8.57 billion**, during the Class Period.

**B.    Defendants Schuck, Hyzer, and Hays Personally Directed the Company to Sell to Unqualified Customers and Engage in Coercive and Predatory Sales Practices**

427.    As alleged herein, Defendants Schuck, Hyzer, and Hays played a pivotal role in planning and executing the fraudulent scheme to pump up ZoomInfo's stock price so they could cash out their holdings. Defendants' direct involvement in inflating the Company's sales growth by directing ZoomInfo's salespeople to execute subscription contracts with customers without performing any due diligence, therefore, supports a strong inference of scienter.  Leading up to and during the Class Period, Defendants' fraudulent growth story produced its desired results and ZoomInfo's rose higher—despite the concealed financial risk related to its scores of customers—particularly SMB customers—that had a high likelihood of nonpayment.

428.    Numerous FEs confirm that Defendants, including Schuck himself, directed these acts for the purpose of inflating ZoomInfo's stock Price. For example, FE-2, a former Senior Sales Manager, detailed that approximately eight months prior to going public, Schuck began talking about the IPO and the Company's "exit plan" during monthly meetings.  FE-2 explained that during monthly meetings leading up to the IPO, Schuck told employees that the Company needs "all-hands-on-deck" to sign up as many customers as possible.  FE-2 added that in the months leading up to the IPO, the Company began distributing equity in ZoomInfo to employees who

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

128

previously did not have it in order to incentivize them to sell to as many customers as possible because the Company's stock price would increase if they were successful in signing up new customers.

429.    Moreover, FEs directly tied the aggressive sales practice and lack of due diligence to customers defaulting on their payment obligations.  For instance, according to FE-3, ZoomInfo's problem with non-payments from customers resulted from the company's aggressive sales incentives and culture, including CEO Henry Schuck's insistence that the company "just sell, sell, sell, sell" – and the company's rapid expansion upon its acquisition by DiscoverOrg.  FE-3 continued to say that the actions of the Company made the aggressiveness apparent, including not conducting credit checks on potential customers, not requiring upfront payment from customers, and not requiring more than a business name and a business address to get a deal signed.    FE-3 explained that there were "no barriers" and "no constraints" placed on the Sales Team regarding which potential customers they could sell to.  FE-3 noted that ZoomInfo "sold to anyone with a pulse, basically."  According to FE-3, "[t]he entire length of the company, a decade, the entire thing is just sell – just sell, get that deal signed.  Does it mean we're going to collect the money?  No.  That's what was happening at a large scale here.  But it got out of control."

430.    Then, as the demand and renewal problem continued to worsen, Defendant Schuck pushed the sales team to use the predatory auto-renewal policy as a leverage to obtain renewals with customers.  FEs also describe how ZoomInfo's attempts to enforce the auto-renewal provision entrapped customers and were met with great resistance from customers—particularly SMBs— that were not able to pay, a problem created by ZoomInfo's failure to conduct initial due diligence.

431.    Defendants' plan to force renewals was simple.  First, entrap customers in an autorenewal, and then threaten them with litigation or turning them over to collection agencies. For example, FE-5, recalled that there were Account Managers who instructed her to not contact customers until their contract was 59 days away from ending. FE-5 explained that the deadline to opt-out was 60 days and by waiting the extra day it ensured the customer was locked into their renewal, which assisted Account Managers in meeting their quotas.  Moreover, FE-10 continued

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                          129

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

to explain that she had seen the copy used for renewal opt-out e-mails and through discussions with colleagues, it appears that the Company purposely structured them with the hope that it would be caught in the user's spam filter and therefore missed.

432.    Defendants utilized these tactics and then dealt with the repercussions after, even though it was clear that the customer was not likely to pay for the autorenewal.  For example, FE-10 recalled discussions with colleagues where they noted that they felt like they were a collections agency for customers who did not want to continue their relationship after being locked into a renewal.  FE-9, a former Senior Account Executive, further explained that auto-renewals were a common reason and SMB customers were prone to "ghosting" ZoomInfo.  FE-9 stated that issues with the auto-renewal policy contributed to "a lot of people not paying."

### C.    Defendants Hyzer and Schuck Closely Monitored Metrics Concerning Demand, Renewal, and Retention

433.    During the Class Period, Defendants repeatedly told investors that they closely monitored the Company's metrics concerning demand, renewal, and retention. For instance, Defendant Schuck stated during the Truist Securities Technology, Internet & Services Conference on March 10, 2021: "And then I think mostly, **we're tracking internally like usage on all of these different products, and where things are falling off**. Where things are accelerating, and making sure we're staying focused on those metrics for the future." Likewise, on December 8, 2021, during the UBS Global TMT Conference, Defendant Hyzer stated that "**we've built a number of tools to look at the engagement and usage of individual users and identifying where we could get in front of people that we're exhibiting less than ideal activity well before the renewal to make sure they're getting all the value out of the platform that there could be**."

434.    Additionally, according to the Company's 10-K for the fiscal year of 2020, filed on February 26, 2021, Defendant Schuck was designated as the chief operating decision maker ("CDOM"), who "reviews financial information for purpose of making operating decisions, assessing financial performance and allocating resources." Further, Defendant Schuck admitted

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

130

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

to tracking different metrics and that he could "feel the rhythm of [his] business." Specifically, during a July 4, 2022 interview with SaaStock, Defendant Schuck said: "There's a whole bunch of data that shows you the rhythm of the business. Without visibility, you cannot properly run the business."

435.     Critically, Defendants Hyzer and Schuck obsessed over metrics. During a March 14, 2024 podcast, *Run the Numbers with CJ Gustafson*, Defendant Hyzer, responding to a questions about the "metrics that you report to the street" (i.e., RPO), stated that "**[t]hose are the metrics that I wake up every day and like think about, that Henry wakes up every day and thinks about**."

436.     Numerous FEs confirmed that they witnessed Defendants taking part in reviewing data regarding the sustainability and profitability of ZoomInfo's sales growth. For example, FEs described Defendants Schuck and Hays reviewing the results of a marketing survey in 2021 that revealed ZoomInfo's market share erosion.

437.     Specifically, according to FE-11, she attended meetings every Thursday with Christopher Hays and Shane Murphy-Reuter to discuss the status updates on demand generation. FE-11 stated that, in 2021, she commissioned a marketing survey in partnership with a vendor to survey several thousand users to compare features of ZoomInfo and their competitors, including data quality, ease of use, etc. FE-11 explained that the results of the survey showed that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed. FE-11 recalled that this was presented during a Thursday meeting that she had weekly with Hays and Murphy-Reuter, but it was "buried because it did not tell the story they wanted to tell."

438.     FE-11 added that ZoomInfo wouldn't realize that the competition was real. FE-11 added that this survey alluded to the declining market share held by ZoomInfo. According to FE-11, ZoomInfo no longer has the best data when previously, as DiscoverOrg, their data quality was what set them apart. FE-11 explained that ZoomInfo "scaled too big" and maintaining the quality of their datasets became more difficult. FE-11 explained that she also had meetings with

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

131

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

[Defendant] Hays, former Chief Marketing Officer Shane Murphy-Reuter, and [Defendant] Schuck that occurred every few weeks during her 2021 tenure. FE-11 explained that she had expressed in these meetings that ZoomInfo's "gravy train of growth" was slowing down to the executives present. FE-11 explained that the "hyper growth" the Company had experienced was not going to last and the Company needed to admit that.

439. Defendants knew that ZoomInfo's subscription contracts were risky and faced serious collectability problems because they tracked customer usage. For example, FE-7 explained that low utilization rates were a "clear sign of trouble" and once seeing these figures she could tell if the New Business group had signed up customers for "a lot" of products that they were not going to use.

440. Indeed, ZoomInfo's robust internal tracking systems confirmed this growing problem of customers not using the Company's platform. Numerous FEs recalled that ZoomInfo's representatives had access to account health information through an online system called Gainsight. FEs explained that the figures from Gainsight were made visible to senior leadership through other internal systems including Salesforce—platforms to support businesses' efforts to manage their customer relationships. Critically, this reporting assigned ZoomInfo's customers scores and color coding based predominantly on how often the customer was logging in and using ZoomInfo which sent an unmistakable signal to Defendants that declining usage rates and collectability challenges were occurring in droves.

441. For example, FE-8 recalled the ability to see notes regarding the health and risk associated with specific accounts in ZoomInfo's customer relationship management (CRM) platform, Gainsight. According to FE-8, Gainsight housed information on all of ZoomInfo's customer accounts. FE-8 explained that ZoomInfo collected usage metrics directly from the customer's platform and that information went to both Gainsight and Salesforce.

442. FE-8 continued to explain that every account had its own Health Score that was color-coded and designated as red, yellow, or green and this was calculated in Gainsight and visible in the dashboard. According to FE-8, the overall Health Score was primarily determined by

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                     132

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

considering the number of active versus unactive licenses and customer sentiment. FE-8 added that customer sentiment was manually input by the representatives responsible for the account and based on conversations with customers. Similarly, according to FE-12, prior to contacting customers she was able to see account metrics in Salesforce to give her an idea of the account's health.

443. FEs confirmed that Defendant Schuck and Hyzer interacted with the information set forth in Gainsight by presenting the color-coded scores in internal meetings. For example, FE-4 recalled quarterly All Hands Meetings typically led by current CEO Henry Schuck and former CFO Cameron Hyzer that also served as a "State of the Union" regarding customer account health. FE-4 further recalled that that the meeting included a "color coded box sequence" with "green fading into yellow, fading into red." FE-4 continued to say based on the customer health status displayed in these meetings that she thought to herself that the current status was "not where we [ZoomInfo] wanted to be." FE-4 recalled having customers that did not use ZoomInfo's product at all or only logged in once a month or went even longer in between logins. FE-4 explained that, if a customer had five to ten seats that there were one or two logging in. FE-4 described that "plenty had not done the basics" with respect to product usage. According to FE-4, it was likely that the percentage of total licenses on her book that were not logging into their ZoomInfo account was greater than 30-45%.

### D. Defendants' Post-Class Period Admissions Support a Strong Inference of Scienter

444. After the end of the Class Period, Defendants admitted that Defendants' undisclosed practices—including entering into contracts with unqualified customer without conducting any due diligence and coercing customers into renewing their contracts—during the Class Period primarily contributed to the $33 million accounting charge.

445. For instance, on August 13, 2024, Defendants attended the CG Growth Conference and spoke extensively about the financial results for 2Q 2024 and the $33 million accounting charge. For instance, Defendant Schuck admitted root cause of the charge was that **"[ZoomInfo]**

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

133

1   **extended credit historically to customers who weren't creditworthy**."  Likewise, Michael

2   O'Brien, the succeeding and current CFO, acknowledged:

> **In June [2023], the receivable cohort that began to progress
> through actually had a higher risk of non-payment than we had
> previously estimated**.  And we applied that increased estimate to
> all the other cohorts that were progressing though the aging at that
> time.  That's what led to the revenue and bad debt charges you saw
> in our results in Q2.

446.   Then, Michael O'Brien, during the December 4, 2024 Wells Fargo TMT Summit,

further clarified the mechanics behind the $33 million charge and admitted that Defendants had

visibility into the collectability and retention problems with SMB customers—

> And then[,] late in 2023 and into 2024, we started to experience
> incremental weakness in our SMB, our small and medium-sized
> businesses. And that showed up kind of in 2 forms.  In late 2023,
> showed up in a increase in our write-off rate or our non-collection
> of cash.  **So, that led to more bad debt expense, that led to us
> upping reserves at that time. And then, in Q2 of this year, we
> saw an incremental increase there, a result of us taking a charge
> on the P&L in Q2, which effectively increased our estimates
> behind those rates and accounted for any P&L activity that had
> occurred to date**.

> So, what that did is effectively remove the volatility from kind of
> change in rates heading into the future.  **We also saw SMB
> retention get worse this year than it was year-to-date last year.**
> And we view that as just a tougher economic environment at the tail
> end of potentially this economic cycle we're in.

447.   Defendants' admission above directly contradicted Defendants' disclosures

concerning the Company's RPO and their assurances that they were seeing strong demand and

renewal from their customers. *See supra* Section VI.  Therefore, when considered holistically, the

admissions support a strong inference that the Individual Defendants had knowledge about, or

were reckless in disregarding, the elevated risk of non-collectability and waning customer demand,

particularly within the SMB segment.

**E.    Defendants' SOX Certifications Support a Strong Inference of Scienter**

448.   As a public company, ZoomInfo must comply with the Sarbanes-Oxley Act of

2002, 15 U.S.C. § 7241 ("SOX"), which required the Company's CEO and CFO to certify

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

134

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

ZoomInfo's quarterly and annual reports filed with the SEC and the procedures established by ZoomInfo to prepare the financial statements and disclosures.  Notably, Congress enacted SOX **for the express purpose of protecting investors by improving the accuracy and reliability of corporate disclosures**.  Accordingly, investors understood Defendants Schuck and Hyzer executing these certificates throughout the Class Period as their word that ZoomInfo's financial reporting was accurate and complete, as based on Schuck and Hyzer's own evaluations.

449.   However, contrary to Schuck and Hyzer's certifications, they knew that ZoomInfo's financial reporting contained material misstatements by way of the Company's overstatement of its RPO, which resulted from the Company's years of aggressive sales practices involving the Company signing contracts with customers without performing any due diligence into their likelihood of payment.  Defendants directed this sales practice to drive up ZoomInfo's stock price and sell their own shares for a profit.  By way of signing the SOX certifications, Defendants Schuck and Hyzer knew, or at the very least were severely reckless in not knowing that the financial reporting contained such material misstatements—the very kind that SOX was enacted to protect investors from.

450.   Specifically, Defendants allowed delinquent accounts to sit in the Company's books as accounts receivable **for months**—which demonstrated that the Company would never collect revenue on these contracts and should have been written down. For example, according to FE-3, ZoomInfo was keeping customers on the books as accounts receivable even though they were many months delinquent, up to 360 days, and such customers should have been written off as uncollectable.   Finally, multiple FEs confirm that Schuck and Hyzer closely tracked performance metrics within the Company, as set forth in Sections IV.I and VIII.C., *supra*.  Indeed, Defendants spoke often about how closely they looked at the Company's financial figures.  For example, in response to an interview on March 14, 2024, Hyzer stated, of the Company's financial metrics reported to investors, "**[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about**."

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                   135

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

451.    Given Defendants Schuck and Hyzer's representation to investors that they closely monitored the Company's financial figures, their execution of SOX certificates indicates knowledge of the Company's false and misleading financial figures.  At the very least, if they were not aware, Defendants Schuck and Hyzer were severely reckless by not knowing the underlying facts behind the Company's materially misleading reports, as set forth in Sections IV.B. and IV.C., *supra*, and executed their SOX certificates regardless.

### F.    Continued Customer Demand and Growth for the Company's Go-To-Market Intelligence Platform Were Critical to ZoomInfo's Core Operations

452.    The Individual Defendants' knowledge, or their reckless disregard, of the declining customer demand and growth and Defendants' undisclosed scheme to conceal the problems can be inferred because these facts were critical to ZoomInfo's core operations.

453.    Continued customer demand and growth for ZoomInfo's Go-To-Market business intelligence platform were critical to ZoomInfo's business.  Indeed, according to the Company's 2021, 2022, and 2023 10-Ks, nearly 99% of ZoomInfo's revenue came from ZoomInfo's intelligence platform, which operates as subscription services, throughout the Class Period. Similarly, as Defendant Hyzer described ZoomInfo's business model, "**the beauty of our business is that it is 100% subscription-based business, which means that what we're recognizing as revenue is really the best indicator of what we're servicing for our customers**."

454.    Specifically, at the beginning of the Class Period, the Company experienced unprecedented demand and growth for its platform, and the Individual Defendants assured the market that demand would not normalize even after COVID-19.  For instance, on August 10, 2020, Defendant Schuck stated: "**We are a go-to market intelligence platform at scale today . . . Given the opportunity here, and the demand for more comprehensive sales and marketing solutions, we believe we can drive durable long-term growth**."

455.    Given the critical importance of ZoomInfo's intelligence platform, which represents substantially all of the Company's revenue, to ZoomInfo's business, Defendants' knowledge, or their reckless disregard, of the problems associated with the declining customer

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

136

demand and growth for the Company's core product and Defendants' undisclosed scheme to cover up the lack of demand and growth can be inferred.

### G. Defendant Hyzer's Suspiciously Timed Departure Supports an Inference of Scienter

456. The proximity between the departure of Defendants Hyzer and the revelation of the $33 million charge is suspicious and therefore supports an inference of scienter. Defendant Hyzer, who had been with ZoomInfo for nearly six years, was instrumental to the Company's financial success. As acknowledged by Defendant Schuck, under Defendant Hyzer's leadership, the Company had "grown to $1.2 billion in revenue, navigated the IPO process and public markets, and driven strong margins and cash flow."

457. Despite his success, the Company abruptly disclosed his departure when Defendants also disclosed the accounting impairment. As alleged herein, on August 5, 2024, ZoomInfo disclosed that the Company was incurring a $33 million charge due to non-payment and collectability problems with their customers, particularly SMB customers, sending the stock crashing 18%. On the same day, the Company also announced the departure of Defendant Hyzer who would "transition to serve in an advisory capacity until October 7, 2024 to facilitate a seamless transition" and appointed Vice President of FP&A, Michael Graham O'Brien, as the interim Chief Financial Officer. Additionally, although the market had not begun to suspect Defendant Hyzer's sudden departure, in the Form 8-K released on the same day, the Company explicitly disclaimed that "Mr. Hyzer's departure as CFO and PFO is not due to any disagreement with the Company on any matter relating to the Company's financial statements, internal control over financial reporting, operations, policies or practices."

458. Therefore, the timing and the circumstances—the resignation and the revelation of the accounting fraud happened on the same day—surrounding Defendant Hyzer's abrupt departure support an inference of scienter.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

137

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

IX.     **DEFENDANTS' SCHEME TO DEFRAUD**

459.     Throughout the Class Period, Defendants needed to maintain the Company's high stock price so they could cash out their holdings in ZoomInfo stock at top dollar.  Thus, to pump ZoomInfo's stock price, Defendants planned and executed a scheme to inflate the Company's sales growth by executing subscription contracts with customers without performing any due diligence into those customers' ability to pay and convincing investors that this sales growth was profitable and sustainable.  Accordingly, Defendants employed the following artifices to artificially boost ZoomInfo's sales growth and make the growth appear profitable and sustainable, in furtherance of their textbook insider sales scheme: (1) Defendants sold ZoomInfo subscription contracts to unvetted customers without conducting due diligence into their likelihood of nonpayment; (2) Defendants overstated ZoomInfo's RPO financial figures by failing to account for customers' likelihood of nonpayment and known collectability problems—particularly among ZoomInfo's SMB customer segment; (3) Defendants further inflated ZoomInfo's RPO by not writing down bad debts that were uncollectable,  and allowing these accounts to remain in accounts receivable for up to hundreds of days, despite their ongoing delinquency; and (4) Defendants made materially misleading statements and omissions designed to conceal the scheme and convince investors that ZoomInfo's sales growth was profitable and sustainable.

460.     Defendants' fraudulent growth story produced its desired results.  ZoomInfo's sales skyrocketed—premised on sales to financially risky SMB customers—allowing ZoomInfo's stock price to soar during the Class Period, rising as high as $77.35 per share during the Class Period. Defendants took full advantage of the artificially inflated stock price by employing the final artifice of their pump-and-dump scheme: manipulating their trading plans and dumping **$8.6 billion** of their shares on unsuspecting investors.  Defendant Schuck alone reaped approximately **$1.1 billion personally** in insider sales proceeds.

461.     Critically, Defendants Schuck and Hyzer furthered Defendants' scheme by making statements and omissions designed to convince investors that ZoomInfo's growth was profitable and sustainable.  Thus, in addition to engaging in a scheme to defraud in violation of Rule 10b-

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

138

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

5(a) and (c), ZoomInfo, Defendant Schuck, and Defendant Hyzer made misleading statements and omissions regarding the following subjects in violation of Rule 10b-5(b): (1) ZoomInfo's financial figures, including RPO; (2) the source, sustainability, and risk of ZoomInfo's sales growth; and (3) demand for ZoomInfo's products, including in relation to the COVID-19 pandemic.

## X.    CONTROL PERSON ALLEGATIONS

462.    The Individual Defendants, by virtue of their high-level and controlling positions at ZoomInfo, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

463.    The Sponsor Defendants, as controlling shareholders of the Company during the Class Period, by virtue of their high-level and controlling positions at ZoomInfo, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

464.    Individual Defendants Schuck, Hyzer, and Hays, as senior executive officers of ZoomInfo—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ZoomInfo's publicly traded common stock would be based on accurate information.  Each of the Individual Defendants violated these requirements and obligations during the Class Period.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    139

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

465.    The Sponsor Defendants, as controlling shareholders of ZoomInfo—a publicly-held company that's common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ZoomInfo's publicly traded common stock would be based on accurate information.  Each of the Sponsor Defendants violated these requirements and obligations during the Class Period.

466.    The Individual Defendants and the Sponsor Defendants, because of their positions of control and authority as senior executive officers of ZoomInfo, were able to and did control the content of ZoomInfo's SEC filings, press releases, and other public statements issued by or on behalf of ZoomInfo during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

467.    Accordingly, the Individual Defendants and Sponsor Defendants were responsible for the accuracy of the public statements alleged herein.

468.    The Individual Defendants and Sponsor Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of ZoomInfo common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts.  The scheme deceived the investing public regarding ZoomInfo's business, operations, and management, and the intrinsic value of ZoomInfo's common stock, and caused Lead Plaintiffs and members of the Class to purchase ZoomInfo common stock at artificially inflated prices.

## XI.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

469.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

140

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased ZoomInfo's publicly traded Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

471. At all relevant times, the market for ZoomInfo shares was efficient for the following reasons, among others:

(a) ZoomInfo's Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, ZoomInfo filed periodic public reports with the SEC and the NASDAQ;

(c) ZoomInfo regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d) ZoomInfo was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

141

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

472.   As a result of the foregoing, the market for ZoomInfo's securities promptly digested current information regarding ZoomInfo from publicly available sources and reflected such information in ZoomInfo's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired ZoomInfo's Class A common stock during the Class Period suffered similar injuries through their purchase of ZoomInfo common stock at artificially inflated prices and thus, the presumption of reliance applies.

473.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of ZoomInfo common stock.

474.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of ZoomInfo's Class A common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

475.   To the extent that Defendants concealed or improperly failed to disclose material facts with respect to ZoomInfo's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XII.   NO SAFE HARBOR

470.   The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

471.   **First**, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions that are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current facts; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                          142                          BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1    and are not entitled to safe harbor protection with respect to the part of the statement that refers to

2    the present.

3    472.  **Second**, any purported forward-looking statements were not accompanied by

4    meaningful cautionary language because any risks that Defendants warned of had already come to

5    pass, and any cautionary language did not mention important factors of similar significance to

6    those actually realized.  Additionally, to the extent Defendants included any cautionary language,

7    such language was not meaningful because any potential risks identified by Defendants had

8    already manifested.  To the extent Defendants included any cautionary language, it was not precise

9    and did not relate directly to any forward-looking statements at issue.  Defendants' cautionary

10   language was boilerplate and did not change during the Class Period, despite the fact that

11   conditions had materially changed.

12   473.  **Third**, to the extent that there were any forward-looking statements that were

13   identified as such, Defendants are liable because, at the time each of those forward-looking

14   statements was made, the speaker knew the statement was false when made.

15   **XIII.  CLASS ACTION ALLEGATIONS**

16   474.  Lead Plaintiffs bring this Action pursuant to Rule 23 of the Federal Rules of Civil

17   Procedure on behalf of themselves and all persons and entities who or which purchased or

18   otherwise acquired the publicly traded common stock of ZoomInfo Technologies, Inc. during the

19   Class Period and who were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii)

20   members of the immediate family of any Defendant who is an individual; (iii) any person who was

21   an officer, director, or control person of ZoomInfo, TA Associates, Carlyle Group, and/or DO

22   Holdings during the Class Period, and members of their immediate families; (iv) any firm, trust,

23   corporation, or other entity in which any Defendant has or had a controlling or beneficial interest;

24   (v) ZoomInfo's employee retirement and benefit plan(s), if any, and their participants or

25   beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

26   representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in

27   their capacities as such.

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                        143

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

475.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, ZoomInfo had between approximately 365 million and 404 million shares of common stock outstanding, which were actively traded on the NASDAQ.

476.    While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can be ascertained only through appropriate discovery, it is likely that the proposed Class numbers is in the thousands and is geographically widely dispersed.  Record owners and other Class members may be identified from records maintained by ZoomInfo and may be notified of the pendency of this Action by mail, using a form of notice similar to that customarily used in securities class actions.

477.    Lead Plaintiffs' claims are typical of the claims of the Class members.  All the Class members were similarly affected by Defendants' conduct in violation of the Exchange Act as alleged herein.

478.    Lead Plaintiffs will fairly and adequately protect the interests of the Class members. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

479.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, without limit:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period contained material misrepresentations;

(c)    whether the Defendants' statements omitted material facts that Defendants had a duty to reveal;

(d)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                                144

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

(e)     whether Defendants acted knowingly or deliberately recklessly in issuing false and misleading financial statements;

(f)     whether the price of ZoomInfo securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein;

(g)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972);

(h)     whether the individuals were controlling persons of ZoomInfo; and

(i)     whether and to what extent the Class members suffered losses due to Defendants' fraudulent conduct.

480.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all Class members is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIV.   COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5(b) Promulgated Thereunder
(Against All Defendants)**

481.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

482.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC, on behalf of Lead Plaintiffs against all Defendants.

483.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded or were deliberately reckless in disregarding were misleading in that they contained misrepresentations and failed to disclose

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              145

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1  material facts necessary in order to make the statements made, in light of the circumstances under
2  which they were made, not misleading.

3      484.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they
4  made untrue statements of material facts or omitted to state material facts necessary in order to
5  make the statements made, in light of the circumstances under which they were made, not
6  misleading.

7      485.    Defendants acted with scienter in that they knew that the public documents and
8  statements issued or disseminated in the name of ZoomInfo were materially false and/or
9  misleading; knew that such statements or documents would be issued or disseminated to the
10  investing public; and knowingly and substantially participated, or acquiesced in the issuance or
11  dissemination of such statements or documents as primary violations of the securities laws.  These
12  Defendants by virtue of their receipt of information reflecting the true facts of ZoomInfo, their
13  control over, and/or receipt and/or modification of ZoomInfo's allegedly materially misleading
14  statements, and/or their associations with the Company which made them privy to material
15  concerning ZoomInfo, participated in the fraudulent scheme alleged herein.

16      486.    The Individual Defendants, who are the senior officers and/or directors of the
17  Company, had actual knowledge of the material omissions and/or the falsity of the material
18  statements set forth above, and intended to deceive Lead Plaintiffs, or in the alternative, acted with
19  reckless disregard for the truth when they failed to ascertain and disclose the true facts in the
20  statements made by them or other ZoomInfo personnel to members of the investing public,
21  including Lead Plaintiffs.

22      487.    As a result of the foregoing, the market price of ZoomInfo securities was artificially
23  inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Lead
24  Plaintiffs relied on statements described above and/or the integrity of the market price of ZoomInfo
25  securities during the Class Period in purchasing ZoomInfo securities at prices that were artificially
26  inflated as a result of Defendants' false and misleading statements.

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    146

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

488.    Had Lead Plaintiffs been aware that the market price of ZoomInfo securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not adequately disclose to market professionals, they would not have purchased ZoomInfo's securities at the artificially inflated prices that they did, or at all.

489.    As a result of the wrongful conduct alleged herein, Lead Plaintiff suffered damages in an amount to be established at trial.

490.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiffs for substantial damages which they suffered in connection with their purchase of ZoomInfo securities during the Class Period.

## COUNT II

### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Promulgated Thereunder
### (Against All Defendants)

491.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

492.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder by the SEC, on behalf of Lead Plaintiffs and the Class against all Defendants.

493.    Accordingly, although Lead Plaintiffs are not required to allege in this Court nor prove in this case that any of the Defendants made any misrepresentation or omissions of material fact for which they may also be liable under Rule 10b-5(b)  and/or any other provisions of law, Lead Plaintiffs have adequately alleged that Defendants made materially false and misleading statements for which they are liable under Rule 10b-5(b).

494.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                    147

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

Lead Plaintiffs and the Class; (ii) artificially inflate the price of ZoomInfo common stock; and (iii) cause Lead Plaintiffs to purchase ZoomInfo common stock at artificially inflated prices.

495. Specifically, Defendants' actions and course of business conduct throughout the Class Period were designed to convince investors that the Company had strong and growing demand that was not due to the COVID-19 pandemic and would continue as the pandemic faded.

496. Defendants' fraudulent scheme also involved contracting with risky SMB and Mid-Market customers, whose ability to pay was not vetted and would bring collectability problems. At the same time Defendants touted that their customer growth in these two segments was sustainable. Defendants concealed the collectability problem associated with SMB and Mid-Market customers. As a result, investors did not know that the Company was facing issues collecting payment from customers which would impact their financial results.

497. Moreover, a key aspect of their fraudulent scheme, the Individual Defendants sold more than $1 billion worth of ZoomInfo stock while the stock price was artificially inflated due to their fraudulent scheme. Indeed, Defendants manipulated ZoomInfo's accounting metrics to falsely convey that the Company was enjoying strong financial success and growing demand to artificially inflate the stock price prior to offloading their shares.

498. Defendants' scheme unraveled through a series of disclosures revealing that the Company was facing collectability issues from SMB and Mid-Market customers. On August 5, 2024, the Company announced they were incurring a $33 million charge due to customer non-payment and that they would now require pre-payment from smaller customers.

499. Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to perpetrate this fraud.

500. Defendants had actual knowledge of the deceptive conduct alleged herein, or acted with deliberate reckless disregard for the effect of their deceptive conduct. The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated above.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

148

501.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices and course of business included the knowing and/or reckless suppression and concealment of their scheme to defraud investors concerning, among other things that ZoomInfo's demand and growth from SMB and Mid-Market Customers was risky and unsustainable.

502.    Despite the numerous representations that were made to the market–ample opportunity to supplement, alter, or correct such misrepresentations–Defendants failed to do so thereby concealing theirs scheme to defraud investors.

503.    Lead Plaintiff and the Class reasonably relied upon the integrity of the market in which ZoomInfo's common stock traded.

504.    During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or impact of the fraudulent scheme.  Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased ZoomInfo's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

505.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of ZoomInfo common stock during the Class Period.

506.    By reason of the foregoing, Defendants, violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgate thereunder, and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchase of ZoomInfo common stock during the Class Period.

## COUNT III

**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants and the Sponsor Defendants)**

507.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

149

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

508.    During the Class Period, the Individual Defendants participated in the operation and management of ZoomInfo, and conducted and participated, directly and indirectly, in the conduct of ZoomInfo's business affairs.  The Individual Defendants conducted and participated, directly and indirectly, in the conduct of ZoomInfo's affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information about ZoomInfo's misstatements because of their senior positions at the Company.

509.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by ZoomInfo that had become materially false or misleading.

510.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that ZoomInfo disseminated in the marketplace during the Class Period concerning the misrepresentations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ZoomInfo to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of ZoomInfo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of ZoomInfo securities.

511.    Each of the Individual Defendants, therefore, acted as a controlling person of ZoomInfo.  By reason of their senior management positions and/or being directors of ZoomInfo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ZoomInfo to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of ZoomInfo and possessed the power to control the specific activities that comprise the primary violations about which Lead Plaintiffs and the other Class members complain.

512.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                         150

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

## XV.    REQUEST FOR RELIEF

**WHEREFORE**, Lead Plaintiffs respectfully pray for relief and judgment on behalf of themselves and the Class, as follows:

> (a)    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

> (b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

> (c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

> (d)    Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## XVI.    JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED this 1st day of April, 2025

**BYRNES KELLER CROMWELL LLP**

*s/ Bradley S. Keller*
Bradley S. Keller, WSBA #10665
*s/ Joshua B. Selig*
Joshua B. Selig, WSBA #39628
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Tel: (206) 622-2000
Fax: (206) 622-2522
bkeller@byrneskeller.com
jselig@byrneskeller.com

*Liaison Counsel for the Proposed Class*

LABATON KELLER SUCHAROW LLP
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
James T. Christie (*pro hac vice*)

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC

151

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jacqueline R. Meyers (*pro hac vice*)
Kaicheng Yu (*pro hac vice* forthcoming)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
jchristie@labaton.com
jmeyers@labaton.com
nyu@labaton.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

OFFICE OF THE ATTORNEY GENERAL OF
THE STATE OF OHIO
Shawn Busken (*pro hac vice* forthcoming)
30 East Broad Street
Columbus, OH 43215
Tel: (800) 282-0515
Shawn.Busken@OhioAttorneyGeneral.gov

*Additional Counsel for Lead Plaintiff*

AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
Case No. 3:24-cv-05739-TMC                              152

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor,
Seattle, WA 98104
Telephone: 206-622-2000 • Fax: 206-622-2522