UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

_____

| CITY OF PONTIAC POLICE AND | ) | |
| FIRE RETIREMENT SYSTEM, on | ) | |
| Behalf of Itself and All | ) | |
| Others Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:24-cv-05739-TMC |
| | ) | |
| vs. | ) | Seattle, WA |
| | ) | |
| ZOOMINFO TECHNOLOGIES INC., | ) | |
| HENRY SCHUCK, CAMERON HYZER, | ) | |
| JOSEPH CHRISTOPHER HAYS, TA | ) | |
| ASSOCIATES MANAGEMENT, L.P., | ) | |
| THE CARLYLE GROUP, INC., and | ) | |
| DO HOLDINGS (WA), LLC, | ) | |
| | ) | Motion Hearing |
| Defendants. | ) | October 27, 2025 |
| | ) | 1:30 p.m. |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE TIFFANY M. CARTWRIGHT
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff :  Jacqueline Meyers
                     Michael P. Canty
                     Labaton Keller Sucharow LLP
                     140 Broadway
                     New York, NY 10005
                     jmeyers@labaton.com
                     mcanty@labaton.com

                     Joshua Bacon Selig
                     Byrnes Keller Cromwell LLP
                     1000 Second Avenue, 38th Floor
                     Seattle, WA 98104
                     jselig@byrneskeller.com

For Defendants
 Schuck, Hyzer,
 Hays, and DO
 Holdings:          James N. Kramer
                    Orrick Herrington & Sutcliffe
                    405 Howard Street, 7th Floor
                    San Francisco, CA 94105
                    jkramer@orrick.com

For Defendants
 TA Associates
 Management and
 The Carlyle Group:  Deborah S. Birnbach
                    Goodwin Procter LLP
                    100 Northern Avenue
                    Boston, MA 02210
                    dbirnbach@goodwinlaw.com

State Teachers v. ZoomInfo, 10/27/25

P R O C E E D I N G S

\*    \*    \*

THE CLERK:  Your Honor, this is the matter of State Teachers vs. ZoomInfo, Case Number C24-5739-TMC.

Parties, if you could please identify yourselves for the record.

ATTY. CANTY:  Good afternoon, Your Honor.  My name is Michael Canty from the law firm of Labaton Keller Sucharow.

ATTY. MEYERS:  Good afternoon, Your Honor.  My name is Jacqueline Meyers, also from Labaton Keller Sucharow, on behalf of plaintiffs.

ATTY. SELIG:  Good afternoon.  Joshua Selig, Byrnes Keller Cromwell, on behalf of the plaintiffs.

THE COURT:  Good afternoon.

ATTY. KRAMER:  Good afternoon, Your Honor.  James Kramer on behalf of defendants Schuck, Hyzer, Hays, and DO Holdings.  And with me in the courtroom today are Ashley McGrane, who is the EVP and general counsel of ZoomInfo, and Kristin Malone, who is deputy general counsel.

THE COURT:  Great.  And, Mr. Kramer, are you going to be arguing for the individual defendants' motion and then your co-counsel for the --

ATTY. KRAMER:  That's right, Your Honor.  I'll let -- forgive me -- Ms. Birnbach will make her own appearance, but she's going to argue for TA/Carlyle.

State Teachers v. ZoomInfo, 10/27/25

THE COURT:  All right.  So let's start with the motion that's directed at the individual -- at the motion to dismiss for the individual defendants.  And we'll do about 15 to 20 minutes per side, and then we'll go to the motion for the sponsor defendants; all right?

ATTY. KRAMER:  Great.  Thank you, Your Honor.

And, Your Honor, I'm prepared to go through, I think, the key arguments that compel dismissal, but, of course, we're very appreciative of the Court holding a hearing today.  And if there's anything in particular the Court wants me to focus on, I'd be happy to do that in my remarks.

THE COURT:  All right.  I'm sure I will have some questions as we go along.

ATTY. KRAMER:  Thank you, Your Honor.

Your Honor, the plaintiffs here allege a sweeping scheme of fraud.  They allege that for over -- for four years, 15 quarters, defendants fraudulently overstated certain accounting estimates in violation of GAAP and other statements about the company's business.

Now, Your Honor, as the Court, I'm sure, is aware, 30 years ago, Congress passed the PSLRA, Private Securities Litigation Reform Act, which heightened the pleading damage for these cases above Rule 9(b).  And in the 30 years since the PSLRA has been in existence, the Ninth Circuit has given us some clear guidance on how those rules get applied to these

State Teachers v. ZoomInfo, 10/27/25

types of cases.

And at a base level, Your Honor, the plaintiffs have to allege specific facts that show at the time the statements were made, they were false.  In addition, when pleading a violation of GAAP, they have to identify the specific amounts that were falsely recognized were estimated in violation of GAAP, the timing when that occurred, and the specific customers.  In addition, they have to allege scienter, which are facts showing that the defendants acted with the intent to defraud the market.  They have to allege specific things to go to their state of mind at the time the statements were made.

Your Honor, here, there are no allegations.  And I want to start with kind of the core theory of this complaint, which is ASC 606.  ASC 606 is an accounting pronouncement that requires companies to account for what's called RPO, remaining performance obligations.  You have a contract.  The contract is valid.  You have to estimate how much of that contract you're going to collect in the future.

In a situation like here, for example, if you have a 12-month license, you would recognize three months at the end of the first quarter, and then you would have to estimate how much of the remaining amount of that contract you're going to -- over the next nine months.  And Your Honor is shaking your head.  I see you're following.

The core theory that plaintiffs have analyzed, though, is

State Teachers v. ZoomInfo, 10/27/25

that the company did it wrong.  But the face of the statute itself for ASC 606 makes clear their theory is wrong.

Now, let me pause here for a minute.  The plaintiffs cite ASC 606 25 times in their complaint.  They cite remaining performance obligation 192 times, but yet they somehow say the Court should not take judicial notice of ASC 606, or that it's not incorporated by reference.  And, Your Honor, that's plainly not the case.

THE COURT:  Well, I mean, isn't it more about how -- what you can do once you take judicial notice?  And that -- because there's -- there's certainly authority, and I think the plaintiffs recognize, for taking judicial notice of those sorts of accounting standards.

But I think what they're saying is that your clients want to go beyond just taking notice of what that is to get into the factual dispute about what complying with that standard actually entails and whether they have sufficiently alleged that it wasn't complied with.

ATTY. KRAMER:  And, Your Honor, I'm not here to make any facts, Your Honor.  These are all the pleadings.  They pled we violated 606.  They --

(Court reporter requests counsel slow down.)

ATTY. KRAMER:  They claim we violated 606 because 606 requires us to do a customer-by-customer assessment of collectability.  The plain language of 606 says that's not the

State Teachers v. ZoomInfo, 10/27/25

case.

THE COURT:  But is that really -- I mean, I understood the complaint to be alleging that that was sort of an example of a type of due diligence that might have been employed.  Credit checks was the specific factual example that's pled.  And so some of the former -- the confidential former employees, some of the things that they've said is that they weren't doing credit checks like they had done with previous companies or something.  And so that's sort of pled as an example of a type of due diligence that might have been employed but was not.  But I didn't read the complaint for them to be saying that the failure to perform that specific example is that that's the failure to comply with the --

ATTY. KRAMER:  Well, Your Honor, how did we violate 606?  Remember, it's their burden to plead it.

And just to make sure I circle back on it again, the Ninth Circuit has said the Court should incorporate by reference to prevent plaintiffs from selecting only portions of documents that support their claims while omitting portions of those very documents that weaken or doom their claims.  And that's the *Khoja* case we cite.

And, Your Honor, 606 says on the front that there's different ways you can do your calculation.  In the introduction -- this is RJN 92-2 at 606-10-10.4.  It says:  The guidance specifies the accounting for individual contracts.

State Teachers v. ZoomInfo, 10/27/25

However, as a practical expedient, any entity may apply this guidance to a portfolio of contracts with similar characteristics.  When accounting for portfolio, an entity shall use estimates and assumptions that reflect the size and composition of the portfolio.

That's what we disclosed we did.  So I'm left wondering what exactly --

THE COURT:  When you say "we disclosed we did" -- so where are you pointing to that?

ATTY. KRAMER:  In the Form 10-K.  And in particular, the RJN, Page 15 of our 10-K for 2020.  And that would be repeated in each of our 10-Ks where this was disclosed.

THE COURT:  But isn't that what they're -- isn't that what the plaintiffs would say?  That's the whole factual dispute, is whether the company's method for making those estimates, in fact, really did comply with the accounting standard.  I mean, the company can say, "We followed this," but that doesn't mean that it's true.

ATTY. KRAMER:  But, Your Honor, the 9(b) -- the PSLRA requires them to plead facts that what we did didn't comply with GAAP; right?  They -- none of the FEs -- and the only FE that touches upon accounting is FE3.  FE3 did not say we didn't comply with 606.  FE3 says we didn't do credit checks on individual customers.

So, Your Honor, they have to plead that we violated 606.

State Teachers v. ZoomInfo, 10/27/25

And they, under *Daou* -- the Ninth Circuit in *Daou* says, when you allege a violation of GAAP, you have to allege essentially what statement was overstated, by how much, and with what particular customers.  That's what *Daou* says, Your Honor.  They don't get to just come in and say, "We disagree," which is what they've done in this complaint.  Nowhere in the complaint do they identify what we overstated in 2020, what we overstated in 2021 or 2022, '23, or '24.

And, in fact, Your Honor, remember, as a public company, the company's accounting is reviewed and signed off on by a public accounting firm.  For each of the years at issue here, KPMG signed off.  And, remember, these are estimates; right?

So, again, they object to 606.  606 on its face says these are estimates.  What they cite in their papers, though -- they cite the KPMG standard, right, the KPMG guidance, which happens to be the company's auditors.  And they cite that in their opposition brief.  And in that guidance, it says these are subjective estimates of what's going to happen in the future.

So we have a situation where they have no facts identifying any specific estimate was false.  And --

THE COURT:  But isn't it the RPO numbers that were being reported that they're alleging?  They're alleging that the RPO numbers were inflated and that the defendants knew they were inflated because they knew that they were including a lot of debt that was not, in fact, collectible.  I mean, that's the

State Teachers v. ZoomInfo, 10/27/25

basic allegation; right?

ATTY. KRAMER:  So that's -- that's the claim.  And that's a fine claim if they have facts to back it up.

What was the amount of the RPO overstated?  You know, where did they identify?  For what periods; right?  They've alleged you just did it wrong, but there's no facts to back that up.  And the PSLRA says you have to have facts.

And, in fact, Your Honor, what we know is, actually, these estimates -- and, remember, these are estimates of what you think is going to happen in the future.  And if you look at our motion to dismiss -- and this is Docket Number 91.  At Page 14 of 37, we have a chart at the top of that page.

And, Your Honor, that chart -- and if Your Honor wants to turn there, I can wait.

THE COURT:  Sure.

Docket 91.  And you said Page 14?

ATTY. KRAMER:  14 of 37, Your Honor.

THE COURT:  All right.  I've got it.

ATTY. KRAMER:  Do you see the chart at the top of the page, Your Honor?

So this is, of course, with the benefit of hindsight, but here's what we know.

In 2020, the company collected -- and, again, the RPO is a projection.  They collected -- they were -- collected 100 percent of the projected amounts of RPO.  In 2021 and 2022,

State Teachers v. ZoomInfo, 10/27/25

they collected 99 percent; in '23, 97; and in '24, 96.

So this theme -- and this is all in front of the Court in the company's SEC filings which the Court can undoubtedly take judicial notice of.  Against this backdrop, they've alleged: You did it wrong for these 15 quarters.

So here's what we have.  We have no facts of how we did it wrong.  We have a disclosure that says what we did is consistent with 606.  We have the accounting firm every year looking at our processes and saying:  We think your processes and numbers are correct.  And we have the benefit of hindsight that shows we collected.

Judge Breyer, in the *Eargo* case, said, in a situation like this -- he was applying -- he was looking at a 606 securities fraud case.  And we cite *Eargo* in our papers.  He said, specifically, when the numbers turned out -- the estimates turned out to be accurate, like they are here, that undercuts any inference of falsity.

So, Your Honor, they can't just come in and say:  We disagree.  They can't just come in and say:  Well, someone in the accounting department did it wrong, so therefore, all of your statements about an IPO are false.  *Daou* requires more. The Ninth Circuit requires more.  And it's just not in the complaint.  It's just not in the complaint.

But, Your Honor, even if they could get past the falsity issue, they have absolutely zero pled on scienter.  There's

State Teachers v. ZoomInfo, 10/27/25

just nothing pled on scienter at all.

As the Court knows, this is not a we-made-a-mistake case. This is not a negligence case. This is a case brought under the federal securities laws for intending to defraud ZoomInfo stockholders. And the Ninth Circuit says you need very specific pleading of facts that go to the state of mind of the defendants. And we don't have any of that here. Instead, what the plaintiffs do is say, well, there was lots of stock traded during the class period. Well, let's talk about that.

The Ninth Circuit in *Vantive* was clear. When you allege a long class period and there's lots of trades, that's not indicative of scienter. What you have to look at is the timing of the trades.

Here, Your Honor, the company went public in June. As the Court is aware, when a company goes public, there's a 180-day lockup on shares. The lockup came up on November 20. And so by definition, all of these trades happened -- for the first time, people were able to trade.

And, Your Honor, we put before the Court the Form 4s for all the defendants. And the Form 4s, of course, identified who traded. As the Court knows, in the *Metzler* decision, the Ninth Circuit said, for purposes of the scienter analysis, trades that occurred under a 10b5-1 plan are not indicative of scienter. And, of course, a 10b5-1 plan is a stock plan entered during an open window that says I'm going to trade in

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

the future.  So even if the trade executes at some time that might be, in hindsight, suspicious, the individual is not deemed to have acted with scienter if the trade's under a 10b5-1 plan.

Your Honor, the documents before the Court made clear that the vast majority of trades happened under 10b5-1 plans.

(Court reporter clarification.)

ATTY. KRAMER:  Your Honor, this is in RJN 13. Mr. Schuck's trades during the class period, 97 percent were under 10b5-1 plans.  Mr. Hyzer, the CFO, right, who would, obviously, have to be a central part of any fraud, him, too, 97 percent of all the sales were under 10b5-1 plans.  And Mr. Hays, the COO, 71 percent were under 10b5-1 plans, and 26 and a half percent were automatic -- so we have a situation where barely 3 percent of the trades during the class period were subject to discretion.  And what *Vantive* says is, in that situation, the plaintiffs have to line up specific trades with specific events and show that they're suspicious or unusual. All we have here is a beautiful lifestyle; right?

So, again, Your Honor, this is critically important because it's not a negligence case.  It's not a you-got-it-wrong case.  This is a situation where people were estimating what is going to happen in the future.  And they're saying you knowingly lied about what was going to happen.  And they have to do more.

State Teachers v. ZoomInfo, 10/27/25

There are former employees that they cite in the complaint. I have a chart here of them. As we talk about our motion to dismiss, only two of the former employees are alleged to have had any contacts with the defendants. One was at a company-wide meeting, and one was in a staff meeting. Neither of the former employees offer any allegations to go to the individual defendants' state of mind.

In FE3, the only one involved in accounting -- the only one allegedly involved in accounting -- and he was a staff accountant, a low-level staff accountant -- is not alleged to have ever talked to defendants about RPO, is not alleged to have ever said to anybody -- any of the defendants or KPMG or anyone higher up -- I think we're doing it wrong.

So, Your Honor, if the plaintiffs want to get there on scienter, they have to do more. They haven't done it here, Your Honor. And *Vantive* is absolutely clear that more is required, Your Honor. So, Your Honor, at the end of the day, I don't think the plaintiffs have pled the falsity or the scienter.

And I just want to come back to one more point on the falsity point, Your Honor. Because, again, these are estimates. This is not a situation where, you know, two plus two equals four. This is what do we think is going to happen in the future. What do we think is going to happen in the future? And as I indicated in the chart we looked at in Docket

State Teachers v. ZoomInfo, 10/27/25

Number 91, what happened in the future is exactly what we thought was going to happen, and we collected the money.

And this lawsuit, Your Honor -- let's look at what caused this lawsuit to get filed.  On August 5, 2024, the company announced that it was going to change its method for looking at and assessing creditworthiness of customers.  And in that quarter, they took a change in approach.  There is nothing about that press release that talks about anything earlier in the class period.  If that press release had come out and said: You know what?  We got it wrong in 2020.  We got it wrong in '22, '23.  We're going to change those numbers -- they'd have to restate.  There is no restatement.  The impetus for this lawsuit is plaintiffs trying to backcast from a press release which said, in this quarter, we're going to do it differently. In this quarter, here's the impact.  There's nothing about the change that impacts the prior numbers.

And, of course, Your Honor, that's what a company should do.  If the business climate has changed, if the nature of your customers have changed, if the 99 percent collectability you're no longer seeing, it's appropriate to say to the market, we're going to do it different going forward.  And that's what they did, Your Honor.  That's what they did.

So, Your Honor, that --

THE COURT:  You know, it seems to me like there are basic facts that have been pled that they knew that long before

State Teachers v. ZoomInfo, 10/27/25

they disclosed it, of the problems with collectability.  I mean, that's the basic allegation, if you look at the statements from the former employees and the -- that they -- when they signed these contracts, that there were red flags regarding collectability in terms of the requirements for signing somebody up and the amount of time that debt was carried and before it was written off as -- these sorts of things existed long before those corrections were made.

ATTY. KRAMER:  Well, so, Your Honor, there was no correction made.  The company never corrected prior statements.  The company never said our prior statements were false.  They do have former employees that say, well, we had concerns, and one-off customers.

But, Your Honor, the RPO number -- the RPO numbers estimate doesn't include every customer; right?  So, of course, there were some customers that weren't included in the RPO; right?  And so what they've got to do is say, here are ten customers that are a mercurial amount, and you wrongly included them in the RPO.  How do we know that those customers were included?  We don't because they haven't alleged that, which is why --

THE COURT:  And what would be your best authority for the most specific analog for that for --

ATTY. KRAMER:  *Daou*.  *Daou* says -- when you plead a violation of GAAP, the Ninth Circuit says you have to allege

the specific customer or the timing or the amount; right?  And that's specifically to deal with prior to *Eargo*, a situation where there might be something immaterial where you disagree.

But, again, this is a pleading motion.  They have to plead that we wrongfully included customers in the RPO, first.  Second, we know that the face of 606 says you can use a portfolio approach, which is what we did.  And, three, we know that the numbers turned out.  So what they need to do to fix this complaint is to identify the customer that got included in RPO.  Because right now, they have former employees saying we think this customer had a credit problem.  Well, was that included in the RPO number?  We don't know.  How big was that deal?  We don't know.  What period?  We don't know.

And, remember, Your Honor, they've alleged fraud for 15 quarters.  They've got to do more than that.  So if they have that, they should amend it.

The other thing is, Your Honor, you said they have a bunch of former employees that had issues with this.  Not one of them had any engagement with the defendants on this topic.

So let's stick with from falsity to scienter here.  None of these former employees -- none -- none is alleged anywhere in the complaint to have talked to Mr. Schuck about the accounting.  None is alleged where Mr. Schuck said, you know, I know that our analysis shows your RPO is 100, but let's take 120.  Nothing.

So, again, we have the -- these are individual and independent elements.  They have to allege falsity and scienter.  So even if they could identify some RPO numbers that were bad, which they haven't, they've got nothing on the scienter piece, Your Honor.  They've got no FE even alleged to have had a conversation with the individual defendants.

And so what do they have?  They have trading.  And we've talked about trading and why that doesn't work.

So if they can amend the complaint, Your Honor, and they can come up with a customer -- customers that they can show were wrongly included in RPO -- because what's missing in the falsity analysis, Your Honor, is the former employees say this customer had credit problems.  They don't say this customer had credit problems and was wrongly included in RPO.  That's what they need.  And it needs to be a mercurial amount.  They don't have that because none of the employees who were alleged, other than FE3, had any involvement in the RPO calculation.  That's the gap that's missing.  That's the gap that's missing, Your Honor.

And, Your Honor, just to be clear, these are -- when you've got claims like this over a 15-quarter class period where they're claiming the entire stock price declined -- these are billions and billions and billions of dollars.  These cases turn the companies upside down on discovery.  Imagine the discovery that we were going to have to produce in a four-year

class period.  That's why the PSLRA was enacted, to put a hold on discovery -- Rule 9(b) pleading standards weren't getting it done, so they raised the pleading standards, and that's why these cases are subject to some very specific rules, Your Honor.  And that's what we have here.

So, again, there's nothing on falsity.  They haven't met *Daou*.  And they've got nothing on scienter, Your Honor.

THE COURT:  All right.  Thank you, Mr. Kramer.

ATTY. KRAMER:  Thank you for the time, Your Honor.  I appreciate it.

ATTY. CANTY:  Your Honor, with the Court's permission, Ms. Meyers, an associate with our law firm, is going to argue on behalf of the plaintiffs.

ATTY. MEYERS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

ATTY. MEYERS:  If it's okay, Your Honor, I'd like to respond to each of the points that Mr. Kramer made.  But if it would be more helpful to the Court to go in a different order, please --

THE COURT:  No.  I think that would be most helpful, and then I'll have a few questions for you at the end.

ATTY. MEYERS:  Great.  Thank you.

In responding to defendants' arguments, I think the best place to start here would be to look at what the company revealed in the final corrective disclosure alleged in the

State Teachers v. ZoomInfo, 10/27/25

complaint.

On August 5, 2024, ZoomInfo revealed, and shocked the market when it did, that the company was going to take a $33 million charge and reduce its revenue guidance by $65 million.  Critically, the company tied those negative disclosures to having to write off previously recognized revenue.  And, specifically, the company attributed a cause to both of those negative events.  The company said that it was going to have to change its estimates related to collectability.  And, notably, the company also revealed that it was going to have to implement changes in its operational procedures to require up-front prepayment from certain smaller customers.

In addition, defendant Schuck, the CEO of ZoomInfo, attributed that drop to an increased rate of nonpayment by these smaller and medium business sized customers, which I'll refer to as the company's SMB customers, that occurred throughout the past 24 months, throughout the past two years.

So I think it's helpful to approach the complaint, in the first instance, by what the company revealed at the end of the class period.  And if we take a look back at what we plaintiffs alleged was actually occurring but concealed from the market during the class period, we see that the complaint is replete with allegations of how the company disregarded its obligations under GAAP and ASC 606.

State Teachers v. ZoomInfo, 10/27/25

Mr. Kramer stated that there were no facts to support the alleged violation of ASC 606. And, really, the fraud alleged here relates to the overstatement -- the consistent overstatement, quarter over quarter, of those figures, which allowed the company to meet Wall Street expectations and allowed the stock price to trade at an artificially inflated amount.

If we look at what ASC 606 requires and what's pled in the complaint, it's twofold. It requires that the company undertake a collectability analysis that's rooted in presently known facts on two fronts -- first, customers' ability to pay for their subscription contracts and, two, customers' intent to pay for those subscription contracts. So it boils down to two simple questions. Could customers pay for their contracts, and would those customers pay for those contracts?

And Mr. Kramer rightly points out that we are required to plead our claims with particularity. And we've done so here by alleging numerous facts, from former employees of the company, that the company failed on both of those fronts.

First, we have the due diligence piece and that first question of could customers pay. And that's where we see numerous allegations in the complaint from several former employees, in addition to Former Employee 3, that is really how the company failed to take undertake any due diligence into customers' ability to pay. Credit checks are a part of that,

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

but they're not the entirety of that.  We have additional allegations that show that the company didn't require up-front payment, which was especially important when it came to small and medium business customers.  Perhaps the easiest way to predict collectibility is to require those customers to pay up front, which the company didn't do, effectively extending credit to these customers.

We've also alleged that the company didn't make any inquiry into who these customers were.  They didn't require more than the name of the business.  There was no vetting.  There was no checking to see about the company's solvency, their legitimacy.  And this is especially important because many of these customers, to the tune of tens of thousands of customers, were onboarded during COVID when those companies, especially smaller and medium business customers, were trying to stay afloat.  Perhaps they were relying on temporary funding.

So we see this extraordinary need for the company to undertake due diligence, which was not occurring on multiple fronts.

THE COURT:  So I understand Mr. Kramer to be arguing that it's not enough to kind of allege these sort of structural flaws in how the company was measuring these things if you can't allege -- if you can't tie that to some sort of particular numbers about, well, how much was the RPO inflated

by in each year, and how many customers were included that shouldn't have been, that sort of more detailed pleading about -- with that level of specificity.

So how would you respond to that argument?

ATTY. MEYERS:  Sure.  So, Your Honor, I think what's important about that is that, here, the fraud alleged and defendants' disregard of ASC 606 doesn't amount to a computational error.  What we're talking about is systemic and widespread failure to collect data on due diligence and to heed the warnings that the company was collecting on the customers' intent to pay for their contracts throughout the course of the class period, such as low usage rates, which Mr. Schuck himself presented on in company-wide meetings, intent from customers who did not want to renew their subscriptions but were locked into adhesive auto-renewal plans.

One thing that Mr. Kramer mentioned numerous times in his argument was the *In re Daou Systems* case.  And we cited to the *Daou* case in our papers as well.  And I think what's important there is *Daou* requires information to be pled about the alleged accounting violation so that the Court can understand whether the alleged fraud was widespread in nature or minor or technical in nature.  And *Daou* itself makes clear that recognizing millions of dollars in revenue prematurely is, and I quote, "certainly not minor or technical in nature."

And when we look at the case law in defendants' briefs,

State Teachers v. ZoomInfo, 10/27/25

for example, the *Kampe* case, which sets out kind of a host of different factors that the Court can look to in assessing the facts as alleged, what we see is that it's all in furtherance of assisting the Court in understanding whether these were systemic problems or whether they were minor in nature.  And here, the wholesale failure to collect any data regarding due diligence or customers' ability to pay and disregard of the data that clearly showed customers' intent not to pay for their subscription contract is what matters here.  And, effectively, that disregard left a cavity, an air pocket, in this otherwise impression that the company was giving of sustainable and solid revenue growth.  And it's the concealment of that information that really is the core of the fraud here.

THE COURT:  Why don't you go to -- well, first, do you want to respond to Mr. Kramer's point about the -- his citation of the revenue numbers in his chart and his argument about the ability to consider that and whether the amounts -- whether that shows that really the RPO estimates weren't off?

ATTY. MEYERS:  Sure.  So in pointing to what I'll first acknowledge is a self-created chart that uses RPO figures that we've contended here to be false and misleading.  But what that chart is angling to do is, I think, part of a thematic element here that we see in defendants' brief.  And that is to look for a silver bullet that defendants intend will explain their compliance with GAAP and why this wasn't a big deal.  But

State Teachers v. ZoomInfo, 10/27/25

that's not the question here.  That, as Your Honor, I believe, stated when Mr. Kramer was at the podium, is a factual inquiry.

But here, when we see that self-created chart hinging on RPO figures that we've alleged to be false and misleading, it doesn't provide the right basis or the right denominator to make that calculation in the first place.  And in addition, it does show bad debt expense rising over the course of the class period.  So I'll say that our response to the tables cited on Page 14 of 37 is it's formed of self-serving numbers that we've alleged to be not a correct basis to extrapolate argument from.

THE COURT:  So with the scienter argument and the relevance of the stock sales, the complaint does plead a lot of facts about the stock sales.  Of course, Mr. Kramer was arguing about the plan, that most of the sales were pursuant to their trading plans.

But my question for you is really -- the Ninth Circuit case law seems pretty strict on requiring there to be a trading history to compare the trades against.  And I think one of the Ninth Circuit cases even say that -- even says that if trading history is unavailable, even due to no fault of the plaintiff's, that, then, that's not enough to be able to really draw an inference from the trading pattern, if you don't have that history outside of the class period.

So do you have any authority for my ability to even really consider the stock sales when there's no trading history

State Teachers v. ZoomInfo, 10/27/25

because of the timing of the IPO?

ATTY. MEYERS:  Sure.  So I think that our most robust challenge in response to that is that this is a holistic analysis.  And the three factors that the Ninth Circuit sets out for assessing stock sales, in terms of how they contribute to the indicia of scienter pled in the complaint -- it has to do with the magnitude first, then it has to do with the timing, and then, third, with whether it was -- the trading practices were in line with prior history.  So, really, the prior trading history is one piece of a holistic analysis that the Court must perform.

And I think it's critical to mention here that while Mr. Kramer did briefly mention the stock sales toward the end of his argument, he didn't mention the amounts of the stock sales, which here are truly mind-boggling.  Defendant Schuck himself, the CEO of the company, made insider sales in possession of material nonpublic information to the tune of almost $1.1 billion.  And that only accounts for his sales personally.  I know that we're going to deal with the sponsor defendants separately.  But collectively, all defendants' insider sales amount to over $8.5 billion.

And here, the magnitude, we would argue, is impactful in terms of that holistic analysis in terms of assessing not only the insider sales as part of scienter, but then if we zoom out, the scienter analysis itself is holistic.  And the complaint

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

does allege a total of seven different indicia of scienter. And we would argue that the inference from the stock sales alone is sufficient to meet the bar in this circuit, but especially when viewed in concert with those other indicia of scienter.

For example, subscription revenue accounted for all of ZoomInfo's revenue during the class period. We have numerous particularized former employee allegations that detailed defendant Schuck himself presenting on and being aware of numbers showing customers' intent not to pay their subscription contracts. We have Mr. Schuck and Mr. Hays and Mr. Hyzer being personally apprised of internal concealed marketing surveys about the lack of demand and unsustainable growth. And I think the complaint makes very clear that when viewed holistically, these show scienter, which is not only did the -- not only an assessment of did defendants know, but, also, were defendants reckless in not knowing.

And so we would argue that the insider sales are one piece of this puzzle, an important one. But when viewed holistically, the seven different indicia of scienter here are compelling evidence.

THE COURT: Do you have a case, though -- is there something that you can point to where the Ninth Circuit includes the stock sales in the holistic analysis when there's not the comparable history?

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

Because I agree with you about the three factors and the holistic analysis overall.  But where I was having trouble interpreting the Ninth Circuit cases is there's -- you know, the three factors would seem to support, you know, looking at those as sort of a balancing test.  But then the language in some of the cases makes it seem more like if you don't have that trading history, you really can't draw any inference from it either way.

ATTY. MEYERS:  And, Your Honor, I -- in all candor, I don't know the name of the case at my fingertips right now, and I don't want to fumble with my papers to find one now.  But I will say that I do believe that that is contained in our papers, and we do believe that's a holistic analysis for scienter.

One thing I wanted to clarify is that -- and we spell this out in our papers -- the way that the stock sales were timed in accordance within the statements made to the market, not only the RPO misstatements but the statements made by defendants kind of doubling down on this growth and strength of the business, and not only in isolation but across all areas of the business, when the company knew that its failures under ASC 606 and GAAP were disproportionately affecting its SMB customer segment and would lead to the eventual disclosures that the company made at the end of the class period.

So I will say that we're not just addressing, as part of

this holistic analysis, the sheer magnitude of the stock sales alone, but their timing as well.

THE COURT:  All right.  And just so I make sure I understand your take on the *Daou* case that Mr. Kramer discussed quite a bit, is your -- you know, your position is that it doesn't necessarily require you to be able to plead the RPO was inflated by "X" million dollars so long as you can show that the defendants had sufficient knowledge of the type of widespread and systemic problem -- that they knew that this was significant, not a minor or technical error, that that's what the import of that case is.

ATTY. MEYERS:  Yes, Your Honor.  My understanding is that the purpose of *Daou* and the analysis under *Daou* is to understand the magnitude and significance of the *Daou* violation alleged.

I will say that there's a lower court decision, *Kampe vs. Volta*, that defendants cite in their papers that relies on *Daou* and contains a parenthetical to the effect of what I just mentioned.  But we also spelled this out in our papers, that those factors aren't absent from our complaint.  In fact -- if I could just have one moment.

If we look at the *Kampe vs. Volta case*, which cites to *Daou*, you'll see that our complaint alleges several analogous facts to the ones set out in that case for the Court's analysis.  We've described the type of overstatement insofar as

State Teachers v. ZoomInfo, 10/27/25

the lack of a variable constraint model in terms of the company leaving delinquent accounts on its books as accounts receivable for, in some cases, almost one year. We see timeframes alleged. That gets back to the 360 days that I just mentioned of delinquent accounts being on the books. We've pointed to specific employees, including defendants Schuck and Hays, and their personal involvement in the lack of due diligence and the failure to incorporate intent-to-pay data that the company was collecting.

And we also describe products. I think defendants here rely on cases such as *Kampe vs. Volta* that deal with different facts. They deal with different businesses that maybe had different projects going on in different geographical locations. And here, ZoomInfo's business was all about its subscription revenue. That was a hundred percent of what was happening here. So, factually, as we've described these widespread, systemic, wholesale failures on due diligence, we believe that that does adequately speak to the facts at issue in this case.

Your Honor, if I may, before we move on from anything involving the insider sales as they relate to scienter, I'd like to go back quickly to the 10b5-1 trading plan analysis, if I could just rebut something that Mr. Kramer had stated.

We don't believe that the existence of the 10b5 plans or trading pursuant to those plans is deserving of any inference

in this case that would take away from the complaint's well-pled allegations.  And the reason for that is that those plans were adopted while defendants were in possession of material, nonpublic information that relates to the fraud alleged.  The company had just gone public several months ago.  And so we don't believe that those 10b5-1 trading plans are deserving of any inference, given defendants' knowledge at the time they were enacted.

THE COURT:  All right.  I think you're just about at 20 minutes.

ATTY. MEYERS:  Thank you.

ATTY. KRAMER:  Your Honor, may I have just a couple minutes?  I assume you would like me to respond before we move to Ms. Birnbach.

THE COURT:  Yes.

ATTY. KRAMER:  Thank you.

When pleading irregularities in revenue recognition or other accounting rules, plaintiffs should allege, quote, "such basic details as the approximate amount by which revenues and earnings were overstated, the products involved in the transaction, the dates of any transactions, or the identities of any customers."  This is the *Volta* case, the *Kampe vs. Volta* case, plaintiffs cite from Judge Tigar.  They haven't done that here, Your Honor.

I kept hearing the vast overstatements of RPO.  I kept

hearing that it was false. Your Honor, we looked at the chart. It's subject to judicial notice. There's never been anything alleged as to just those numbers were wrong. People may disagree with them, but the numbers -- and, again, these are estimates. The estimates turned out to be good -- 100 percent collected in 2020; 99 percent in '21, '22, and '23; and 96 percent in '24. Where is the falsity there, Your Honor? They haven't alleged it.

And, Your Honor, they said, well, it's the press release. Well, let's look at the press release. It's part of the request for judicial notice. And the press release starts with "during the quarter." During the quarter, the company made a change in estimates. And then they took a -- they took a charge of $15 million for revenue in that quarter and $14 million of bad debt expense in that quarter. There's nothing about the August 5 press release that says, oh, we're making a change to prior statements. There's nothing about that whatsoever, Your Honor.

And, you know, there's the citation to FE3. But, again, FE3 doesn't tell us anything about what any individual knows or knew or believed. And, of course, in a situation where you have estimates like we do here, the Supreme Court has said, in the *Thor Power Tool* case, you have to apply the *Omnicare* standard, objective falsity and subjective falsity. It's a Supreme Court decision, *Omnicare*; right?

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Here, what facts are alleged?  Well, I'll do it this way.  There are no facts alleged to suggest any of the individual defendants didn't believe the estimates, nor are there facts alleged to suggest those statements, those estimates, were objectively false, nor can there be, Your Honor, because we have the chart that shows what happened.

And in response to the claim that, well, the amount of stocks were just so astonishing.  Well, that's interesting.  The Ninth Circuit says, specifically, that doesn't matter.  As the Court pointed out, the Ninth Circuit requires in *Zucco*, as you point out, Your Honor, they've got to plead history.  They haven't done that; right?

And in *Metzler*, the Court said 10b5-1 plans matter.  The SEC adopted those so people could trade and diversify.  There's not a single case that they've cited in their papers that say, if you sell a lot, that's indicative of scienter, and you get a pass.  It doesn't exist.  Because that would be contrary to Ninth Circuit law.

But let me fall back to one more Supreme Court case, and then I'm going to end my remarks.

As the Court knows, under *Tellabs*, the Court should do an analysis -- a holistic analysis on scienter, whether individually the plaintiffs allege it or whether holistically, everything taken together, the inference of scienter is cogent and compelling, and at least as cogent and compelling as the

contrary inferences.  And let's talk about that for a second.

Here, what we have is an application of 606 which permits a portfolio method, which is what the company disclosed it did. Second, we've got a situation where the estimates turned out to be accurate, not this wholesale fraud, this wholesale overstatement.  They were accurate.  We have the benefit of history here, which, as we know, Judge Breyer said matters a lot.

We got clean audit opinions from KPMG for every single quarter during the class period.  We have the company updating its approach when it saw the world change and going to the market affirmatively and saying, we're going to do this differently going forward.  We have a situation where only 3 percent of the trades during the class period were discretionary.  And we've got no facts that suggest any defendant subjectively believed the estimates were false or that they were objectively false.

Your Honor, against this backdrop, plaintiffs have not met their standard.

Now, look.  I know the Ninth Circuit says leave to amend is freely given.  They should, if the Court -- if the Court -- what the Court should do here, honestly, is dismiss this case. But if the Court is so inclined, have them plead *Daou*.  Have them come back and plead what did Mr. Schuck allegedly know. Why did he believe his statements about RPO were false; right?

Why did they act with intent to defraud?  If it's such a wholesale fraud, they should be able to plead with some specificity under *Daou*, Your Honor.

Unless the Court has any questions, I thank the Court for the time.

THE COURT:  All right.  Thank you, Mr. Kramer.

ATTY. BIRNBACH:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

And if you could remind me how to pronounce your last name.

ATTY. BIRNBACH:  Birnbach.

THE COURT:  Birnbach.

ATTY. BIRNBACH:  You burn your back.

Your Honor, I represent TA Associates Management L.P. and the Carlyle Group Inc., who are investors who invested early in ZoomInfo, when it was private, and then continued to hold and sell stock during the class period, the lengthy class period.

These defendants are named in all three claims, so not simply the Section 20(a) control person claim but in the direct primary violation claims for false statements under 10(b) and Rule 10b-5 as well as in scheme liability under 10(b) and Rules -- 10b (a) and (c).

So I was going to address those in turn.  If Your Honor has a preference, I'm happy to do it a different way.

THE COURT:  That's fine.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

ATTY. BIRNBACH:  As to the false statements, Your Honor -- and this will be a theme -- there are no allegations saying that either of the investment firms -- and there's no allegation about any person at either of these investment firms had any involvement in the alleged false statements.

Plaintiffs don't argue that the statements didn't come from these defendants.  What plaintiffs argue is that under *Janus*, the Supreme Court decision, a maker of the statement has to have ultimate authority over the statement, including its content and whether and how to communicate it.  Plaintiffs claim that they've met that burden.

But, Your Honor, there is no information from this 500-plus-paragraph complaint that alleges anything about either TA or Carlyle having any involvement, much less ultimate authority over these statements.  And, in fact, there's no allegations that they had involvement in preparing them, in seeing them, that they had any reason to know how or why they might be false, that they participated in anything related to the management of ZoomInfo that would give them access to that information.  And even if they had, *Janus* specifically says, for example, that someone who prepares and drafts these statements are not a maker of the statement.  So there are simply no facts from which the Court can understand anything about the statements.

Instead, the amended complaint relies on conclusory

A n d r e a   R a m i r e z ,   C R R ,   R P R ,   O f f i c i a l   C o u r t   R e p o r t e r
U S D C   W A W D ,   7 0 0   S t e w a r t   S t r e e t ,   S e a t t l e ,   W A   9 8 1 0 1
a n d r e a _ r a m i r e z @ w a w d . u s c o u r t s . g o v ,   ( 2 0 6 ) 3 7 0 - 8 5 0 7

allegations lumping all defendants together.  And this is another theme throughout all the claims, which is, if you look at the *Nvidia* case that we cite, I believe, in our reply brief, you can't impermissibly have a group pleading that simply says "defendants."  The allegations that plaintiffs rely on for TA and Carlyle having culpability in any of the claims is Paragraph 154 of the amended complaint where they say defendants were aware of and/or had access to information.  Paragraph 466, defendants were able to and did control the content of ZoomInfo's SEC filings, press releases, et cetera.  And Paragraph 466 also says defendants would have been provided with copies of the statements and would have had the ability to prevent the statements.

None of these allegations has any specific fact.  It's simply a conclusion and lumping all defendants to together.

We cite cases in this district, the *In re Impinj* case, where a COO and president, an individual defendant, who participated in drafting was not a maker of the statement under *Janus*.  And, in particular, the Court said even an ability to suggest changes to the statement is not sufficient to have ultimate authority over the statement.

We cite many other cases for similar propositions and with a lot more involvement where -- like *Cesario vs. Biocept*, where third parties, outside directors, lawyers, accountants, who participated in drafting approved statements, et cetera -- that

State Teachers v. ZoomInfo, 10/27/25

was not sufficient for 10b liability under *Janus*.

If the Court doesn't have any questions on Claim 1, I'm happy to move along to the others.

THE COURT:  You can go on.

ATTY. BIRNBACH:  For scheme liability, the allegations are even more scant.  And I don't have to spend a lot of time on them because they're primarily based on the same statements.

So unless a defendant disseminated statements, which there is zero factual allegations that TA or Carlyle did, then there's no scheme.  There's not a single allegation that a person from either TA or Carlyle participated, other than generic, conclusory allegations that defendants, as a group, schemed.  So there's simply no allegation that they participated in any scheme.

Very importantly for scheme liability, the Ninth Circuit requires that you have to have each defendant committing a manipulative or deceptive act in furtherance of the scheme. There are no acts as to TA and Carlyle whatsoever in the complaint.

And as to scienter, which is relevant to these claims, even further from the other defendants, there are simply none of the seven or so indicia, other than trading that plaintiff's counsel described.  In other words, none of the confidential witnesses says they even spoke to TA or Carlyle.  There are no

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

allegations about internal documents, confidential information sources.  There are no individualized allegations, as opposed to the impermissible group pleading which is not allowed under *Nvidia*, to say what TA or Carlyle did.  But most importantly as to scienter, the Court's inquiry at the heightened pleading burden is to look at the state of mind of the defendants.  They don't even tell you a person as to whose state of mind the Court should consider.

So there are so few allegations at all that mention TA or Carlyle, but those allegations are simply the following.  They traded a lot of stock.  And in particular, the complaint alleges four trades.  The complaint alleges that in December of 2020, there was, immediately after the expiration of the lockup -- and plaintiff's papers acknowledge the lockup.  I think they put it at December 2.  I think Mr. Kramer mentioned the end of November 2020.  But they acknowledge that of the four trades that they refer to, the December 2021 was at the time of the lockup.  It was on December 4.

The second of the four is a secondary offering on August 6 of 2021.  And the third is a secondary offering that commenced on August 11, 2021.  The last of the four allegations of trades is September 2 of 2021, shortly after the secondary offerings, when they allege a sale by TA, a much smaller sale but still $65 million, pursuant to a Rule 10b5-1 plan.

After September 2, 2021, the only allegation about trades

State Teachers v. ZoomInfo, 10/27/25

is the total amount that plaintiffs allege was so large.  But they also allege that all of that trading -- so this is $2.1 billion as of September 2, 2021, and the four timing allegations.  And the remainder of it, the over $5.4 billion, is -- all they say in Paragraph 185 is that that occurred by October 2022.  So what they don't do is give you the timing at all of $5.4 billion worth of the trading they say is a problem.

And we said in our motion -- and they didn't respond to this -- is that the timing allegations can't be suspicious because the first one is at the expiration of the lockup.  That, they acknowledge.  The two secondary offerings and the September 2021 are not alleged to have happened with TA or Carlyle having knowledge of any statement that was false.  And all of those were 14 months before the first allegedly corrective statement in November of 2022 and, frankly, three years before the end of the class period.

So what the cases have said in the Ninth Circuit is that the allegations of timing have to show the Court that they were designed to take advantage of some information.  And here, we have no allegations that any information was given to TA or Carlyle.  And for most of the trading, they alleged nothing about the timing, other than they allege false statements every quarter, so there's virtually no time when they would say timing wasn't suspicious.  But, Your Honor, because there are zero other indicia, including whose mind are we looking at for

State Teachers v. ZoomInfo, 10/27/25

state of mind here, they can't possibly allege scienter.

The last claim, Your Honor, is the control person claim under 20(a) of the '34 Act.  And here, we have cited many cases that find no control person liability for far greater facts.

So, for example, we cite the *Welgus vs. TriNet* case where control person claims were dismissed against a private equity firm where they were boilerplate allegations that they were controllers, but there are no facts.  So what plaintiffs point to in their opposition to our points on control person is that the complaint is replete with allegations like "defendants controlled," but they have no underlying facts.

And what *Welgus* said and what many of the other cases said is you can't make conclusory allegations of control by just pleading the standard, by saying the circular logic like Paragraph 463, TA and Carlyle were controlling shareholders during the class period and thus directly participated in the management of the company.  In other words, they were controllers; therefore, they control.

So the *Fouad* case, in particular, which is in this district, *Fouad vs. Isilon*, was very instructive here because there, like here, plaintiffs tried to lump together three venture capital firms to get to majority shareholders.  Here, they don't even allege that either TA or Carlyle were majority shareholders individually at any time, but what they do is they lump them together and call them significant stockholders.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

State Teachers v. ZoomInfo, 10/27/25

Well, Your Honor, that's not enough.  And the *Fouad* case makes clear that you can't simply lump together stock holdings of individual investors, which are not even pled here how much they owned, unless you have factual allegations of those stockholders acting in concert to control the company.  There are zero allegations in the amended complaint of TA and Carlyle acting in concert to use control, have control.

Plaintiffs, in their opposition, came back and said, well, 1.10(k) says they could each appoint a director.  But, Your Honor, aside from that not being in the pleading, were they to amend with that, it's woefully insufficient.  This is not a close case.  We cited the cases where there are board seats that people can get, where there are the ability to participate via the board, and that isn't enough.

And in particular, in the *Golub vs. Gigamon* case, this was a case for a 20(a) where a particular activist investor did -- they did plead that they had 15 percent ownership.  So they were also a minority stockholder, which we know under Ninth Circuit law is not enough, but they said they could review statements.  They got to review a proxy statement before it was filed that had misleading statements.  And then they had a merger agreement that gave them covenants that without their consent, the company couldn't make changes to its operations.  Even that, in the *Golub vs. Gigamon* case, which was affirmed by the Ninth Circuit, was not enough because they didn't have that

State Teachers v. ZoomInfo, 10/27/25

ability to control what was ultimately put out there.

So the one thing I should mention as to scienter, Your Honor, is, I think -- Your Honor talked about before -- about the trading history. I didn't emphasize that as well. But, obviously, there are zero allegations of trading history for TA or Carlyle.

I don't want to prolong this, Your Honor, but I'm happy to answer any questions, except to say that these allegations aren't a close call on any of these claims. They're woefully short under Ninth Circuit law.

THE COURT: All right. Thank you.

ATTY. BIRNBACH: Thank you, Your Honor.

ATTY. MEYERS: Your Honor, with respect to TA Associates and Carlyle, these were not passive investors, and the complaint's allegations are clear. These were early investors that had an active role in the company.

THE COURT: And what are the specific facts of the complaint that you would -- because, you know, I'll just tell you that I tend to agree with defendants on this point, that the allegations against TA and Carlyle seem quite conclusory.

And then -- let's talk about that first, but then I would also like you to address in your argument, although it's included in the first -- in the other motion, it seems to me that DO Holdings fits in really more with TA Associates and Carlyle in the analysis in terms of there not being many

specific allegations about that entity other than that -- an allegation that it was controlled by Schuck.  And so I would like to specifically talk about that entity as well.

ATTY. MEYERS:  Sure.  If it's okay with Your Honor, I think tackling that question first might make the most sense, before focusing on TA and Carlyle.

So for DO Holdings, as the complaint alleges, it is an LLC that is owned by defendant Schuck and ZoomInfo's predecessor, DiscoverOrg, its cofounder.  Based on defendant Schuck's ability to exercise control over the company and to use DO Holdings as essentially a personal investment vehicle for shares of which he was the beneficial owner, as pled in the complaint, we see DO Holdings as more of an alter ego to defendant Schuck and, therefore, properly categorized within what we've been calling the ZoomInfo defendants, which would include the corporate defendants, the individual defendants, and DO Holdings.

In response to Ms. Birnbach's argument, she raised a theme that we had lumped together all of the defendants.  Your Honor, we are not intending to do so, either in the complaint or in our papers.  To be clear, we have briefed the ZoomInfo defendants and what we are calling the sponsor defendants separately.  We acknowledge that there is a difference in flavor between defendant Schuck personally delivering misstatements on earnings calls or at conferences, or to TA and

State Teachers v. ZoomInfo, 10/27/25

Carlyle and their role in this litigation.

THE COURT:  Do you have or could you point to some authority on the DO Holdings issue?  I felt like neither set of briefs really addressed that.

I understand your position of it essentially being an alter ego of Schuck, but do you have authority for that type of -- for including that type of entity in this sort of thing, especially when you're talking about can you impute scienter to both DO Holdings as well as to ZoomInfo for Schuck's statements and those sorts of things?  I mean, it seems to me like it's a different type of analysis, and it's not really briefed.

ATTY. MEYERS:  Your Honor, I tend to agree with you there.  And I think that the best authority that we can put forward is factual authority, rather than legal authority, that we've pled in the complaint and highlighted in our briefs with respect to the beneficial ownership of the shares and the control that defendant Schuck exercised over that entity.

THE COURT:  All right.  Why don't we turn, then, back to TA and Carlyle.

ATTY. MEYERS:  Sure.  And if it's all right, unless there's a reason to distinguish between the two, I'll turn to the sponsor defendants.

So with respect to the sponsor defendants, the complaint's allegations hinge on the fact that these two entities exercised significant control over the company.  In addition to

State Teachers v. ZoomInfo, 10/27/25

describing their intimate knowledge of confidential proprietary information with respect to the business, its operations, its internal control, in the complaint, we also highlight the significant voting power of those two entities. And we have pointed to information in the company's disclosures relating to the sponsor defendants' ability to significantly influence management to affect the composition of the board of directors and key decisions that the company makes.

THE COURT: And that particular -- that was just in your opposition, though. That's not actually in the complaint.

ATTY. MEYERS: That is correct, Your Honor.

THE COURT: Are you seeking leave to amend?

ATTY. MEYERS: Generally, we believe that the allegations in the complaint are sufficient to withstand the motion to dismiss. But to the extent that the Court wishes for us to expound on certain aspects of our claim, we do -- you know, we are able to investigate and fill those out as needed.

But to be clear, we do believe that the allegations as pled are sufficient at this time.

THE COURT: All right. And so with respect to voting power, there's not a specific allegation of the percentage of control. I mean, you refer to them as controlling, but you don't say majority, or you don't have specific facts that between the two of them, they were able to exercise their majority by agreeing to do so in certain ways or -- there's

State Teachers v. ZoomInfo, 10/27/25

nothing like that.

So what are the -- what are you -- what are the specific facts in the complaint that you say support the assertion that they were controlling shareholders?

ATTY. MEYERS:  So that relates to the allegations in the complaint in Paragraph 463 and also Paragraphs 92 and 93 that describe their role as key stakeholders and the specific areas of the company to which the sponsor defendants had confidential and inside knowledge.

THE COURT:  And, I guess -- I mean, perhaps we'll just have to agree to disagree.  But, you know, 463 seems like an example to me of one of the allegations that I would describe as conclusory in that all -- it's saying that they were directly involved.  It's saying they participated in the management, but it's not providing any examples of that.

ATTY. MEYERS:  It's true that the complaint does not contain allegations to the extent that the allegations give details -- give details related to Mr. Schuck or Mr. Hays' individual activity.  But we do believe that just because the complaint contains more allegations related to those individuals, that that should not overshadow the complaint's allegations related to the sponsor defendants' access to knowledge on which they traded and personally made profits on.

THE COURT:  All right.  Do you want to address Ms. Birnbach's arguments about maker liability?

State Teachers v. ZoomInfo, 10/27/25

ATTY. MEYERS:  Sure.  So here -- looking back at the Supreme Court's *Janus* decision, there, the Court raised this idea that it's really about the control that an entity has in terms of making and disseminating statements to the market. And the kind of key example that the Court provides there is that a ghost writer wouldn't be kind of liable for a statement that ultimately is delivered by another individual.  But we see that as distinguishable here because of the control that's alleged, the voting power, the ultimate authority, the access to inside information related to a company that was 100 percent based on the same operations.

Ms. Birnbach raised some arguments related to scienter and how other indicia of scienter pled in the complaint would not be applicable to the sponsor defendants, and we disagree on that point.  We raise numerous indicia of scienter -- Mr. Hyzer's departure, core operations -- that a sponsor defendant situated in the way that TA and Carlyle were, with inside information about the company, would be privy to.

THE COURT:  You mentioned Mr. Hyzer's departure as one of the indicia of scienter.

Is there anything other than just the timing of the departure that makes it suspicious?

ATTY. MEYERS:  So the timing of his departure is suspicious, and that is what the case law that we've described and the facts in the complaint allege as being the basis for

State Teachers v. ZoomInfo, 10/27/25

that, given the disclosures about the company's financial position and his role as the chief financial officer.

THE COURT:  Do you want to address Ms. Birnbach's argument about there being even less of an inference that can be drawn from the stock trades for the sponsor defendants?

ATTY. MEYERS:  Yes.  With respect to her argument that the timing here cannot be suspicious, we disagree with that.  For example, the December 2020 trades that Ms. Birnbach mentioned, they had come on the heels of what we had described in the complaint and in our papers as a media blitz that the individual defendants had gone on in November of 2020 while in possession of this inside information related to the company's lack of due diligence, which we have alleged that the sponsor defendants were aware of, and that those trades followed those statements to the market, which were made either in contravention to or with omissions related to that material nonpublic information.

I'd also like to briefly address Ms. Birnbach's arguments regarding kind of the time horizon of the fraud in this complaint.  We have cited to case law in our papers -- I believe it's the *S.E.C. vs. Richman* case -- that speaks specifically to scheme liability that fits a fact pattern similar to here that the company is engaging in a scheme while it knows that the walls are closing in.  And I think that that's perhaps the best way to describe that.

State Teachers v. ZoomInfo, 10/27/25

We also cite in our papers to the *Questcor* case, which talks about the time frame of a fraud being essentially as long as defendants can ride out the wave of their fraud, which here we think is explained by several of the particularized allegations in the complaint that talk about locking customers into renewals to extend the fraud by another year or keeping delinquent accounts on the books to extend months and years at a time onto the fraud.

THE COURT:  All right.  I don't think I have any more questions on this motion.

Ms. Birnbach, if you want to have any brief rebuttal?

ATTY. BIRNBACH:  Very brief, Your Honor.

The cases that we're relying on on the scienter point, which is an independent element, *Curry vs. Yelp* about no evidence of the prior trading history and *Callan vs. Motricity*, which we cite in our papers, that plaintiffs are not relieved of their burden because of no earlier trading available.

*Zucco Partners* in the Ninth Circuit says they need to show that this is uncharacteristic.  And that's their pleading burden.  And these are investors whose whole business is to invest early.  After a company goes public, they sell down their position.  There's just nothing remarkable or suspicious about that.

On the timing point, there are three years left in the class period after which they -- all their trading had been

State Teachers v. ZoomInfo, 10/27/25

completed, meaning what are they getting in on that they know about, given zero allegations that anyone at TA or Carlyle knew about anything.

And, then, finally, as to the control person allegations. Again, *Fouad* specifically said, on the conclusory nature of the allegations -- and if you look at Paragraphs 92 and 93 that the Court didn't get to, cited just now, those identify who TA and Carlyle are. And then conclusion, they say, they exercised actual power or control over the company, its officers, and directors. That is not sufficient under *Fouad* and under Ninth Circuit law.

I think those are the two points I wanted to make.

THE COURT:  All right.

ATTY. BIRNBACH:  Thank you, Your Honor.

THE COURT:  Well, thank you all for your arguments, and we anticipate having an order out fairly soon. So thank you for being here today. It was very helpful.

And we'll be adjourned.

(Adjourned.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ *Andrea Ramirez*

ANDREA RAMIREZ
OFFICIAL COURT REPORTER

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507